UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Thomas Dexter Jakes<br><br>                Plaintiff<br><br>~against~<br><br>Duane Youngblood, et al.<br><br>                Defendant | Civil Action No. **2:24-CV-1608-WSS**<br><br>**Sworn Affidavit of Duane Youngblood** |

I, Duane Youngblood, being duly sworn, depose and state under the penalty of perjury as follows:

1. I am the Defendant in the above-captioned case and submit this affidavit in further support of my anti-SLAPP motion.

2. When I was nine years old, my life took a dark turn as I began to experience sexual abuse. I shared these painful experiences publicly during an interview on October 28, 2024, on "Larry Reid Live," titled "The Abused Became the Abuser." Over the course of this two-hour interview, I revealed personal truths that I have carried for decades, recounting my journey of trauma and healing.

3. I began the interview by dedicating nearly an hour to discussing my own history of abusing others, including my arrests, convictions, and time in prison for my actions. I did so with the intent to take accountability and to demonstrate my commitment to transparency in telling my story.

4. As a child, I lived in a household where my own father abused my sister. This abuse continued for over five years, from the time I was nine until I was around fourteen. Growing up in this environment was deeply confusing and traumatic.

5. At the age of twelve, I entered a singing competition and won. That summer, while traveling with Christine McCaskill, I was sexually abused on three separate occasions. These incidents compounded the trauma I was already enduring.

6. At sixteen, I encountered further abuse. Our church's head bishop, Quander Wilson, invited me to his home in Columbus, Ohio, after preaching at our church in Homestead, Pennsylvania. He showed me to a room at the end of the hall with a large bed and a big

TV. Later that night, he came into the room, undressed, and got into bed. I was shocked and frightened. When I stirred, he pretended to be praying for me, but his actions had already crossed clear boundaries.

7. As I grew older, I crossed paths with other prominent church figures. I met Bishop T.D. Jakes during one of his visits to Pittsburgh. After a dinner celebrating his birthday, I drove him back to his lodging. Once there, he invited me in, and we talked for over an hour. It was a deep, emotional conversation that brought me to tears. As I prepared to leave, he pulled me close and tried to kiss me. The next morning, he called my family's home, spoke to my mother, and then told me he wanted me to be the only person he had a sexual relationship with when he came to town. He also made it clear that I wasn't to be involved with anyone else and promised to take care of me for life. I did not agree to this.

8. I also spoke about Bishop Sherman Watkins, the leader of the organization my church belonged to. In 2005, I left the organization, but before that, I accompanied Bishop Watkins on a trip to Miami. One evening, when the hotel's massage service was unavailable, he offered to give me a massage. Reluctantly, I agreed. During the massage, he crossed clear boundaries, touching me inappropriately. The next day, our interactions felt strained, but I chose to confront him about his actions later and ultimately left the organization.

9. Over the years, I have worked tirelessly to process and heal from these painful experiences. I have shared my story with family and close friends, sought therapy, and found solace in resources like "It Didn't Start With You" by Mark Wolynn. This book helped me understand how unresolved patterns contributed to my own struggles. Through reflection and reconciliation, I have worked to heal and break the cycle of harm.

10. Sharing my story publicly was not easy. Each individual I spoke about in the interview is a respected church leader, but I felt compelled to expose how abuse can remain hidden within church systems. The interview gave me the platform to speak honestly, and since its airing, others have reached out to share how my story has empowered them to confront their own experiences of abuse.

11. While I understand that Bishop Jakes has focused on the portion of the interview that involved him, it was just a small part of a much larger narrative. My intention was never to target him or anyone else with malice. My purpose was to shed light on the trauma and

abuse that have long gone unchecked in our communities and to use my experiences to help others heal.

12. I firmly believe that recounting one's personal experiences, particularly to shed light on systemic issues and advocate for change, is a constitutionally protected right. To silence such speech would be to deny survivors the opportunity to share their truth and contribute to necessary reform.

13. It is also important to note that during the interview, my comments about Bishop Jakes were made in the context of a broader conversation about systemic failures in the church, the signs of grooming, and the need for accountability among leaders. The intention was not to target any single individual but to create a dialogue that might lead to institutional change.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 1/23/2025

Duane Youngblood (Jan 23, 2025 20:04 EST)

Duane Youngblood

3