# Exhibit P

# New York Times Co. v. Sullivan

Supreme Court of the United States

January 6, 1964, Argued ; March 9, 1964, Decided [*]

No. 39

**Reporter**

376 U.S. 254 *; 84 S. Ct. 710 **; 11 L. Ed. 2d 686 ***; 1964 U.S. LEXIS 1655 ****; 95 A.L.R.2d 1412; 1 Media L. Rep. 1527

NEW YORK TIMES CO. v. SULLIVAN

**Prior History:  [****1]**  CERTIORARI TO THE SUPREME COURT OF ALABAMA.

**Disposition:**  273 Ala. 656, 144 So. 2d 25, reversed and remanded.

## Syllabus

 Respondent, an elected official in Montgomery, Alabama, brought suit in a state court alleging that he had been libeled by an advertisement in corporate petitioner's newspaper, the text of which appeared over the names of the four individual petitioners and many others.  The advertisement included statements, some of which were false, about police action allegedly directed against students who participated in a civil rights demonstration and against a leader of the civil rights movement; respondent claimed the statements referred to him because his duties included supervision of the police department. The trial judge instructed the jury that such statements were "libelous per se," legal injury being implied without proof of actual damages, and that for the purpose of compensatory damages malice was presumed, so that such damages could be awarded against petitioners if the statements were found **[****2]** to have been published by them and to have related to respondent.  As to punitive damages, the judge instructed that mere negligence was not evidence of actual malice and would not justify an award of punitive damages; he refused to instruct that actual intent to harm or recklessness had to be found before punitive damages could be awarded, or that a verdict for respondent should differentiate between compensatory and punitive damages. The jury found for respondent and the State Supreme Court affirmed. *Held*: A State cannot under the First and Fourteenth Amendments award damages to a public official for defamatory falsehood relating to his official conduct unless he proves "actual malice" -- that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false.  Pp. 265-292.

(a) Application by state courts of a rule of law, whether statutory or not, to award a judgment in a civil action, is "state action" under the Fourteenth Amendment. P. 265.

(b) Expression does not lose constitutional protection to which it would otherwise be entitled because it appears in the form of a paid advertisement. Pp. 265-266.

(c) Factual error, content **[****3]**  defamatory of official reputation, or both, are insufficient to warrant an award of damages for false statements unless "actual malice" -- knowledge that statements are false or in reckless disregard of the truth -- is alleged and proved. Pp. 279-283.

(d) State court judgment entered upon a general verdict which does not differentiate between punitive damages, as to which under state law actual malice must be proved, and general damages, as to which it is "presumed,"

---

[*] Together with No. 40, Abernathy et al. v. Sullivan, also on certiorari to the same court, argued January 7, 1964.

New York Times Co. v. Sullivan, 376 U.S. 254

precludes any determination as to the basis of the verdict and requires reversal, where presumption of malice is inconsistent with federal constitutional requirements.  P. 284.

(e) The evidence was constitutionally insufficient to support the judgment for respondent, since it failed to support a finding that the statements were made with actual malice or that they related to respondent.  Pp. 285-292.

**Counsel:** Herbert Wechsler argued the cause for petitioner in No. 39.  With him on the brief were Herbert Brownell, Thomas F. Daly, Louis M. Loeb, T. Eric Embry, Marvin E. Frankel, Ronald S. Diana and Doris Wechsler.

William P. Rogers and Samuel R. Pierce, Jr. argued the cause for petitioners in No. 40.  With Mr. Pierce **[****4]** on the brief were I. H. Wachtel, Charles S. Conley, Benjamin Spiegel, Raymond S. Harris, Harry H.  Wachtel, Joseph B. Russell, David N. Brainin, Stephen J. Jelin and Charles B. Markham.

M. Roland Nachman, Jr. argued the cause for respondent in both cases.  With him on the brief were Sam Rice Baker and Calvin Whitesell.

Briefs of amici curiae, urging reversal, were filed in No. 39 by William P. Rogers, Gerald W. Siegel and Stanley Godofsky for the Washington Post Company, and by Howard Ellis, Keith Masters and Don H. Reuben for the Tribune Company.  Brief of amici curiae, urging reversal, was filed in both cases by Edward S. Greenbaum, Harriet F. Pilpel, Melvin L. Wulf, Nanette Dembitz and Nancy F. Wechsler for the American Civil Liberties Union et al.

**Judges:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Goldberg

**Opinion by:** BRENNAN

# Opinion

 **[\*256]   [\*\*\*692]   [\*\*713]**  MR. JUSTICE BRENNAN delivered the opinion of the Court.

We are required in this case to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his **[****5]**  official conduct.

Respondent L. B. Sullivan is one of the three elected Commissioners of the City of Montgomery, Alabama.  He testified that he was "Commissioner of Public Affairs and the duties are supervision of the Police Department, Fire Department, Department of Cemetery and Department of Scales." He brought this civil libel action against the four individual petitioners, who are Negroes and Alabama clergymen, and against petitioner the New York Times Company, a New York corporation which publishes the New York Times, a daily newspaper. A jury in the Circuit Court of Montgomery County awarded him damages of $ 500,000, the full amount claimed, against all the petitioners, and the Supreme Court of Alabama affirmed.  273 Ala. 656, 144 So. 2d 25.

Respondent's complaint alleged that he had been libeled by statements in a full-page advertisement that was carried in the New York Times on March 29, 1960. [1] Entitled "Heed Their Rising Voices," the advertisement began by stating that "As the whole world knows by now, thousands of Southern Negro students are engaged in widespread non-violent demonstrations in positive affirmation of the right to live in human dignity as **[****6]**  guaranteed by the U.S. Constitution and the Bill of Rights." It went on to charge that "in their efforts to uphold these guarantees, they are being met by  **[\*\*\*693]**  an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom. . . ." Succeeding  **[\*257]**  paragraphs purported to illustrate the "wave of terror" by describing certain alleged events.  The text concluded with an appeal for funds for three purposes: support of the student movement, "the struggle for the right-

---

[1] A copy of the advertisement is printed in the Appendix.

to-vote," and the legal defense of Dr. Martin Luther King, Jr., leader of the movement, against a perjury indictment then pending in Montgomery.

The text appeared over the names of 64 persons, many widely known for their **[\*\*714]** activities in public affairs, religion, trade unions, and the performing arts. Below these names, and under a line reading "We in the south who are struggling **[\*\*\*\*7]** daily for dignity and freedom warmly endorse this appeal," appeared the names of the four individual petitioners and of 16 other persons, all but two of whom were identified as clergymen in various Southern cities. The advertisement was signed at the bottom of the page by the "Committee to Defend Martin Luther King and the Struggle for Freedom in the South," and the officers of the Committee were listed.

Of the 10 paragraphs of text in the advertisement, the third and a portion of the sixth were the basis of respondent's claim of libel. They read as follows:

Third paragraph:

"In Montgomery, Alabama, after students sang 'My Country, 'Tis of Thee' on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission."

Sixth paragraph:

"Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They **[\*\*\*\*8]** have **[\*258]** assaulted his person. They have arrested him seven times -- for 'speeding,' 'loitering' and similar 'offenses.' And now they have charged him with 'perjury' -- a *felony* under which they could imprison him for *ten years. . . .*"

Although neither of these statements mentions respondent by name, he contended that the word "police" in the third paragraph referred to him as the Montgomery Commissioner who supervised the Police Department, so that he was being accused of "ringing" the campus with police. He further claimed that the paragraph would be read as imputing to the police, and hence to him, the padlocking of the dining hall in order to starve the students into submission. [2] As to the sixth paragraph, he contended that since arrests are ordinarily made by the police, the statement "They have arrested [Dr. King] seven times" would be read as referring to him; he further contended that the "They" who did the arresting would be equated with the "They" who committed the other described acts and with the "Southern violators." Thus, he argued, the paragraph would be read as accusing the Montgomery police, and hence him, of answering Dr. King's protests with **[\*\*\*\*9] [\*\*\*694]** "intimidation and violence," bombing his home, assaulting his person, and charging him with perjury. Respondent and six other Montgomery residents testified that they read some or all of the statements as referring to him in his capacity as Commissioner.

It is uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions of events which occurred in Montgomery. Although Negro students staged a demonstration on the State Capitol steps, they sang the National Anthem and not "My **[\*259]** Country, 'Tis of Thee." Although nine students were expelled by the State Board of Education, this was not for leading the demonstration at the Capitol, but for demanding service at a lunch counter in the Montgomery County Courthouse on another day. Not the entire student body, but most of it, had protested **[\*\*\*\*10]** the expulsion, not by refusing to register, but by boycotting classes on **[\*\*715]** a single day; virtually all the students did register for the ensuing semester. The campus dining hall was not padlocked on any occasion, and the only students who may have been barred from eating there were the few who had neither signed a preregistration application nor requested temporary meal tickets. Although the police were deployed near the campus in large numbers on three occasions, they did not at any time "ring" the campus, and they were not called to the campus in connection with the demonstration on the State Capitol steps, as the third paragraph implied. Dr. King had not been arrested seven times, but only four; and although he claimed

---

[2] Respondent did not consider the charge of expelling the students to be applicable to him, since "that responsibility rests with the State Department of Education."

New York Times Co. v. Sullivan, 376 U.S. 254

to have been assaulted some years earlier in connection with his arrest for loitering outside a courtroom, one of the officers who made the arrest denied that there was such an assault.

On the premise that the charges in the sixth paragraph could be read as referring to him, respondent was allowed to prove that he had not participated in the events described. Although Dr. King's home had in fact been bombed twice when his wife and child were there, [****11] both of these occasions antedated respondent's tenure as Commissioner, and the police were not only not implicated in the bombings, but had made every effort to apprehend those who were. Three of Dr. King's four arrests took place before respondent became Commissioner. Although Dr. King had in fact been indicted (he was subsequently acquitted) on two counts of perjury, each of which carried a possible five-year sentence, respondent had nothing to do with procuring the indictment.

[*260] Respondent made no effort to prove that he suffered actual pecuniary loss as a result of the alleged libel. [3] One of his witnesses, a former employer, testified that if he had believed the statements, he doubted whether he "would want to be associated with anybody who would be a party to such things that are stated in that ad," and that he would not re-employ respondent if he believed "that he allowed the Police Department to do the things that the paper say he did." But neither this witness nor any of the others testified that he had actually believed the statements in their supposed reference to respondent.

[****12] The cost of the advertisement was approximately $ 4800, and it was [***695] published by the Times upon an order from a New York advertising agency acting for the signatory Committee. The agency submitted the advertisement with a letter from A. Philip Randolph, Chairman of the Committee, certifying that the persons whose names appeared on the advertisement had given their permission. Mr. Randolph was known to the Times' Advertising Acceptability Department as a responsible person, and in accepting the letter as sufficient proof of authorization it followed its established practice. There was testimony that the copy of the advertisement which accompanied the letter listed only the 64 names appearing under the text, and that the statement, "We in the south . . . warmly endorse this appeal," and the list of names thereunder, which included those of the individual petitioners, were subsequently added when the first proof of the advertisement was received. Each of the individual petitioners testified that he had not authorized the use of his name, and that he had been unaware of its use until receipt of respondent's demand for a retraction. The manager of the Advertising Acceptability [****13] [*261] Department testified that he had approved the advertisement for publication because he knew nothing to cause him to believe that anything in it was false, and because it [**716] bore the endorsement of "a number of people who are well known and whose reputation" he "had no reason to question." Neither he nor anyone else at the Times made an effort to confirm the accuracy of the advertisement, either by checking it against recent Times news stories relating to some of the described events or by any other means.

Alabama law denies a public officer recovery of punitive damages in a libel action brought on account of a publication concerning his official conduct unless he first makes a written demand for a public retraction and the defendant fails or refuses to comply. Alabama Code, Tit. 7, § 914. Respondent served such a demand upon each of the petitioners. None of the individual petitioners responded to the demand, primarily because each took the position that he had not authorized the use of his name on the advertisement and therefore had not published the statements that [****14] respondent alleged had libeled him. The Times did not publish a retraction in response to the demand, but wrote respondent a letter stating, among other things, that "we . . . are somewhat puzzled as to how you think the statements in any way reflect on you," and "you might, if you desire, let us know in what respect you claim that the statements in the advertisement reflect on you." Respondent filed this suit a few days later without answering the letter. The Times did, however, subsequently publish a retraction of the advertisement upon the demand of Governor John Patterson of Alabama, who asserted that the publication charged him with "grave misconduct and . . . improper actions and omissions as Governor of Alabama and Ex-Officio Chairman of the State Board of Education of Alabama." When asked to explain why there had been a retraction for the Governor but not for respondent, the [*262] Secretary of the Times testified: "We did that because we didn't want anything that was

---

[3] Approximately 394 copies of the edition of the Times containing the advertisement were circulated in Alabama. Of these, about 35 copies were distributed in Montgomery County. The total circulation of the Times for that day was approximately 650,000 copies.

published by The Times to be a reflection on the State of Alabama and the Governor was, as far as we could see, the embodiment of the State of Alabama and the proper representative of the State and, furthermore, **[****15]** we had by that time learned more of the actual facts which the ad purported to recite and, **[***696]** finally, the ad did refer to the action of the State authorities and the Board of Education presumably of which the Governor is the ex-officio chairman . . . ." On the other hand, he testified that he did not think that "any of the language in there referred to Mr. Sullivan."

The trial judge submitted the case to the jury under instructions that the statements in the advertisement were "libelous per se" and were not privileged, so that petitioners might be held liable if the jury found that they had published the advertisement and that the statements were made "of and concerning" respondent. The jury was instructed that, because the statements were libelous *per se*, "the law . . . implies legal injury from the bare fact of publication itself," "falsity and malice are presumed," "general damages need not be alleged or proved but are presumed," and "punitive damages may be awarded by the jury even though the amount of actual damages is neither found nor shown." An award of punitive damages -- as distinguished from "general" damages, which are compensatory in nature -- apparently **[****16]** requires proof of actual malice under Alabama law, and the judge charged that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages." He refused to charge, however, that the jury must be "convinced" of malice, in the sense of "actual intent" to harm or "gross negligence and recklessness," to make such an award, and he also refused to require that a verdict for respondent differentiate between compensatory and punitive damages. The judge rejected petitioners' contention **[*263]** that his rulings abridged the freedoms of speech and of the press that are guaranteed by the First and Fourteenth Amendments.

**[**717]** In affirming the judgment, the Supreme Court of Alabama sustained the trial judge's rulings and instructions in all respects. 273 Ala. 656, 144 So. 2d 25. It held that "where the words published tend to injure a person libeled by them in his reputation, profession, trade or business, or charge him with an indictable offense, or tend to bring the individual into public contempt," they are "libelous per se"; that "the matter complained of is, under the above doctrine, **[****17]** libelous per se, if it was published of and concerning the plaintiff"; and that it was actionable without "proof of pecuniary injury . . . , such injury being implied." *Id.*, at 673, 676, 144 So. 2d at 37, 41. It approved the trial court's ruling that the jury could find the statements to have been made "of and concerning" respondent, stating: "We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner. In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." *Id.*, at 674-675, 144 So. 2d at 39. In sustaining the trial court's determination that the verdict was not excessive, the court said that malice could be inferred from the Times' "irresponsibility" in printing the advertisement while "the Times in its own files had articles already published which would have demonstrated the falsity of the allegations in the advertisement"; from the Times' failure **[****18]** to retract for respondent while retracting for the Governor, whereas the falsity of some of the allegations was then **[***697]** known to the Times and "the matter contained in the advertisement was equally false as to both parties"; and from the testimony of the Times' Secretary that, **[*264]** apart from the statement that the dining hall was padlocked, he thought the two paragraphs were "substantially correct." *Id.*, at 686-687, 144 So. 2d at 50-51. The court reaffirmed a statement in an earlier opinion that "There is no legal measure of damages in cases of this character." *Id.*, at 686, 144 So. 2d at 50. It rejected petitioners' constitutional contentions with the brief statements that "The First Amendment of the U.S. Constitution does not protect libelous publications" and "The Fourteenth Amendment is directed against State action and not private action." *Id.*, at 676, 144 So. 2d at 40.

**[1]**Because of the importance of the constitutional issues involved, we granted the separate petitions for certiorari of the individual petitioners and of the Times. **[****19]** 371 U.S. 946.We reverse the judgment. We hold that the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action

New York Times Co. v. Sullivan, 376 U.S. 254

brought by a public official against critics of his official conduct. [4] **[\*\*718]**  **[\*265]**  We further hold that under the proper safeguards the evidence presented in this case is constitutionally insufficient to support the judgment for respondent.


**[\*\*\*\*20]**  I.


 [3] [4]We may dispose at the outset of two grounds asserted to insulate the judgment of the Alabama courts from constitutional scrutiny.  The first is the proposition relied on by the State Supreme Court -- that "The Fourteenth Amendment is directed against State action and not private action." That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press.  It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. See, *e. g.*, Alabama Code, Tit. 7, §§ 908-917.  The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.  See  *Ex parte Virginia*, 100 U.S. 339, 346-347; **[\*\*\*698]**  **[\*\*\*\*21]**  *American Federation of Labor* v. *Swing*, 312 U.S. 321.

The second contention is that the constitutional guarantees of freedom of speech and of the press are inapplicable here, at least so far as the Times is concerned, because the allegedly libelous statements were published as part of a paid, "commercial" advertisement.  The argument relies on  *Valentine* v. *Christensen*, 316 U.S. 52, where the Court held that a city ordinance forbidding street distribution of commercial and business advertising matter did not abridge the First Amendment freedoms, even as applied to a handbill having a commercial message on one side but a protest against certain official action on the other.  The reliance is wholly misplaced.  The Court in *Christensen* reaffirmed the constitutional protection for "the freedom of communicating **[\*266]** information and disseminating opinion"; its holding was based upon the factual conclusions that the handbill was "purely commercial advertising" and that the protest against official action had been added only to evade the ordinance.


 [5] **[\*\*\*HR6]** [6] **[\*\*\*\*22]**  The publication here was not a "commercial" advertisement in the sense in which the word was used in *Christensen*.  It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.  See *N. A. A. C. P.* v.  *Button*, 371 U.S. 415, 435.  That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold.  *Smith* v. *California*, 361 U.S. 147, 150; cf.   *Bantam Books, Inc.*, v. *Sullivan*, 372 U.S. 58, 64, n. 6.  Any other conclusion would discourage newspapers from carrying "editorial advertisements" of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities -- who wish to exercise their freedom of speech even though they are not members of the press. Cf.   *Lovell* v. *Griffin*, 303 U.S. 444, 452; **[\*\*\*\*23]**   *Schneider* v. *State*, 308 U.S. 147, 164.  The effect would be to shackle the First Amendment in its attempt to secure "the widest possible dissemination of information from diverse and antagonistic sources."  *Associated Press* v. *United States*, 326 U.S. 1, 20.  **[\*\*719]**  To avoid placing such a handicap upon the freedoms of expression, we hold that if the allegedly libelous statements would otherwise be

---

[4]  [2]

Since we sustain the contentions of all the petitioners under the First Amendment's guarantees of freedom of speech and of the press as applied to the States by the Fourteenth Amendment, we do not decide the questions presented by the other claims of violation of the Fourteenth Amendment.  The individual petitioners contend that the judgment against them offends the Due Process Clause because there was no evidence to show that they had published or authorized the publication of the alleged libel, and that the Due Process and Equal Protection Clauses were violated by racial segregation and racial bias in the courtroom.  The Times contends that the assumption of jurisdiction over its corporate person by the Alabama courts overreaches the territorial limits of the Due Process Clause.  The latter claim is foreclosed from our review by the ruling of the Alabama courts that the Times entered a general appearance in the action and thus waived its jurisdictional objection; we cannot say that this ruling lacks "fair or substantial support" in prior Alabama decisions.  See  *Thompson* v. *Wilson*, 224 Ala. 299, 140 So. 439 (1932); compare *N. A. A. C. P.* v.  *Alabama*, 357 U.S. 449, 454-458.

New York Times Co. v. Sullivan, 376 U.S. 254

constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement. [5]

[*267]  II.

Under Alabama law as applied in this case, a publication is "libelous per se" if the words "tend to injure a person . . . in his reputation" **[****24]** or to "bring [him] into public contempt"; the trial court stated that the standard was met if the words are such as to "injure him in his public office, or impute misconduct to him in his office, or want of official integrity, or want of fidelity to a public trust . . . ." The jury  **[***699]** must find that the words were published "of and concerning" the plaintiff, but where the plaintiff is a public official his place in the governmental hierarchy is sufficient evidence to support a finding that his reputation has been affected by statements that reflect upon the agency of which he is in charge.  Once "libel per se" has been established, the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars.  *Alabama Ride Co.* v. *Vance*, 235 Ala. 263, 178 So. 438 (1938); *Johnson Publishing Co.* v. *Davis*, 271 Ala. 474, 494-495, 124 So. 2d 441, 457-458 (1960). His privilege of "fair comment" for expressions of opinion depends on the truth of the facts upon which the comment is based.  *Parsons* v. *Age-Herald Publishing Co.*, 181 Ala. 439, 450, 61 So. 345, 350 (1913).  **[****25]** Unless he can discharge the burden of proving truth, general damages are presumed, and may be awarded without proof of pecuniary injury.  A showing of actual malice is apparently a prerequisite to recovery of punitive damages, and the defendant may in any event forestall a punitive award by a retraction meeting the statutory requirements. Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight.  *Johnson Publishing Co.* v. *Davis, supra*, 271 Ala., at 495, 124 So. 2d, at 458.

[*268]  The question before us is whether this rule of liability, as applied to an action brought by a public official against critics of his official conduct, abridges the freedom of speech and of the press that is guaranteed by the First and Fourteenth Amendments.

[7][8]Respondent relies heavily, as did the Alabama courts, on statements of this Court to the effect that **[****26]** the Constitution does not protect libelous publications. [6]  **[***28]**  Those statements do not foreclose our inquiry here.  None of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public officials.  The dictum in  *Pennekamp* v. *Florida*, 328 U.S. 331, 348-349, that "when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants," implied no view as to what remedy might constitutionally be afforded to public officials.  In  *Beauharnais* v. *Illinois*, 343 U.S. 250, the Court sustained an Illinois criminal libel statute as applied to a publication held to be both defamatory of a racial group and "liable to cause violence and disorder." But the Court was careful to note that it "retains and  **[**720]** exercises authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel"; for "public men, are, as it were, public property,  **[****27]**  " and "discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled."  *Id.,* at 263-264, and n. 18. In the only previous case that did present the question of constitutional limitations upon the power to award damages for libel of a public official, the  **[***700]**  Court was equally divided and the question was not decided.  *Schenectady Union Pub. Co.* v. *Sweeney*, 316 U.S. 642.  [*269]  In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet "libel" than we have to other "mere labels" of state law.  *N. A. A. C. P.* v. *Button*, 371 U.S. 415, 429. Like insurrection, [7]  contempt, [8]  advocacy of unlawful acts, [9]  breach of the peace, [10]

---

[5] See American Law Institute, **Restatement of Torts, § 593, Comment b** (1938).

[6] *Konigsberg* v. *State Bar of California*, 366 U.S. 36, 49, and n. 10; *Times Film Corp.* v. *City of Chicago*, 365 U.S. 43, 48; *Roth* v. *United States*, 354 U.S. 476, 486-487; *Beauharnais* v. *Illinois*, 343 U.S. 250, 266; *Pennekamp* v. *Florida*, 328 U.S. 331, 348-349; *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572; *Near* v. *Minnesota*, 283 U.S. 697, 715.

[7] *Herndon* v. *Lowry*, 301 U.S. 242.

obscenity, [11] solicitation of legal business, [12] and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.

[9][10][11]The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the [****29] people." Roth v. United States, 354 U.S. 476, 484. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." Stromberg v. California, 283 U.S. 359, 369. "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," Bridges v. California, 314 U.S. 252, 270, and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." N. A. A. C. P. v. Button, 371 U.S. 415, 429. [*270] The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. [****30] To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F. Supp. 362, 372 (D. C. S. D. N. Y. 1943). Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375-376, gave the principle its classic formulation:

"Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, [**721] hope and imagination; that fear breeds repression; that repression [***701] breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law -- the argument of force in its worst form. Recognizing [****31] the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

[12][13]Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. See Terminiello v. Chicago, 337 U.S. 1, 4; De Jonge v. Oregon, 299 U.S. 353, 365. [*271] The present advertisement, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent.

---

[8]  Bridges v. California, 314 U.S. 252;  Pennekamp v. Florida, 328 U.S. 331.

[9]  De Jonge v. Oregon, 299 U.S. 353.

[10]  Edwards v. South Carolina, 372 U.S. 229.

[11]  Roth v. United States, 354 U.S. 476.

[12] N. A. A. C. P. v.  Button, 371 U.S. 415.

New York Times Co. v. Sullivan, 376 U.S. 254

[14] [****32]  Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker.  Cf.  *Speiser* v. *Randall,* 357 U.S. 513, 525-526.The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." *N. A. A. C. P.* v.  *Button,* 371 U.S. 415, 445. As Madison said, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution (1876), p. 571.  In  *Cantwell* v. *Connecticut,* 310 U.S. 296, 310, the Court declared:

"In the realm of religious faith, and in [****33] that of political belief, sharp differences arise.  In both fields the tenets of one man may seem the rankest error to his neighbor.  To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.  But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression [*272] are to have the "breathing space" that they "need . . . to survive," *N. A. A. C. P.* v. *Button,* 371 U.S. 415, 433, was also recognized by the Court of Appeals for the District of Columbia Circuit in *Sweeney* v. *Patterson,* 76 U.S. App. D. C. 23, 24, 128 F.2d 457, 458 (1942), cert. denied,  317 U.S. 678. Judge [****34]  Edgerton spoke for a unanimous court which affirmed the dismissal of a Congressman's libel suit based upon a newspaper [***702] article charging him with anti-Semitism in opposing a judicial appointment.  He said:

"Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. . . .  The interest of the public here outweighs the interest of appellant [**722] or any other individual.  The protection of the public requires not merely discussion, but information.  Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen.  Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. . . .  Whatever is added to the field of libel is taken from the field of free debate." [13]

[****35]  [15]Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error.  Where judicial officers are involved, this Court has held that concern for the dignity and [*273] reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision.  *Bridges* v. *California,* 314 U.S. 252. This is true even though the utterance contains "half-truths" and "misinformation." *Pennekamp* v. *Florida,* 328 U.S. 331, 342, 343, n. 5, 345. Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice. See also  *Craig* v. *Harney,* 331 U.S. 367;  *Wood* v. *Georgia,* 370 U.S. 375. If judges are to be treated as "men of fortitude, able to thrive in a hardy climate," *Craig* v. *Harney, supra,* 331 U.S., at 376, surely the same must be true of other government officials, such [****36] as elected city commissioners. [14] Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.

---

[13] See also Mill, On Liberty (Oxford: Blackwell, 1947), at 47:

". . . To argue sophistically, to suppress facts or arguments, to misstate the elements of the case, or misrepresent the opposite opinion . . . all this, even to the most aggravated degree, is so continually done in perfect good faith, by persons who are not considered, and in many other respects may not deserve to be considered, ignorant or incompetent, that it is rarely possible, on adequate grounds, conscientiously to stamp the misrepresentation as morally culpable; and still less could law presume to interfere with this kind of controversial misconduct."

[14] The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: "Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like

New York Times Co. v. Sullivan, 376 U.S. 254

[16]If neither factual **[****37]** error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate. This is the lesson to be drawn from the great controversy over the Sedition Act of 1798, 1 Stat. 596, which first crystallized a national awareness of the central meaning of the <u>First Amendment</u>. See Levy, Legacy of Suppression (1960), at 258 *et seq.*; Smith, Freedom's Fetters (1956), at 426, 431, **[***703]** and *passim*. That statute made it a crime, punishable by a $ 5,000 fine and five years in prison, "if any person shall write, print, utter or publish . . . any false, scandalous and malicious **[*274]** writing or writings against the government of the United States, or either house of the Congress . . . , or the President . . . , with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States." The Act allowed the defendant the defense of truth, and provided that the jury were **[**723]** to be judges both of the law and the facts. Despite these qualifications, the Act was **[****38]** vigorously condemned as unconstitutional in an attack joined in by Jefferson and Madison. In the famous Virginia Resolutions of 1798, the General Assembly of Virginia resolved that it

"doth particularly protest against the palpable and alarming infractions of the Constitution, in the two late cases of the 'Alien and Sedition Acts,' passed at the last session of Congress . . . . [The Sedition Act] exercises . . . a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto -- a power which, more than any other, ought to produce universal alarm, because it is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." 4 Elliot's Debates, *supra*, pp. 553-554.

Madison prepared the Report in support of the protest. His premise was that the Constitution created a form of government under which "The people, not the government, possess the absolute sovereignty." The structure of the government dispersed power in reflection of the people's distrust **[****39]** of concentrated power, and of power itself at all levels. This form of government was "altogether different" from the British form, under which the Crown was sovereign and the people were subjects. "Is **[*275]** it not natural and necessary, under such different circumstances," he asked, "that a different degree of freedom in the use of the press should be contemplated?" <u>*Id.,* pp. 569-570</u>. Earlier, in a debate in the House of Representatives, Madison had said: "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." 4 Annals of Congress, p. 934 (1794). Of the exercise of that power by the press, his Report said: "In every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description, which has not been confined to the strict limits of the common law. On this footing the freedom of the press has stood; on this foundation it yet stands . . . ." 4 Elliot's Debates, *supra*, p. 570. The right of free public discussion of the stewardship of public officials was thus, in Madison's view, **[****40]** a fundamental principle of the American form of government. [15]

---

usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent." Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875 (1949).

For a similar description written 60 years earlier, see Chase, Criticism of Public Officers and Candidates for Office, 23 Am. L. Rev. 346 (1889).

[15] The Report on the Virginia Resolutions further stated:

"It is manifestly impossible to punish the intent to bring those who administer the government into disrepute or contempt, without striking at the right of freely discussing public characters and measures; . . . which, again, is equivalent to a protection of those who administer the government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it, by free animadversions on their characters and conduct. Nor can there be a doubt . . . that a government thus intrenched in penal statutes against the just and natural effects of a culpable administration, will easily evade the responsibility which is essential to a faithful discharge of its duty.

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 Elliot's Debates, *supra*, p. 575.

New York Times Co. v. Sullivan, 376 U.S. 254

[****41]  [*276]  Although  [***704]  the Sedition Act was never tested in this Court, [16] the attack upon its validity has carried the day in the court of history.  Fines levied in its prosecution were repaid by Act of Congress on the ground that it was unconstitutional.  See, *e. g.*, Act of July 4, 1840, c. 45, 6  [**724]  Stat. 802, accompanied by H. R. Rep. No. 86, 26th Cong., 1st Sess. (1840).  Calhoun, reporting to the Senate on February 4, 1836, assumed that its invalidity was a matter "which no one now doubts." Report with Senate bill No. 122, 24th Cong., 1st Sess., p. 3.  Jefferson, as President, pardoned those who had been convicted and sentenced under the Act and remitted their fines, stating: "I discharged every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." Letter to Mrs. Adams, July 22, 1804, 4 Jefferson's Works (Washington ed.), pp. 555, 556.  The invalidity of the Act has also been assumed by Justices of this Court.  See Holmes, J., dissenting and joined by Brandeis, J., in  *Abrams* v. *United States*, 250 U.S.  616, 630; [****42]  Jackson, J., dissenting in  *Beauharnais* v. *Illinois*, 343 U.S. 250, 288-289; Douglas, The Right of the People (1958), p. 47.  See also Cooley, Constitutional Limitations (8th ed., Carrington, 1927), pp. 899-900; Chafee, Free Speech in the United States (1942), pp. 27-28.  These views reflect a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment.

 [17]There is no force in respondent's argument that the constitutional limitations implicit in the history of the Sedition Act apply only to Congress and not to the States.  It is true that the First Amendment was originally addressed only to action by the Federal Government, and  [*277]  that Jefferson, for one, while denying [****43]  the power of Congress "to control the freedom of the press," recognized such a power in the States.  See the 1804 Letter to Abigail Adams quoted in  *Dennis* v. *United States*, 341 U.S.  494, 522, n. 4 (concurring opinion).  But this distinction was eliminated with the adoption of the Fourteenth Amendment and the application to the States of the First Amendment's restrictions.  See, *e. g.,*  *Gitlow* v. *New York*, 268 U.S. 652, 666;  *Schneider* v. *State*, 308 U.S. 147, 160;  *Bridges* v. *California*, 314 U.S. 252, 268;  *Edwards* v. *South Carolina*, 372 U.S. 229, 235.

 [***705]  [18]What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. [17]  The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute.  See  *City of Chicago* v. *Tribune Co.*, 307 Ill. 595, 607, 139 N. E. 86, 90 (1923).  [****44]  Alabama, for example, has a criminal libel law which subjects to prosecution "any person who speaks, writes, or prints of and concerning another any accusation falsely and maliciously importing the commission by such person of a felony, or any other indictable offense involving moral turpitude," and which allows as punishment upon conviction a fine not exceeding $ 500 and a prison sentence of six months.  Alabama Code, Tit. 14, § 350.  Presumably a person charged with violation of this statute enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt.  These safeguards are not available to the defendant in a civil action.  The judgment awarded in this case -- without the need for any proof of actual pecuniary loss -- was one thousand times greater than the maximum fine provided by the Alabama criminal statute, and one hundred times greater than that provided by the Sedition Act.  [*278]  And since there is no double-jeopardy limitation [****45]  applicable to civil  [**725]  lawsuits, this is not the only judgment that may be awarded against petitioners for the same publication. [18]  Whether or not a

---

[16] The Act expired by its terms in 1801.

[17] Cf.  *Farmers Union* v. *WDAY*, 360 U.S. 525, 535.

[18] The Times states that four other libel suits based on the advertisement have been filed against it by others who have served as Montgomery City Commissioners and by the Governor of Alabama; that another $ 500,000 verdict has been awarded in the only one of these cases that has yet gone to trial; and that the damages sought in the other three total $ 2,000,000.

newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive. Plainly the Alabama law of civil libel is "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Bantam Books, Inc.*, v. *Sullivan*, 372 U.S. 58, 70.

[****46]    [19]The state rule of law is not saved by its allowance of the defense of truth. A defense for erroneous statements honestly made is no less essential here than was the requirement of proof of guilty knowledge which, in *Smith* v. *California*, 361 U.S. 147, we held indispensable to a valid conviction of a bookseller for possessing obscene writings for sale. We said:

"For if the bookseller is criminally liable without knowledge of the contents, . . . he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. . . . And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. . . . [His] timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word [***706] which the State could not constitutionally [*279] suppress directly. The bookseller's self-censorship, compelled by [****47] the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded." (361 U.S. 147, 153-154.)

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. [19] Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, *e. g., Post Publishing Co.* v. *Hallam*, 59 F. 530, 540 (C. A. 6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt [****48] whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone." *Speiser* v. *Randall, supra*, 357 U.S., at 526. The rule thus dampens the vigor and limits the variety of public debate. It is [**726] inconsistent with the First and Fourteenth Amendments.

[20]The constitutional guarantees require, [****49] we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made [*280] with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. An oft-cited statement of a like rule, which has been adopted by a number of state courts, [20] is found in the [***707] Kansas case of *Coleman* v. *MacLennan*, 78 Kan. 711, 98 P. 281 (1908). The

---

[19] Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about "the clearer perception and livelier impression of truth, produced by its collision with error." Mill, On Liberty (Oxford: Blackwell, 1947), at 15; see also Milton, Areopagitica, in Prose Works (Yale, 1959), Vol. II, at 561.

[20]  *E. g., Ponder* v. *Cobb*, 257 N. C. 281, 299, 126 S.E.2d 67, 80 (1962);  *Lawrence* v. *Fox*, 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959);  *Stice* v. *Beacon Newspaper Corp.*, 185 Kan. 61, 65-67, 340 P.2d 396, 400-401 (1959);  *Bailey* v. *Charleston Mail Assn.*, 126 W. Va. 292, 307, 27 S.E.2d 837, 844 (1943);  *Salinger* v. *Cowles*, 195 Iowa 873, 889, 191 N. W. 167, 174 (1922);  *Snively* v. *Record Publishing Co.*, 185 Cal. 565, 571-576, 198 P. 1 (1921);  *McLean* v. *Merriman*, 42 S. D. 394, 175 N. W. 878

New York Times Co. v. Sullivan, 376 U.S. 254

State Attorney General, a candidate for re-election and a member of the commission charged with the management and control of the state school fund, sued a newspaper publisher for alleged libel in an article purporting to state facts relating to his official conduct in connection with a school-fund transaction. The defendant pleaded privilege and the trial judge, over the plaintiff's objection, instructed the jury that

"where an article is published and circulated among voters for the sole purpose of giving what the defendant **[\*281]** believes to be truthful information concerning a candidate for public office and for the purpose of enabling **[\*\*\*\*50]** such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article."

In answer to a special question, the jury found that the plaintiff had not proved actual malice, and a general verdict was returned for the defendant. On appeal the Supreme Court of Kansas, in an opinion by Justice Burch, reasoned as follows ( 78 Kan., at 724, 98 P., at 286):

"It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the **[\*\*\*\*51]** public welfare, although at times such injury may be great. The **[\*\*727]** public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged."

The court thus sustained the trial court's instruction as a correct statement of the law, saying:

"In such a case the occasion gives rise to a privilege, qualified to this extent: any one claiming to be defamed by the communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of **[\*282]** public concern, public men, and candidates for office." 78 Kan., at 723, 98 P., at 285.

**[\*\*\*\*52]** Such a privilege for criticism of official conduct [21] is appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen. In *Barr* v. *Matteo*, 360 U.S. 564, 575, this Court held the utterance of a federal official to be absolutely privileged if made "within the outer perimeter" of his duties. The

---

(1920). Applying the same rule to candidates for public office, see, *e. g., Phoenix Newspapers* v. *Choisser*, 82 Ariz. 271, 276-277, 312 P. 2d 150, 154 (1957); *Friedell* v. *Blakely Printing Co.*, 163 Minn. 226, 230, 203 N. W. 974, 975 (1925). And see *Chagnon* v. *Union-Leader Corp.*, 103 N. H. 426, 438, 174 A. 2d 825, 833 (1961), cert. denied, **369 U.S. 830**.

The consensus of scholarly opinion apparently favors the rule that is here adopted. *E. g.,* 1 Harper and James, Torts, § 5.26, at 449-450 (1956); Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 891-895, 897, 903 (1949); Hallen, Fair Comment, 8 Tex. L. Rev. 41, 61 (1929); Smith, Charges Against Candidates, 18 Mich. L. Rev. 1, 115 (1919); Chase, Criticism of Public Officers and Candidates for Office, 23 Am. L. Rev. 346, 367-371 (1889); Cooley, Constitutional Limitations (7th ed., Lane, 1903), at 604, 616-628. But see, *e. g.,* American Law Institute, **Restatement of Torts, § 598, Comment a** (1938) (reversing the position taken in Tentative Draft 13, § 1041 (2) (1936)); Veeder, Freedom of Public Discussion, 23 Harv. L. Rev. 413, 419 (1910).

[21] The privilege immunizing honest misstatements of fact is often referred to as a "conditional" privilege to distinguish it from the "absolute" privilege recognized in judicial, legislative, administrative and executive proceedings. See, *e. g.,* Prosser, Torts (2d ed., 1955), § 95.

New York Times Co. v. Sullivan, 376 U.S. 254

States accord the same immunity to statements of their highest officers, although some differentiate their lesser officials and qualify the privilege they enjoy. [22] But all hold that all officials are protected unless actual malice **[\*\*\*708]** can be proved.  The reason for the official privilege is said to be that the threat of damage suits would otherwise "inhibit the fearless, vigorous, and effective administration of policies of government" and "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." _Barr_ v. _Matteo, supra,_ 360 U.S., at 571. Analogous considerations support the privilege for the citizen-critic of government. It is as much his duty to criticize as it is the official's duty to administer.  See _Whitney_ v. _California,_ 274 U.S. 357, 375 **[\*\*\*\*53]**  (concurring opinion of Mr. Justice Brandeis), quoted _supra,_ p. 270.  As Madison said, see _supra,_ p. 275, "the censorial power is in the people over the Government, and not in the Government over the people." It would give public servants an unjustified preference over the public they serve, if critics of official conduct **[\*283]** did not have a fair equivalent of the immunity granted to the officials themselves.

We conclude that such a privilege is required by the First and Fourteenth Amendments.

III.

 [21] **[\*\*\*\*54]** [22][23]We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct.  Since this is such an action, [23] **[\*\*\*\*56]**  the rule requiring proof of actual malice is applicable.  While **[\*\*728]** Alabama law apparently requires proof of actual malice for an award of punitive damages, [24] **[\*\*\*\*57]**  where general damages are concerned malice is "presumed."  Such a presumption is inconsistent **[\*284]** with the **[\*\*\*709]** federal rule.  "The power to create presumptions is not a means of escape from constitutional restrictions," _Bailey_ v. _Alabama,_ 219 U.S. 219, 239; "the showing of

---

[22] See 1 Harper and James, Torts, § 5.23, at 429-430 (1956); Prosser, Torts (2d ed., 1955), at 612-613; American Law Institute, Restatement of Torts (1938), § 591.

[23] We have no occasion here to determine how far down into the lower ranks of government employees the "public official" designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included.  Cf.  _Barr_ v. _Matteo,_ 360 U.S. 564, 573-575. Nor need we here determine the boundaries of the "official conduct" concept.  It is enough for the present case that respondent's position as an elected city commissioner clearly made him a public official, and that the allegations in the advertisement concerned what was allegedly his official conduct as Commissioner in charge of the Police Department. As to the statements alleging the assaulting of Dr. King and the bombing of his home, it is immaterial that they might not be considered to involve respondent's official conduct if he himself had been accused of perpetrating the assault and the bombing.  Respondent does not claim that the statements charged him personally with any of these acts; his contention is that the advertisement connects him with them only in his official capacity as the Commissioner supervising the police, on the theory that the police might be equated with the "They" who did the bombing and assaulting. Thus, if these allegations can be read as referring to respondent at all, they must be read as describing his performance of his official duties.

[24] _Johnson Publishing Co._ v. _Davis,_ 271 Ala. 474, 487, 124 So. 2d 441, 450 (1960).  Thus, the trial judge here instructed the jury that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages in an action for libel."

The court refused, however, to give the following instruction which had been requested by the Times:

"I charge you . . . that punitive damages, as the name indicates, are designed to punish the defendant, the New York Times Company, a corporation, and the other defendants in this case, . . . and I further charge you that such punitive damages may be awarded only in the event that you, the jury, are convinced by a fair preponderance of the evidence that the defendant . . . was motivated by personal ill will, that is actual intent to do the plaintiff harm, or that the defendant . . . was guilty of gross negligence and recklessness and not of just ordinary negligence or carelessness in publishing the matter complained of so as to indicate a wanton disregard of plaintiff's rights."

The trial court's error in failing to require any finding of actual malice for an award of general damages makes it unnecessary for us to consider the sufficiency under the federal standard of the instructions regarding actual malice that were given as to punitive damages.

New York Times Co. v. Sullivan, 376 U.S. 254

malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff . . . ." *Lawrence* v. *Fox*, 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959). **[****55]** [25] Since the trial judge did not instruct the jury to differentiate between general and punitive damages, it may be that the verdict was wholly an award of one or the other.  But it is impossible to know, in view of the general verdict returned.  Because of this uncertainty, the judgment must be reversed and the case remanded.  *Stromberg* v. *California,* 283 U.S. 359, 367-368; *Williams* v. *North Carolina,* 317 U.S. 287, 291-292; see  *Yates* v. *United States,* 354 U.S. 298, 311-312; *Cramer* v. *United States,* 325 U.S. 1, 36, n. 45.

[24][25][26]Since respondent may seek a new trial, we deem that considerations of effective judicial administration require us to review the evidence in the present record to determine  **[*285]**  whether it could constitutionally support a judgment for respondent.  This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.  This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally **[****58]** guaranteed and speech which may legitimately be regulated."  *Speiser* v. *Randall,* 357 U.S. 513, 525.  In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the **[**729]** First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect."  *Pennekamp* v. *Florida,* 328 U.S. 331, 335; see also  *One, Inc.,* v. *Olesen,* 355 U.S. 371; *Sunshine Book Co.* v.  *Summerfield,* 355 U.S. 372.  We must "make an independent examination of the whole record,"  *Edwards* v. *South Carolina,* 372 U.S. 229, 235, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. [26]

[27] [28] [29]

**[****59]** [30]Applying **[***710]** these standards, we consider that the proof presented to show actual malice lacks the convincing **[*286]** clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law.  The case of the individual petitioners requires little discussion.  Even assuming that they could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard.  The judgment against them is thus without constitutional support.

[31] [32]As to the Times, we similarly conclude that the facts do not support a finding of actual malice. The statement by the Times' Secretary that, apart from the padlocking allegation, he thought the advertisement was "substantially correct," affords no constitutional warrant for the **[****60]** Alabama Supreme Court's conclusion that it was a "cavalier ignoring of the falsity of the advertisement [from which] the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable therefrom."  The statement does not indicate malice at the time of the publication; even if the advertisement was not "substantially correct" -- although respondent's own

---

[25] Accord,  *Coleman* v. *MacLennan, supra,* 78 Kan., at 741, 98 P., at 292;  *Gough* v. *Tribune-Journal Co.,* 75 Idaho 502, 510, 275 P.2d 663, 668 (1954).

[26] The Seventh Amendment does not, as respondent contends, preclude such an examination by this Court.  That Amendment, providing that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law," is applicable to state cases coming here.  *Chicago, B. & Q. R. Co.* v.  *Chicago,* 166 U.S. 226, 242-243; cf.  *The Justices* v. *Murray,* 9 Wall. 274.  But its ban on re-examination of facts does not preclude us from determining whether governing rules of federal law have been properly applied to the facts.  "This Court will review the finding of facts by a State court . . . where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts."  *Fiske* v. *Kansas,* 274 U.S. 380, 385-386. See also  *Haynes* v. *Washington,* 373 U.S. 503, 515-516.

New York Times Co. v. Sullivan, 376 U.S. 254

proofs tend to show that it was -- that opinion was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it.  The Times' failure to retract upon respondent's demand, although it later retracted upon the demand of Governor Patterson, is likewise not adequate evidence of malice for constitutional purposes.  Whether or not a failure to retract may ever constitute such evidence, there are two reasons why it does not here.  *First*, the letter written by the Times reflected a reasonable doubt on its part as to whether the advertisement could reasonably be taken to refer to respondent at all.  *Second*, it was not a final refusal, since it asked for an explanation on this point -- a request that respondent chose to ignore.  Nor does the retraction upon **[****61]** the demand of the Governor supply the **[*287]** necessary proof.  It may be doubted that a failure to retract which is not itself evidence of malice can retroactively become such by virtue of a retraction subsequently made to another party.  But in any event that did not happen here, since the **[**730]** explanation given by the Times' Secretary for the distinction drawn between respondent and the Governor was a reasonable one, the good faith of which was not impeached.

 [33]Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files.  The mere presence of the stories in the files does not, of course, establish that the Times "knew" the advertisement was false, since the state of mind required for **[***711]** actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement. With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those **[****62]** whose names were listed as sponsors of the advertisement, and upon the letter from A. Philip Randolph, known to them as a responsible individual, certifying that the use of the names was authorized.  There was testimony that the persons handling the advertisement saw nothing in it that would render it unacceptable under the Times' policy of rejecting advertisements containing "attacks of a personal character"; [27] their failure to reject it on this ground was not unreasonable.  We think  **[*288]** the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice. Cf. *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 618, 116 A.2d 440, 446 (1955); *Phoenix Newspapers, Inc.*, v. *Choisser*, 82 Ariz. 271, 277-278, 312 P.2d 150, 154-155 (1957).

 **[****63]**    [34]We also think the evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made "of and concerning" respondent. Respondent relies on the words of the advertisement and the testimony of six witnesses to establish a connection between it and himself.  Thus, in his brief to this Court, he states:

"The reference to respondent as police commissioner is clear from the ad.  In addition, the jury heard the testimony of a newspaper editor . . . ; a real estate and insurance man . . . ; the sales manager of a men's clothing store . . . ; a food equipment man . . . ; a service station operator . . . ; and the operator of a truck line for whom respondent had formerly worked . . . .  Each of these witnesses stated that he associated the statements with respondent . . . ." (Citations to record omitted.)

There was no reference to respondent in the advertisement, either by name or official position.  A number of the allegedly libelous statements -- the charges that the dining hall was padlocked and that Dr.  **[****64]** King's home was bombed, his person assaulted, and a perjury prosecution instituted against him -- did not even concern the police; despite the ingenuity of the arguments which would attach this significance to the word "They," it is plain that these statements could not reasonably be read as accusing respondent of personal involvement in the acts **[*289]** in question.  The statements upon which respondent **[**731]** principally relies as referring to him are the two allegations that did concern the police or police functions: that "truckloads of police . . . ringed the Alabama **[***712]** State College Campus" after the demonstration on the State Capitol steps, and that Dr. King had been

---

[27] The Times has set forth in a booklet its "Advertising Acceptability Standards." Listed among the classes of advertising that the newspaper does not accept are advertisements that are "fraudulent or deceptive," that are "ambiguous in wording and . . . may mislead," and that contain "attacks of a personal character."  In replying to respondent's interrogatories before the trial, the Secretary of the Times stated that "as the advertisement made no attacks of a personal character upon any individual and otherwise met the advertising acceptability standards promulgated," it had been approved for publication.

New York Times Co. v. Sullivan, 376 U.S. 254

"arrested . . . seven times." These statements were false only in that the police had been "deployed near" the campus but had not actually "ringed" it and had not gone there in connection with the State Capitol demonstration, and in that Dr. King had been arrested only four times.  The ruling that these discrepancies between what was true and what was asserted were sufficient to injure respondent's reputation may itself raise constitutional problems, but we need not consider them here.  Although **[****65]** the statements may be taken as referring to the police, they did not on their face make even an oblique reference to respondent as an individual.  Support for the asserted reference must, therefore, be sought in the testimony of respondent's witnesses.  But none of them suggested any basis for the belief that respondent himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct; to the extent that some of the witnesses thought respondent to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been. [28] **[****67]**  This reliance on the bare **[*290]** **[***713]** fact of respondent's **[**732]** official position [29] was made explicit by the Supreme Court of Alabama.  That court, in holding that the trial court "did not err in overruling the demurrer [of the Times] in the aspect that the libelous **[*291]** **[****66]** matter was not of and concerning the [plaintiff,]" based its ruling on the proposition that:

———————————————————

[28] Respondent's own testimony was that "as Commissioner of Public Affairs it is part of my duty to supervise the Police Department and I certainly feel like it [a statement] is associated with me when it describes police activities." He thought that "by virtue of being Police Commissioner and Commissioner of Public Affairs," he was charged with "any activity on the part of the Police Department." "When it describes police action, certainly I feel it reflects on me as an individual." He added that "It is my feeling that it reflects not only on me but on the other Commissioners and the community."

Grover C. Hall testified that to him the third paragraph of the advertisement called to mind "the City government -- the Commissioners," and that "now that you ask it I would naturally think a little more about the police Commissioner because his responsibility is exclusively with the constabulary." It was "the phrase about starvation" that led to the association; "the other didn't hit me with any particular force."

Arnold D. Blackwell testified that the third paragraph was associated in his mind with "the Police Commissioner and the police force.  The people on the police force." If he had believed the statement about the padlocking of the dining hall, he would have thought "that the people on our police force or the heads of our police force were acting without their jurisdiction and would not be competent for the position." "I would assume that the Commissioner had ordered the police force to do that and therefore it would be his responsibility."

Harry W. Kaminsky associated the statement about "truckloads of police" with respondent "because he is the Police Commissioner." He thought that the reference to arrests in the sixth paragraph "implicates the Police Department, I think, or the authorities that would do that -- arrest folks for speeding and loitering and such as that." Asked whether he would associate with respondent a newspaper report that the police had "beat somebody up or assaulted them on the streets of Montgomery," he replied: "I still say he is the Police Commissioner and those men are working directly under him and therefore I would think that he would have something to do with it." In general, he said, "I look at Mr. Sullivan when I see the Police Department."

H. M. Price, Sr., testified that he associated the first sentence of the third paragraph with respondent because: "I would just automatically consider that the Police Commissioner in Montgomery would have to put his approval on those kind of things as an individual."

William M. Parker, Jr., testified that he associated the statements in the two paragraphs with "the Commissioners of the City of Montgomery," and since respondent "was the Police Commissioner," he "thought of him first." He told the examining counsel: "I think if you were the Police Commissioner I would have thought it was speaking of you."

Horace W. White, respondent's former employer, testified that the statement about "truck-loads of police" made him think of respondent "as being the head of the Police Department." Asked whether he read the statement as charging respondent himself with ringing the campus or having shotguns and tear-gas, he replied: "Well, I thought of his department being charged with it, yes, sir.  He is the head of the Police Department as I understand it." He further said that the reason he would have been unwilling to re-employ respondent if he had believed the advertisement was "the fact that he allowed the Police Department to do the things that the paper say he did."

[29] Compare *Ponder* v. *Cobb, 257 N. C. 281, 126 S.E.2d 67 (1962)*.

New York Times Co. v. Sullivan, 376 U.S. 254

"We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner.  In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." 273 Ala., at 674-675, 144 So.2d, at 39.

[35][38]This proposition has disquieting implications for criticism of governmental conduct.  For good reason, "no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence." *City of Chicago* v. *Tribune Co.*, 307 Ill. 595, 601, 139 N. E. 86, 88  [*292]  (1923).  The present proposition would sidestep this obstacle by transmuting criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed.  There is no legal alchemy by which a State may thus create the cause of action that would otherwise be denied for a publication which,  [****68]  as respondent himself said of the advertisement, "reflects not only on me but on the other Commissioners and the community." Raising as it does the possibility that a good-faith critic of government will be penalized for his criticism, the proposition relied on by the Alabama courts strikes at the very center of the constitutionally protected area of free expression. [30] We hold that such a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations.  Since it was relied on exclusively here, and there was no other  [***714]  evidence to connect the statements with respondent, the evidence was constitutionally insufficient to support a finding that the statements referred to respondent.

[36] [37]

[****69]  The  [**733]  judgment of the Supreme Court of Alabama is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

[***715]  [APPENDIX]

[***716]  [SEE ILLUSTRATION IN ORIGINAL.]

**Concur by:** BLACK; GOLDBERG

# Concur

[*293]  MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

I concur in reversing this half-million-dollar judgment against the New York Times Company and the four individual defendants.  In reversing the Court holds that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Ante*, p. 283.  I base my vote to reverse on the belief that the First and Fourteenth Amendments not merely "delimit" a State's power to award damages to "public officials against critics of their official conduct" but completely prohibit a State from exercising such a power.

---

[30] Insofar as the proposition means only that the statements about police conduct libeled respondent by implicitly criticizing his ability to run the Police Department, recovery is also precluded in this case by the doctrine of fair comment.  See American Law Institute, Restatement of Torts (1938), § 607.  Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact.  Both defenses are of course defeasible if the public official proves actual malice, as was not done here.

New York Times Co. v. Sullivan, 376 U.S. 254

The Court goes on to hold that a State can subject such critics to damages if "actual malice" can be proved against them.  "Malice," even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to **[\*\*\*\*70]** disprove.  The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguard embodied in the First Amendment.  Unlike the Court, therefore, I vote to reverse exclusively on the ground that the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials.  I do not base my vote to reverse on any failure to prove that these individual defendants signed the advertisement or that their criticism of the Police Department was aimed at the plaintiff Sullivan, who was then the Montgomery City Commissioner having supervision of the city's police; for present purposes I assume these things were proved.  Nor is my reason for reversal the size of the half-million-dollar judgment, large as it is.  If Alabama has constitutional power to use its civil libel law to impose damages on the press for criticizing the way public officials perform or fail  **[\*294]**  to perform their duties, I know of no provision in the Federal Constitution which either expressly **[\*\*\*\*71]**  or impliedly bars the State from fixing the amount of damages.

The half-million-dollar verdict does give dramatic proof, however, that state libel laws threaten the very existence of an American press virile enough to publish unpopular views on public affairs and bold enough to criticize the conduct of public officials.  The factual background of this case emphasizes the imminence and enormity of that threat.  One of the acute and highly emotional issues in this country arises out of efforts of many people, even including some public officials, to continue state-commanded segregation of races in the public schools and other public places, despite our several holdings that such a state practice is forbidden by the Fourteenth Amendment.  Montgomery is one of the localities in which widespread hostility to desegregation has been manifested.  This hostility has sometimes extended itself to persons who favor desegregation, particularly to so-called "outside agitators," a term which can be made to fit papers like the Times, which is published in New York.  The scarcity of testimony to show that Commissioner Sullivan suffered any actual damages at all suggests that these feelings of hostility **[\*\*\*\*72]**  had at least as much to do with rendition of this half-million-dollar  **[\*\*\*717]**  verdict as did an appraisal of damages.  Viewed realistically, this record lends support to an inference that instead of being damaged Commissioner Sullivan's political, social, and financial prestige has likely been enhanced by the Times' publication.  Moreover, a second half-million-dollar libel verdict against the Times based on the same advertisement has already been  **[\*\*734]**  awarded to another Commissioner.  There a jury again gave the full amount claimed.  There is no reason to believe that there are not more such huge verdicts lurking just around the corner for the Times or any other newspaper or broadcaster which  **[\*295]**  might dare to criticize public officials.  In fact, briefs before us show that in Alabama there are now pending eleven libel suits by local and state officials against the Times seeking $ 5,600,000, and five such suits against the Columbia Broadcasting System seeking $ 1,700,000.  Moreover, this technique for harassing and punishing a free press -- now that it has been shown to be possible -- is by no means limited to cases with racial overtones; it can be used in other **[\*\*\*\*73]**  fields where public feelings may make local as well as out-of-state newspapers easy prey for libel verdict seekers.

In my opinion the Federal Constitution has dealt with this deadly danger to the press in the only way possible without leaving the free press open to destruction -- by granting the press an absolute immunity for criticism of the way public officials do their public duty. Compare  _Barr_ v. _Matteo_, 360 U.S. 564.  Stopgap measures like those the Court adopts are in my judgment not enough.  This record certainly does not indicate that any different verdict would have been rendered here whatever the Court had charged the jury about "malice," "truth," "good motives," "justifiable ends," or any other legal formulas which in theory would protect the press.  Nor does the record indicate that any of these legalistic words would have caused the courts below to set aside or to reduce the half-million-dollar verdict in any amount.

I agree with the Court that the Fourteenth Amendment made the First applicable to the States. [1] This means to me that since the adoption of the Fourteenth Amendment a State has no more power than the Federal Government to use a civil **[\*\*\*\*74]**  libel law or any other law to impose damages for merely discussing public affairs and criticizing

---

[1] See cases collected in  _Speiser_ v. _Randall_, 357 U.S. 513, 530 (concurring opinion).

New York Times Co. v. Sullivan, 376 U.S. 254

public officials.  The power of the United  **[\*296]**  States to do that is, in my judgment, precisely nil.  Such was the general view held when the <u>First Amendment</u> was adopted and ever since. [2] **[\*\*\*\*75]**  Congress never has sought to challenge this viewpoint by passing any civil libel law.  It did pass the Sedition Act in 1798, [3] which made it a crime -- "seditious libel" -- to criticize federal officials or the Federal Government.  As the Court's opinion correctly points out, however, *ante*, pp. 273-276, that Act came to an ignominious end and by common consent has generally been treated as having been a wholly unjustifiable and much to be regretted violation of  **[\*\*\*718]**  the <u>First Amendment</u>.  Since the <u>First Amendment</u> is now made applicable to the States by the Fourteenth, it no more permits the States to impose damages for libel than it does the Federal Government.

We would, I think, more faithfully interpret the <u>First Amendment</u> by holding that at the very least it leaves the people and the press free to criticize officials and discuss public affairs with impunity.  This Nation of ours elects many of its important officials; so do the States, the municipalities, the counties, and even many precincts.  These officials are responsible to the people for the way they perform their duties.  While our Court has held that some kinds of speech and writings, such as "obscenity," *Roth* **[\*\*735]** v. *United States,* 354 U.S. 476, and "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, are not expression within the protection of the <u>First Amendment</u>, [4] freedom to discuss public affairs and public officials  **[\*297]**  is unquestionably, as the Court today holds, the kind of speech the <u>First Amendment</u> was primarily designed to keep within the area of free discussion.  To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge **[\*\*\*\*76]** or shut off discussion of the very kind most needed.  This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials.  But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials.  "For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it." [5] **[\*\*\*\*77]**  An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the <u>First Amendment</u>. [6]

I regret that the Court has stopped short of this holding indispensable to preserve our free press from destruction.

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE DOUGLAS joins, concurring in the result.

The Court today announces a constitutional standard which prohibits "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with  **[\*298]**  'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Ante*, at 279-280.  The Court thus rules that the Constitution gives citizens and newspapers a "conditional privilege" immunizing nonmalicious misstatements of fact regarding the official conduct of a government officer.   The impressive array of history [1] and precedent marshaled by the Court, **[\*\*\*719]** however, confirms my belief that the

---

[2] See, *e. g.*, 1 Tucker, Blackstone's Commentaries (1803), 297-299 (editor's appendix).  St. George Tucker, a distinguished Virginia jurist, took part in the Annapolis Convention of 1786, sat on both state and federal courts, and was widely known for his writings on judicial and constitutional subjects.

[3] Act of July 14, 1798, 1 Stat. 596.

[4] But see *Smith* v. *California,* 361 U.S. 147, 155 (concurring opinion);   *Roth* v. *United States,* 354 U.S. 476, 508 (dissenting opinion).

[5] 1 Tucker, Blackstone's Commentaries (1803), 297 (editor's appendix); cf. Brant, Seditious Libel: Myth and Reality,  39 N. Y. U. L. Rev. 1.

[6] Cf. Meiklejohn, Free Speech and Its Relation to Self-Government (1948).

[1] I fully agree with the Court that the attack upon the validity of the Sedition Act of 1798, 1 Stat. 596, "has carried the day in the court of history," *ante*, at 276, and that the Act would today be declared unconstitutional.  It should be pointed out, however, that the Sedition Act proscribed writings which were "false, scandalous *and malicious*." (Emphasis added.) For prosecutions under

New York Times Co. v. Sullivan, 376 U.S. 254

Constitution affords greater protection than that provided by the Court's standard to citizen and press in exercising the right [****78] of public criticism.

In my view, the First and Fourteenth Amendments to the Constitution afford to the citizen and to the press an absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses. The prized American right "to speak one's [**736] mind, [****79] " cf. *Bridges* v. *California*, 314 U.S. 252, 270, about public officials and affairs needs "breathing space to survive," *N. A. A. C. P.* v. *Button*, 371 U.S. 415, 433. The right should not depend upon a probing by the jury of the motivation [2] of the citizen or press. The theory [*299] of our Constitution is that every citizen may speak his mind and every newspaper express its view on matters of public concern and may not be barred from speaking or publishing because those in control of government think that what is said or written is unwise, unfair, false, or malicious. In a democratic society, one who assumes to act for the citizens in an executive, legislative, or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel.

 [****80] It has been recognized that "prosecutions for libel on government have [no] place in the American system of jurisprudence." *City of Chicago* v. *Tribune Co.*, 307 Ill. 595, 601, 139 N. E. 86, 88. I fully agree. Government, however, is not an abstraction; it is made up of individuals -- of governors responsible to the governed. In a democratic society where men are free by ballots to remove those in power, any statement critical of governmental action is necessarily "of and concerning" the governors and any statement critical of the governors' official conduct is necessarily "of and concerning" the government. If the rule that libel on government has no place in our Constitution is to have real meaning, then libel on the official conduct of the governors likewise can have no place in our Constitution.

We must recognize that we are writing upon a clean slate. [3] As the  [***720] Court notes, although there have been  [*300] "statements of this Court to the effect that the Constitution does not protect libelous publications . . . none of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public [****81] officials." *Ante*, at 268. We should be particularly careful, therefore, adequately to protect the liberties which are embodied in the First and Fourteenth Amendments. It may be urged that deliberately and maliciously false statements have no [**737] conceivable value as free speech. That argument, however, is not responsive to the real issue presented by this case, which is whether that freedom of speech which all agree is constitutionally protected can be effectively safeguarded by a rule allowing the imposition of liability upon a jury's evaluation of the speaker's state of mind. If individual citizens may be held liable in damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained. And if newspapers, publishing advertisements dealing with public issues, thereby risk liability, there

---

the Sedition Act charging malice, see, *e. g.*, Trial of Matthew Lyon (1798), in Wharton, State Trials of the United States (1849), p. 333; Trial of Thomas Cooper (1800), in *id., at 659*; Trial of Anthony Haswell (1800), in *id., at 684*; Trial of James Thompson Callender (1800), in *id., at 688*.

[2] The requirement of proving actual malice or reckless disregard may, in the mind of the jury, add little to the requirement of proving falsity, a requirement which the Court recognizes not to be an adequate safeguard. The thought suggested by Mr. Justice Jackson in *United States* v. *Ballard*, 322 U.S. 78, 92-93, is relevant here: "As a matter of either practice or philosophy I do not see how we can separate an issue as to what is believed from considerations as to what is believable. The most convincing proof that one believes his statements is to show that they have been true in his experience. Likewise, that one knowingly falsified is best proved by showing that what he said happened never did happen." See note 4, *infra*.

[3] It was not until *Gitlow* v. *New York*, 268 U.S. 652, decided in 1925, that it was intimated that the freedom of speech guaranteed by the First Amendment was applicable to the States by reason of the Fourteenth Amendment. Other intimations followed. See *Whitney* v. *California*, 274 U.S. 357; *Fiske* v. *Kansas*, 274 U.S. 380. In 1931 Chief Justice Hughes speaking for the Court in *Stromberg* v. *California*, 283 U.S. 359, 368, declared: "It has been determined that the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech." Thus we deal with a constitutional principle enunciated less than four decades ago, and consider for the first time the application of that principle to issues arising in libel cases brought by state officials.

New York Times Co. v. Sullivan, 376 U.S. 254

can also be little doubt that the ability of minority groups to secure publication of their views on public affairs and to seek support for their causes will be greatly diminished. Cf. _Farmers Educational & Coop. Union v. WDAY, Inc., 360 U.S. 525, 530_. The opinion of the **[****82]** Court conclusively demonstrates the chilling effect of the Alabama libel laws on First Amendment freedoms **[*301]** in the area of race relations. The American Colonists were not willing, nor should we be, to take the risk that "men who injure and oppress the people under their administration [and] provoke them to cry out and complain" will also be empowered to "make that very complaint the foundation for new oppressions and prosecutions." _The Trial of John Peter Zenger_, 17 Howell's St. Tr. 675, 721-722 (1735) (argument of counsel to the jury). To impose liability for critical, albeit erroneous or even malicious, comments on official conduct would effectively resurrect "the obsolete doctrine that the governed must not criticize their governors." Cf. _Sweeney v. Patterson, 76 U.S. App. D.C. 23, 24, 128 F.2d 457, 458_.

 **[****83]** Our national experience teaches that repressions breed hate and "that hate menaces stable government." _Whitney v. California, 274 U.S. 357, 375_ (Brandeis, J., concurring). We should be ever mindful of the wise counsel of Chief Justice Hughes:

"Imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if **[***721]** desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." _De Jonge v. Oregon, 299 U.S. 353, 365_.

This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen. Freedom of press and of speech insures that government will respond to the will of the people and that changes may be obtained by peaceful means. Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private **[****84]** defamation does not **[*302]** abridge the freedom of public speech or any other freedom protected by the First Amendment. [4] This, of course, cannot be said "where **[**738]** public officials are concerned or where public matters are involved. . . . One main function of the First Amendment is to ensure ample opportunity for the people to determine and resolve public issues. Where public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it." Douglas, The Right of the People (1958), p. 41.

 **[****85]** In many jurisdictions, legislators, judges and executive officers are clothed with absolute immunity against liability for defamatory words uttered in the discharge of their public duties. See, _e. g., Barr v. Matteo, 360 U.S. 564; City of Chicago v. Tribune Co., 307 Ill., at 610, 139 N. E., at 91_. Judge Learned Hand ably summarized the policies underlying the rule:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the **[*303]** case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. **[****86]** Again and again the public

---

[4] In most cases, as in the case at bar, there will be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct. I recognize, of course, that there will be a gray area. The difficulties of applying a public-private standard are, however, certainly of a different genre from those attending the differentiation between a malicious and nonmalicious state of mind. If the constitutional standard is to be shaped by a concept of malice, the speaker takes the risk not only that the jury will inaccurately determine his state of mind but also that the jury will fail properly to apply the constitutional standard set by the elusive concept of malice. See note 2, _supra_.

New York Times Co. v. Sullivan, 376 U.S. 254

interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In **[\*\*\*722]** this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that **[\*\*\*\*87]** that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." *Gregoire* v. *Biddle,* 177 F.2d 579, 581.

 **[\*304]** If the government official should be immune from libel actions so that his ardor to serve the public will not be dampened and "fearless, vigorous, and effective administration of policies of government" not be inhibited, *Barr* v. *Matteo, supra,* at 571, then the citizen and the press should likewise be immune from libel actions for their criticism of official conduct. Their ardor as citizens will thus not be dampened and they will **[\*\*739]** be free "to applaud or to criticize the way public employees do their jobs, from the least to the most important." [5] If liability can attach to political criticism because it damages the reputation of a public official as a public official, then no critical citizen can safely utter anything but faint praise about **[\*\*\*\*88]** the government or its officials. The vigorous criticism by press and citizen of the conduct of the government of the day by the officials of the day will soon yield to silence if officials in control of government agencies, instead of answering criticisms, can resort to friendly juries to forestall criticism of their official conduct. [6]

The conclusion that the Constitution affords the citizen and the press an absolute **[\*\*\*\*89]** privilege for criticism of official conduct does not leave the public official without defenses against unsubstantiated opinions or deliberate misstatements. "Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment . . . of free speech . . . ." *Wood* v. *Georgia,* 370 U.S. 375, 389. The public  **[\*305]** official certainly has equal if not greater access than most private citizens to media of communication. In any event, despite the possibility that some excesses and abuses may go unremedied, we must recognize that "the people of this nation have ordained in the light of history, that, in spite of the probability of excesses **[\*\*\*723]** and abuses, [certain] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell* v. *Connecticut,* 310 U.S. 296, 310. As Mr. Justice Brandeis correctly observed, "sunlight is the most powerful of all disinfectants." [7]

 **[\*\*\*\*90]** For these reasons, I strongly believe that the Constitution accords citizens and press an unconditional freedom to criticize official conduct. It necessarily follows that in a case such as this, where all agree that the allegedly defamatory statements related to official conduct, the judgments for libel cannot constitutionally be sustained.

---

[5] MR. JUSTICE BLACK concurring in *Barr* v. *Matteo,* 360 U.S. 564, 577, observed that: "The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees. Such an informed understanding depends, of course, on the freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important."

[6] See notes 2, 4, *supra.*

[7] See Freund, The Supreme Court of the United States (1949), p. 61.

New York Times Co. v. Sullivan, 376 U.S. 254

# References

The Supreme Court and the right of free speech and press

Annotation References:

1. The Supreme Court and the right of free speech and press. 93 L ed 1151, 2 L ed 2d 1706.

2. Libel and slander: actionability of statement imputing incapacity, inefficiency, misconduct, fraud, dishonesty, or the like to public employee. 53 ALR2d 8.

3. Doctrine of privilege or fair comment as applicable to misstatements of fact in publication relating to public officer or candidate for office. 110 ALR 412, 150 ALR 358.

4. Constitutionality of statutes or ordinances making one fact presumptive evidence of another. 51 ALR 1139, 86 ALR 179, 162 ALR 495.

5. Retraction as affecting right of action or amount of damages for libel [****91] or slander. 13 ALR 794.

6. Sufficiency of identification of plaintiff by publication or statement complained of as libelous or slanderous. 91 ALR 1161.

7. Libel and slander: publication or statement as defamatory, by reason of extrinsic facts, of person not referred to nor intended to be referred to. 69 ALR 734.

8. What evidence is admissible to identify plaintiff as person defamed. 95 ALR 2d 227.