`

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS DEXTER JAKES,

*Plaintiff*,

v.

DUANE YOUNGBLOOD,
JOHN DOE 1,
JOHN DOE 2,
JOHN DOE 3,
JOHN DOE 4,
JOHN DOE 5,
JOHN DOE 6,
JOHN DOE 7,
JOHN DOE 8,
JOHN DOE 9, and
JOHN DOE 10,

*Defendants*.

No. 2:24-CV-1608-WSS

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT YOUNGBLOOD'S ANTI-SLAPP MOTION</u>

`

## <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction ......................................................................................................................... 1

   I.     Relevant Background ............................................................................................ 2

       A.    From Extremely Humble Beginnings in West Virginia during the 1980s, Bishop T.D. Jakes Builds a Church in America's Rust Belt and Beyond ...................... 2

       B.    Duane Youngblood Gets Caught Sexually Abusing Multiple Minors He Was Counseling at His Church—and Gets Caught Lying About It Repeatedly. ........ 2

       C.    Duane Youngblood Concocts a Plan—With the Help of Others—to Falsely Accuse Bishop Jakes of Misconduct .................................................................. 3

       D.    Youngblood Falsely Attacks Bishop Jakes's Son with a Made-For-Litigation Claim ................................................................................................................... 5

       E.    Youngblood Enlists Convicted Felons and Family Members to Submit Bogus Affidavits. ........................................................................................................... 5

   II.    Argument ................................................................................................................ 6

       A.    Statutory Issues Are Fatal to Defendant's Anti-SLAPP Motion. ....................... 6

            1.    There Are No Anti-SLAPP Motions in Pennsylvania Yet. ....................... 7

            2.    Pennsylvania's Anti-SLAPP Would Not Apply in Federal Court Anyway. .................................................................................................... 7

       B.    Regardless, this Lawsuit Is Not a SLAPP—It Is a Meritorious Claim. ............. 10

            1.    No Matter the Standard, Bishop Jakes' Defamation *Per Se* Claim Stands. ...................................................................................................... 10

                *(a)*   *Youngblood's Claims About Bishop Jakes Are False.* ................... 11

                *(b)*   *Youngblood's Claims Were Made with Actual Malice.* ................. 13

                *(c)*   *Bishop Jakes Has Made the Required "Damages" Showing in this Defamation Per Se Case.* ............................................................... 16

            2.    The Conspiracy Claims Withstand Scrutiny Too. .................................... 17

       C.    Public Policy Does Not Favor Letting Fraudsters Lie and Exploit Others. ........ 19

       D.    Defendants' Request for Permission to Join Additional Claims. ...................... 19

  III.    Conclusion ............................................................................................................. 20

`

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbas v. Foreign Policy Grp., LLC,*
   783 F.3d 1328 (D.C. Cir. 2015) ............................................................. 8, 9

*Beverly Enters., Inc. v. Trump,*
   182 F.3d 183 (3d Cir.1999) ....................................................................... 17

*Blossoms & Blooms, Inc. v. Doe,*
   No. 22-cv-1557, 2022 WL 3030788 (E.D. Pa. July 29, 2022) ................................ 17

*Briganti v. Chow,*
   42 Cal.App.5th 504 (2019) ......................................................................... 12

*Burrill v. Nair,*
   217 Cal.App.4th 357 (2013) ........................................................................11

*Carbone v. CNN,*
   910 F.3d 1345 (11th Cir. 2018) ............................................................... 8, 9

*Celle v. Filipino Rep. Enters., Inc.,*
   209 F.3d 163 (2d Cir. 2000) ...................................................................... 15

*Chastain v. Hodgdon,*
   202 F. Supp. 3d 1216 (D. Kan. 2016) .......................................................... 15

*Chastain v. Hodgdon,*
   No. 16-cv-2087, 2016 WL 5109944 (D. Kan. Sept. 20, 2016) ................................ 16

*Davis v. Wells Fargo,*
   824 F.3d 333 (3d Cir. 2016) .................................................................. 7, 8

*Doe v. Princeton Univ.,*
   30 F.4th 335 (3d Cir. 2022) ......................................................................... 8

*Eastwood v. Nat'l Enquirer, Inc.,*
   123 F.3d 1249 (9th Cir. 1997) .................................................................... 14

*Erie R.R. Co. v. Tompkins,*
   304 U.S. 64 (1938) ............................................................................ 7, 10

*Garrett v. Bamford,*
   582 F.2d 810 (3d Cir. 1978) ......................................................................... 7

*Grane Healthcare Co.v. Maxim Healthcare Servs.,*
   No. 2:23-cv-01199-RJC, 2024 U.S. Dist. LEXIS 140026 (W.D. Pa. Aug. 7, 2024)................ 18

`

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657 (1989) ..................................................................................... 14

*Herbert v. Lando*,
    441 U.S. 153 (1979) ............................................................................ 13, 14, 15

*In re 42 Pa. C. S. § 1703*,
    394 A.2d 444 (Pa. 1978).................................................................................. 7

*Joseph v. Scranton Times L.P.*,
    129 A.3d 404 (Pa. 2015 ................................................................................ 17

*Klocke v. Watson*,
    936 F.3d 240 (5th Cir. 2019) .......................................................................... 8

*L.S.S. v. S.A.P.*,
    523 P.3d 1280 (Colo. App. 2022) ........................................................... 15, 19

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) .......................................................................... 8, 9

*LCV Cap. Mgmt., LLC v. Nuova Argo Finanziaria S.p.A.*,
    No. 18-cv-01645, 2021 WL 716728 (W.D. Pa. Feb. 24, 2021)................................ 20

*Liberty Synergistics Inc. v. Microflo Ltd.*,
    718 F.3d 138 (2d Cir. 2013) ......................................................................... 10

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
    885 F.3d 659 (10th Cir. 2018) .................................................................. 8, 10

*Manzari v. Associated Newspapers Ltd.*,
    830 F.3d 881 (9th Cir. 2016) ........................................................................ 13

*Marcone v. Penthouse Int'l Mag. for Men*,
    754 F.2d 1072 (3d Cir. 1985) ....................................................................... 17

*Menkowitz v. Peerless Publ'ns, Inc.*,
    211 A.3d 797 (Pa. 2019).............................................................................. 17

*Merritts v. Richards*,
    62 F.4th 764 (3d Cir. 2023) ......................................................................... 19

*Osborne v. Pleasanton Auto. Co., LP*,
    106 Cal.App.5th 361 (2024).......................................................................... 12

*Ralston v. Garabedian*,
    623 F. Supp. 3d 544 (E.D. Pa. 2022)............................................................. 16

`

*Ratner v. Kohler*,
  No. 17-cv-00542, 2018 WL 1055528 (D. Haw. Feb. 26, 2018) ................................. 16

*Robert D. Mabe, Inc. v. OptumRX*,
  43 F.4th 307 (3d Cir. 2022) ............................................................................... 9

*Ruth v. Carter*, 560 P.3d 659 (Nev. 2024) ................................................................ 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) .................................................................................. 7, 8, 9

*Sprague v. Am. Bar Ass'n*,
  276 F. Supp. 2d 365 (E.D. Pa. 2003) ................................................................. 16

*Sprague v. Walter*,
  656 A.2d 890 (Pa. Super. 1995) ....................................................................... 14

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ................................................................................. 13, 15

*Synthes (USA) v. Globus Med., Inc.*,
  No. 04-cv-1235, 2005 U.S. Dist. LEXIS 19962 (E.D. Pa. 2005) ............................. 17

*Tavoulareas v. Piro*,
  763 F.2d 1472 (D.C. Cir. 1985) ........................................................................ 14

*Volomino v. Messenger Publ'g Co.*,
  189 A.2d 873 (Pa. 1963) .................................................................................. 11

*Zunzurovski v. Fisher*,
  No. 23-cv-1088, 2024 WL 1434076 (S.D.N.Y. Apr. 3, 2024) ................................. 20

**Statutes**

42 Pa. C.S. § 8340.15 ........................................................................ 6, 8, 9, 10, 12

42 Pa. C.S. § 8340.16 .................................................................................... 7, 8, 9

2024 Pa. Legis. Serv. 72 ...................................................................................... 7

**Other Authorities**

Rodney A. Smolla, *Law of Defamation* (2d ed.) .......................................................... 15

Charles Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed. 2024) .................... 8

Tracy Bateman et al., *Federal Procedure, Lawyers Edition* (2024) ............................................. 19

`

**Rules**

Fed. R. Civ. P. 11 .................................................................................................................. 9, 20

Fed. R. Civ. P. 12 ............................................................................................................ 6, 8, 9, 20

Fed. R. Civ. P. 56 ...................................................................................................................... 9

Fed. R. Civ. P. 7 ....................................................................................................................... 20

Fed. R. Civ. P. 8 ........................................................................................................................ 9

`

## INTRODUCTION

In August 2024, Defendant Duane Youngblood left Pennsylvania state prison, after serving almost ten years for exploiting his position as a clergyman to sexually abuse minors. Within two months of his release, Youngblood found himself on a YouTube podcast run by a longtime critic of Plaintiff T.D. Jakes. There, he minimized his own conduct and cast blame onto Bishop Jakes, claiming that he assaulted Youngblood in June 1986 by cornering him, preventing him from leaving, and attempting to involuntarily kiss the teenaged Youngblood. He also claimed that Bishop Jakes called the next day and offered to support him for life in exchange for sexual favors.

That is all a lie. The tale reflects an ex-con's effort to take advantage of Bishop Jakes—who had met Youngblood and his family through their involvement in the same rust-belt church network, but of course never assaulted him—to deflect the blame for his own heinous conduct, to extort millions, and to launch a new chapter in his career along with his co-conspirators.  Indeed, after his podcast appearances, Youngblood hired a publicist, launched a website, announced a new book, and created a life-coaching and public-speaking business. He also hired a lawyer—Tyrone Blackburn—to send a letter to Bishop Jakes, demanding $6 million or else he would file unspecified claims against him and his church. Instead, Bishop Jakes filed this suit.

Youngblood now attempts to avoid accountability yet again, this time by invoking Pennsylvania's anti-SLAPP law—necessary portions of which have not yet gone into effect—and misrepresenting its text, enlisting felons and family members to submit flawed affidavits, and by lobbing more lies, all to distract from the issues. Those efforts fail as a matter of law and fact.

Bishop Jakes believes in the power of forgiveness and always tries to turn the other cheek. But this is too much for anyone to bear. Bishop Jakes should be allowed to hold Youngblood and his co-conspirators accountable for their lies and Youngblood's Motion and any attempts to attack the Jakes family with more false allegations should be rejected.

`

# I.    RELEVANT BACKGROUND

**A.**    **From Extremely Humble Beginnings in West Virginia during the 1980s, Bishop T.D. Jakes Builds a Church in America's Rust Belt and Beyond.**

Bishop T.D. Jakes is one of the most prominent and respected spiritual leaders in the United States today. (Compl. ¶ 11.) He is the founder and senior pastor of The Potter's House church in Dallas, Texas, which has a global reach and a congregation exceeding 80,000 persons. (*Id.*) He has authored 30 books, produces faith-focused music and films, and has even won a Grammy. (*Id.*)

But that wasn't always so. Bishop Jakes grew up in small-town West Virginia and began preaching part-time in 1980, founding a small church with just ten parishioners while working at a chemical plant to support himself and his family. (*Id.* ¶ 12; Jakes Decl. ¶¶ 4-5.) After the plant closed in 1982, Bishop Jakes spent the rest of the 1980s building a church while struggling to make ends meet, digging ditches at night. (Jakes Decl. ¶¶ 5-6, 8.) It was not until the 1990s—after meeting prominent evangelical Carlton Pearson and speaking at the 1993 AZUSA evangelical conference—that Bishop Jakes first gained some recognition, which later grew into The Potters House and national acclaim. (*Id.* ¶¶ 9-10.)

**B.**    **Duane Youngblood Gets Caught Sexually Abusing Multiple Minors He Was Counseling at His Church—and Gets Caught Lying About It Repeatedly.**

At the same time Bishop Jakes was building a community of the faithful, Youngblood was purporting to do the same. Unfortunately, Youngblood was abusing that position of trust to exploit children—in January 2006, Youngblood was arrested and charged with abusing a 15-year-old boy he was counseling. (Pusch Decl. ¶ 4.) After two years of denial, he pled guilty in March 2008, receiving one year of detention and seven years' probation. (*Id.*) But Youngblood did not stay out of trouble.  In 2014, he was prosecuted again for additional sex crimes against minors, which also violated his probation. (Ex. 3 at 2:10-4:10.) During the sentencing for his probation violations, the presiding judge stated that Youngblood was a liar and scammer who had "misled" and "deceived"

`

the Court. (*Id.* at 6:13-15, 19:2-5.) He had even manufactured evidence about his travel plans while on probation, and concealed his repeated arrests. (*Id.* at 6:12-24, 18:16-19:5.) During the hearing, Youngblood discussed his own past but made no mention of having been abused by Bishop Jakes, claiming that all incidents of abuse were "before [he] was 18 years of age." (*Id.* at 10:22-25.) Youngblood was sentenced to a maximum of and served over 9 years in prison. (Pusch Decl. ¶ 7.)

**C.    Duane Youngblood Concocts a Plan—With the Help of Others—to Falsely Accuse Bishop Jakes of Misconduct.**

Beginning in October 2024, Youngblood and John Does 1-10 worked together to launch knowingly false and defamatory attacks on Bishop Jakes and accuse him of sexually assaulting a teenage Youngblood in a Pittsburgh-area home. (Compl. ¶¶ 20-23, 51, 69.)

On October 28 and November 3, 2024, Youngblood appeared on the Larry Reid Live YouTube show ("LRL"), where he claimed that when he was a teenager—on or around June 9, 1986 (Pusch Decl. ¶¶ 8-11)—Bishop Jakes cornered him, prevented him from exiting the room, hugged him, and tried to kiss him without Youngblood's consent. (Compl. ¶¶ 20, 24, 28; Ex. 7 at 57:2-10; Ex. 8 at 27:20-28:11.) Youngblood added to his false story by claiming that the next day, Bishop Jakes called him and told him that if Youngblood would be his "guy" in Pittsburgh, who he could have sex with whenever he visited, he would "take care" of Youngblood for "the rest of his life." (Compl. ¶ 25; Ex. 7 at 57:11-20, 62:19-25; Ex. 8 at 28:12;29:24.)

He then recounted two other fictional events to add credibility to his story: (1) that years later he confronted Bishop Jakes at a hotel (while Mrs. Jakes was sleeping in the other room) and Bishop Jakes responded, "My stock was rising, and I would have had sex with anybody at that time" and (2) that another pastor tried to mediate a dispute between Bishop Jakes and Youngblood about the supposed assault. (Compl. ¶ 27; Ex. 7 at 68:7-69:11.)

Those claims are all completely fabricated—Bishop Jakes never tried to corner, grab, or

`

kiss any teenagers during his visits to Pittsburgh, and he certainly did not phone Youngblood to proposition him for sex in exchange for financial support. (Jakes Decl. ¶ 7; Compl. ¶ 32.) He never apologized for doing so—because it didn't happen, as Youngblood very well knows. (Jakes Decl. ¶¶ 7, 13; Compl. ¶ 32.) And the stories make no sense because, as explained above, in 1986 Bishop Jakes was a small-town preacher who could barely support his own family, let alone another person in another city. (Jakes Decl. ¶¶ 4-10; Compl. ¶ 12.)

Youngblood's motivations for making up these stories became clear shortly after. On November 9—just six days after his second LRL interview—Youngblood purchased the rights to duaneyoungblood.com and created a "Launching Soon" placeholder webpage. (Pusch Decl. ¶ 13 & Ex. 10.) On November 15, Youngblood's lawyer sent Bishop Jakes a letter demanding $6 million and a response by November 23, or else they would file a frivolous lawsuit designed to embarrass him; he even claimed that Youngblood may have been 17 years old during the fictional incident, to make it even more salacious. (Ex. 26 at 1-2.) Instead of capitulating, Bishop Jakes filed this suit on November 25.

After receiving an extension to respond to the Complaint, claiming he needed more time to find counsel (despite having long ago retained Blackburn) (Letter at 1-2 (ECF No. 17)), but before filing his response, Youngblood launched his business on January 12, 2025. (Pusch Decl. ¶ 14.) According to his website,  he offers workshops and one-on-one "coaching" on how to move on from past trauma; he even hired a publicist to help. (Pusch Decl. ¶¶ 14-17; Ex. 12.) The website features the LRL interviews and a countdown for the release of his new book, "I Overcame It to Live My Best Life" which promises to go into "sexual abuse and betrayal by prominent spiritual leaders," including Bishop Jakes, set to be released through Amazon on March 3, 2025. (Pusch Decl. ¶ 1 8; Ex. 13.)

`

And two days after filing the instant Motion, Youngblood's attorney, Blackburn, appeared on LRL to boast about his Motion and attack Bishop Jakes, but not before he provided Reid with a draft version of Youngblood's anti-SLAPP motion, which Reid broadcast. (Pusch Decl. ¶ 20.)

**D.    Youngblood Falsely Attacks Bishop Jakes's Son with a Made-For-Litigation Claim.**

On November 3, 2024, before Youngblood's second appearance on LRL, Bishop Jakes's son Jermaine sent a message to Youngblood after seeing an ad on social media for his LRL appearance. (J. Jakes Decl. ¶¶ 2-4.)  Jermaine sent the message to warn Youngblood about getting involved with Larry Reid, who Jermaine knew to be a destructive person. (J. Jakes Decl. ¶ 4.) Tellingly, Youngblood responded to Jermaine's message that the concern was "noted," which Youngblood omitted from his filing with this Court. (J. Jakes Decl. ¶ 7.). Two days after Bishop Jakes filed this lawsuit, Youngblood then filed a complaint with the Pitcairn, PA police department against Jermaine.  (Blackburn Decl., Ex. T (ECF No. 35-24).)  Youngblood admitted to the intake officer that "his attorney" wanted the complaint "on file."  (*Id.*)

**E.    Youngblood Enlists Convicted Felons and Family Members to Submit Bogus Affidavits.**

To try and bolster his own lack of credibility, Youngblood enlisted seven people with no first-hand knowledge of the events at issue, who claim that Youngblood told them his story at various times since 1990. (ECF No. 35-5–35-10.) But each of their claims are flawed, including glaring inaccuracies, contradictions, and omissions.

- **Affiant Joshua Munoz** omitted from his affidavit that he was convicted of child sex abuse crimes, is a registered sex offender, and that Youngblood was in prison when he allegedly told Munoz about Bishop Jakes over "breakfast" (Pusch Decl. ¶ 21);
- **Affiant Landon Claybourne** is also a convicted felon who served 41 months for heroin distribution, but omitted that fact from his affidavit (Pusch Decl. ¶ 22);
- **Affiant LaShawn Youngblood**'s story about her husband telling her about Bishop Jakes "a few years" before "the spring of 2015" is directly contradicted by her and her husband's prior statements to the Court in 2014 and 2015 (Pusch Decl. ¶ 23);

`

- **<u>Affiant Jeffrey Gray</u>** did not work for Merrill Lynch in 1992, when he claims Youngblood told him about Bishop Jakes (Pusch Decl. ¶¶ 23);

- **<u>Affiant Daniel Spaulding</u>**'s story about Youngblood telling him about Bishop Jakes would have taken place right after Youngblood's arrest and first charges for sexually assaulting a minor he was counseling (Ex. 1 at 1);

- **<u>Affiant Richard Youngblood</u>**'s entire story—both his own tale and his brother sharing his—are belied by Richard's own history of vindictiveness against Bishop Jakes, including the facts that Richard began plotting against Bishop Jakes in 2008 when Bishop did not speak up for Duane at his first criminal sentencing hearing and that within the last 10 years, Richard has begged for a job and assistance, which Bishop Jakes rejected (Jakes Decl. ¶ 16; Pusch Decl. ¶ 24); and

- With regard to **<u>Youngblood's Psychological Impact Report</u>** (ECF No. 35-14), it conspicuously omits whether and when the "therapist" first met Youngblood or when he recounted his story (including whether they were after the filing of this lawsuit), and simply accepts as true Youngblood's (false) accusations about Bishop Jakes.

These affiant's testimony must be tested through cross-examination—these issues were all uncovered without the benefit of any discovery and are likely just the tip of the iceberg.

## II.    ARGUMENT

Youngblood's Motion (ECF No. 35) is both procedurally and substantively flawed because the anti-SLAPP statute does not apply and, even if it did, Bishop Jakes readily satisfies its standard.

## A.    <u>Statutory Issues Are Fatal to Defendant's Anti-SLAPP Motion.</u>

Youngblood's Motion does not invoke Federal Rule 12 or discuss the relevant considerations under its standard, because he knows he cannot meet it. Instead, he elected to file an anti-SLAPP Motion, relying on matters outside of the pleadings to contradict the complaint's well-pled factual allegations. The Motion relies on Pennsylvania's novel anti-SLAPP law, parts of which went into effect in July 2024. The law contains a "substantive" section, which requires the plaintiff to have a valid claim under various procedural standards, providing an "immunity" where (1) the plaintiff "fails to: (i) establish a prima facie case as to each essential element … or (ii) state a cause of action," or where (2) "[t]here is no genuine issue as to any material fact, and the [defendant] … is entitled to judgment as a matter of law." 42 Pa. C.S. § 8340.15. And a

`

"procedural" section creates a mechanism for enforcing those rights through the anti-SLAPP Motion. § 8340.16. Two issues are fatal to Defendant's Motion: (1) the procedural section has not yet gone into effect, and (2) state anti-SLAPP statutes, like this one, are fundamentally state procedural rules that do not apply in federal court. Because Youngblood cannot file a Pennsylvania anti-SLAPP Motion and has not provided any other basis for dismissal,[1] it must be denied.

### 1.      There Are No Anti-SLAPP Motions in Pennsylvania Yet.

While parts of the new Pennsylvania anti-SLAPP statute went into effect in July 2024, the provision creating the anti-SLAPP motion and related procedures, § 8340.16, is not yet in effect. *See* 2024 Pa. Legis. Serv. 72, § 7(1) ("§ 8340.16 shall take effect on the effective date specified in the notice under section 3(4)."); *see also id.* § 3(1)-(4) (requiring promulgation by the Pennsylvania Supreme Court and additional steps). In fact, the provision may never become effective because Section 8340.16 is essentially advisory—"'the Pennsylvania Constitution gives the state's supreme court exclusive power to establish rules of procedure for state courts' and [] 'the legislature . . . is Without power to control procedure.'" *In re 42 Pa. C. S. § 1703*, 394 A.2d 444, 448 (Pa. 1978) (quoting *Garrett v. Bamford*, 582 F.2d 810, 814 (3d Cir. 1978)). So, until the Pennsylvania Supreme Court acts to create anti-SLAPP motions, they do not exist in Pennsylvania.

### 2.      Pennsylvania's Anti-SLAPP Would Not Apply in Federal Court Anyway.

But even if Pennsylvania had an applicable law, "anti-SLAPP" statutes like this one do not apply in federal court under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) and *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010). Under those precedents, "when there is a valid and … applicable federal procedural rule … the Supremacy Clause requires that it be utilized, notwithstanding a state rule to the contrary." 19 Charles Wright

---

[1] *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016) (on "a Rule 12 (b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim").

`

& Arthur R. Miller, *Federal Practice and Procedure* § 4520 (3d ed. 2024). In this analysis, "[w]e must first determine whether [a federal rule] answers the question in dispute. If it does, it governs," so long as the rule is valid. *Shady Grove*, 559 U.S. at 398 (citation omitted).

Five federal circuit courts have held that state "anti-SLAPP" statutes conflict with valid Federal Rules of Civil Procedure and, therefore, cannot be applied in the federal forum. *See, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015); *La Liberte v. Reid*, 966 F.3d 79, 86-88 & n.1 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240, 244-49 (5th Cir. 2019); *Carbone v. CNN*, 910 F.3d 1345, 1349-57 (11th Cir. 2018); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659, 673 (10th Cir. 2018).[2] As these courts have explained, state "anti-SLAPP" laws "answer the same question[s] as" Federal Rules 8, 11, 12, and 56—but "require [a] plaintiff to make a showing that the Federal Rules do not require." *La Liberte*, 966 F.3d at 87.

In Pennsylvania, Section 8340.15(1)'s burden of persuasion conflicts with the Federal Rules. In federal court, it is Defendants—not Plaintiffs—who bear the burden of demonstrating that their Rule 12(b)(6) motion to dismiss should be granted. *Davis*, 824 F.3d at 349 (on "a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim"). But the anti-SLAPP assigns the burden of proof to the "[t]he party asserting the cause of action based on protected public expression" (i.e. the plaintiff), § 8340.15(1), thereby "'abrogat[ing]," the federal standard, *La Liberte*, 966 F.3d at 87.

Sections 8340.16(a), (d)(1), and (d)(4) conflict with Federal Rule 12(d) by permitting the Court to use a summary-judgment procedure to resolve factual disputes at the pleading stage. *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) ("[t]he proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment" and evidence cannot "be

---

[2] The First and Ninth Circuits disagree.

`

used in a motion to dismiss to decide disputed issues of material fact").

And Sections 8340.15 and 8340.18(a) together conflict with Federal Rules 11 and 12, because they answer the same question regarding awards of attorneys' fees: When are defendants entitled to attorneys' fees based on deficiencies in the pleadings and pre-suit investigation? Under Federal Rules 11 and 12, the answer is: only if plaintiff's claims were frivolous or presented for an improper purpose. Fed. R. Civ. P. 11(b). Pennsylvania's anti-SLAPP answers that same question differently: by imposing strict liability on an unsuccessful plaintiff. §§ 8340.16, 8340.18.

Sections 8340.16(e) and (f)(2) also conflict with Federal Rules 12(d) and 56(d)(2). The former stay all discovery pending resolution of the anti-SLAPP Motion, unless the party seeking discovery "shows that specific information: (A) is necessary to establish whether a party has satisfied or failed to satisfy a burden"; and "(B) is not reasonably available unless discovery is allowed." § 8340.16(f)(2)(i). However, federal law entitles the plaintiff to discovery before having the merits of their claims resolved against them. *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 330 (3d Cir. 2022) (under Rule 12(d) "'reasonable allowance must be made for the parties to obtain discovery … [o]therwise, weighing … factual assertions against the facts pleaded in the complaint would 'invite courts to consider facts and evidence that have not been tested in formal discovery'").

In sum, Rules 8, 11, 12, and 56 answer the same question as the anti-SLAPP statute. Accordingly, the Pennsylvania anti-SLAPP cannot apply in federal court unless those federal rules are invalid. *See Shady Grove*, 559 U.S. at 398-99. And every court considering the issue has affirmed their conformance with the Rules Enabling Act and their corresponding validity. *La Liberte*, 966 F.3d at 88 (citing *Carbone*, 910 F.3d at 1357; *Abbas*, 783 F.3d at 1336).

Moreover, while Section 8340.15 purports to provide an "immunity," rather than a procedure, that is not dispositive. "Whether a particular state rule of decision is 'substantive' under

`

*Erie* is a question of federal law…. Th[e] test looks not to the labels but to the content of state rules of decision." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013). As courts have found, calling something an "immunity" does not make it so—an immunity exempts a person from suit on grounds distinct from the claim. *See Los Lobos*, 885 F.3d at 672-73. An anti-SLAPP law "provides a movant the 'right' to have a trial court promptly review the merits of the case" but "if the merits of the case justify liability, a defendant will [still] be held liable notwithstanding the anti-SLAPP." *Id.* at 673. Because only "a successful defense wholly unrelated to the anti-SLAPP statute" will forestall liability; it is not an "immunity." *Id.* Accordingly, "[t]he proper course is to recognize the … anti-SLAPP statute as a procedural mechanism for vindicating existing rights and nothing more." *Id.*

With no other cited source of authority, the anti-SLAPP's inapplicability means that the Motion fails.

**B.     Regardless, this Lawsuit Is Not a SLAPP—It Is a Meritorious Claim.**

Youngblood offers little coherent guidance on what he believes the required anti-SLAPP showing to be, except to falsely claim that the law employs a "burden shifting" framework and that "[o]nce a defendant demonstrates that the action arises from protected expression, the burden shifts to the Plaintiff to establish a *probability* of prevailing on the merits of their claims (§ 8340.15(1))" (ECF No. 35 at 7, 15.) But Youngblood misrepresents the standard set by the Pennsylvania Legislature.  Neither the cited provision (§ 8340.15(1)) nor any other part of the law impose that framework or require that showing (§§ 8340.11-18). Even assuming that the statute applies (it does not) and that his statements qualify as "protected public expression," Bishop Jakes's lawsuit meets its requirements by a longshot.

**1.     No Matter the Standard, Bishop Jakes' Defamation *Per Se* Claim Stands.**

The Pennsylvania anti-SLAPP statute does not bar viable defamation claims, like those

`

arising from Youngblood's lies about Bishop Jakes. "A libel is a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession[.]" *Volomino v. Messenger Publ'g Co.*, 189 A.2d 873, 874-75 (Pa. 1963). Youngblood incorrectly claims that Bishop Jakes has failed to show falsehood, actual malice, and damages. None of those arguments are availing.

### (a)    Youngblood's Claims About Bishop Jakes Are False.

Between the October 28 and November 3, 2024 podcasts, Youngblood leveled the following false accusations against Bishop Jakes:

- That when Youngblood was in his late teens, Bishop Jakes cornered him, wrapped his arms around him, and tried to kiss him, in a way that Youngblood found threatening and predatory—in other words, sexual assault.

- Afterwards, Jakes called him and said "there's three things I need you to do. The first one is, when I come to Pittsburgh you're going to be the only person I sleep with. The second one is you can't sleep with anybody else because I don't want to give my wife anything. And thirdly, I will take care of you the rest of your life."

- And that "[t]here is so much more to me and Bishop Jakes and my family and Bishop Jakes and the ***absolute destructive sexual damage***."

(Compl. ¶¶ 52-53; Ex. 7 at 56:17-58:9, Ex. 8 at 27:20-29:24.) Youngblood's Motion (ECF No. 35) does not dispute the gist of his lies—"that Bishop Jakes groomed, sexually abused, sexually assaulted, and engaged in predatory conduct of a sexual nature." (Compl. ¶ 56.) None of this is true; it's a complete fabrication. (Jakes Decl. ¶¶ 2, 6-7, 13.)

While Bishop Jakes occasionally traveled from his home in West Virginia to Pittsburgh to preach in the mid-80s, none of the salient events Youngblood describes occurred—Bishop Jakes never tried to corner, grab, or kiss any teenagers during his trip, and he certainly did not call to proposition him for sex in exchange for financial support. (*Id.*; Compl. ¶¶ 32, 52.) Bishop Jakes' denials satisfy his burden on falsehood, even under the highest possible standard. *E.g., Burrill v. Nair*, 217 Cal.App.4th 357, 389 (2013) ("[plaintiff's] denial of these charges in her declaration

`

provides a sufficient prima facie showing that the accusations are false"); *Briganti v. Chow*, 42 Cal.App.5th 504, 509-10 (2019) (same). And while Youngblood offers countervailing declarations (with glaring omissions, contradictions, and inaccuracies), courts don't weigh credibility at the anti-SLAPP phase, even under the most robust anti-SLAPP laws. *E.g.*, § 8340.15(2) (precluding relief where any "genuine issue as to any material fact" exists); *Osborne v. Pleasanton Auto. Co., LP*, 106 Cal.App.5th 361, 382 (2024) ("[w]e do not weigh credibility, nor do we evaluate the weight of the evidence .... [i]nstead, we accept as true all evidence favorable to the plaintiff") (quotation marks omitted).

But if the Court **did** weigh credibility, it should not credit anything Youngblood—a known liar—says. As one judge found during a 2015 probation violation hearing: "[Youngblood] has lied and he has scammed and he has conned me from the day he stood in front of me" seven years earlier; "I have been misled. I have been deceived. I have been actually lied to" by Youngblood. (Ex. 3 at 6:13-15, 19:2-5.) At that same hearing, Youngblood testified about his own history of abuse, but he told the court that he'd been assaulted at the age of 12—in 1979—in a "penthouse" after he won a singing competition. (*Id.* at 8:11-9:3.) That incident bears no resemblance to any of the 2024 allegations he made on LRL. (Ex. 7 at 57:2-10.) And he stated that all incidents of abuse were "before [he] was 18 years of age." (*Id.* at 10:22-25.) Despite having an incentive to discuss all abuse he suffered to explain his own sex crimes and mitigate his sentence, he did not mention Bishop Jakes or anything resembling his new accusations. That is proof that his new accusations are lies, and that he and his affiants' statements lack credibility—in addition to other reasons to doubt them. (*See* Pusch Decl. ¶¶ 21-25.) Youngblood is simply not credible.

Further undermining Youngblood's claims, is the reality that in the mid-1980's, Bishop Jakes wasn't a wealthy globe-trotting preacher who could support Youngblood "for life" in

`

exchange for sexual favors whenever he came to Pittsburgh; nor was his "stock [] rising" such that he "would have had sex with anybody at that time." (Compl. ¶¶ 25, 27.) Rather, throughout the 1980s, Jakes lived in crushing poverty, having only become a full-time preacher in 1982 after losing his job at a chemical plant, which closed. (Jakes Decl. ¶ 5.) He only began to experience modest success—at the absolute earliest—in 1992. (*Id.* ¶ 7.) Far from being able to support Youngblood, in 1986 Bishop Jakes was a humble rust-belt preacher who could barely afford to maintain a store-front church in rural West Virginia. (*Id.* ¶¶ 4-7.) The tales are *ex post facto* inventions, full of anachronisms that reflect Bishop Jakes' post-1993 success, rather than the reality of the mid-1980s.

### (b)    Youngblood's Claims Were Made with Actual Malice.

The circumstances of this case vividly demonstrate that Youngblood ***knew*** he was lying about Bishop Jakes but did so for money, fame, and even revenge.

The actual malice inquiry—a creature of the First Amendment—asks whether the defendant published a false statement with knowledge that it was false or with reckless disregard for the truth. *Herbert v. Lando*, 441 U.S. 153, 156 (1979).[3] Although the defendant's state of mind is the focus, "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself" because defamation defendants "are prone to assert their good-faith belief in the truth of their publications[.]" *Herbert*, 441 U.S. at 170; *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Therefore, courts are "guided by circumstantial evidence"; "[b]y examining the [publisher's] actions we try to understand their motives." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997). In this inquiry, "all the relevant circumstances surrounding

---

[3] While actual malice is proved by clear and convincing evidence at trial, that does not apply to the anti-SLAPP phase, even under California's higher "probability" requirement. *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016).

`

the transaction may be shown." *Herbert*, 441 U.S. at 164 n.12; *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. 1995) ("Any competent evidence can be used to establish actual malice."). And while "no [single] piece of evidence … will support a verdict," that "does not mean that together all the evidence may not be clear and convincing. Pieces to a jigsaw puzzle sometimes appear nothing more than scattered fragments, but when placed together in proper fashion they create a clear picture." *Tavoulareas v. Piro*, 763 F.2d 1472, 1478 (D.C. Cir. 1985) (Scalia, J., concurring).

Here, the evidence of malice paints a compelling picture. In August of 2024, Youngblood completed a nine-year prison sentence and needed to build a new life. (Ex. 4; Ex. 12 at 1-6.) To that end, Youngblood initiated a plan to transform himself from a sex offender into an inspiration, even enlisting a publicist to help. (Ex. 12 at 5.) By October, he joined forces with wannabe spiritual leader Larry Reid—who regularly books guests to attack Bishop Jakes on LRL.  (Compl.¶ 20; J. Jakes Decl. ¶ 3.) Working with Reid, Youngblood told his new story that Bishop Jakes played a part in his abuse. (Ex. 7 at 57:2-10.) The story was a goldmine for Youngblood—allowing him to appear on Reid's show, garnering attention for his business, and recasting him as the victim, rather than the minors he abused during counseling sessions. (*Id.*; Ex. 12 at 4-5; Compl. ¶ 45); *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 665 n.6, 668 (1989) (court correctly considered newspaper's profit motive in actual malice analysis). And just a few weeks later, he dispatched a lawyer to demand $6 million from Bishop Jakes or else he would sue for unspecified tort claims arising from the tale. (Ex. 26 at 1; Compl. ¶¶ 38-44).

Youngblood's fabrications also furthered his brother Richard's vendetta against Bishop Jakes, which began in 2008 shortly after Duane Youngblood pled guilty to child molestation. (Ex. 1; Ex. 20.) According to an acquaintance of Richard's, "Richard mentioned that Jakes has known his family so long and that a man of his caliber could have easily spoken up in defense for Dwayne

`

and maybe aided for his case." (Ex. 20 at 1.) "He wanted Bishop to know how it felt to be falsely accused of the same thing his brother was …. Richard was determined to get retribution for his family and the pain of such allegation has cause him." (*Id.*); *see also Herbert*, 441 U.S. at 164 n.12 (1979) (ill will is circumstantial evidence of actual malice); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (same). After Duane's guilty plea, Richard made his accusations.

To effectuate those goals, Youngblood fabricated a story about Bishop Jakes that sounded compelling but was false. (Compl. ¶¶ 32, 45; Jakes Decl. ¶¶ 2, 6-7, 13); *St. Amant*, 390 U.S. at 732 (fabrication is proof of actual malice). Because Youngblood claims to have personally witnessed conduct that never occurred, the lies about Jakes were necessarily made with actual malice. *See Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1221-22 (D. Kan. 2016) ("[i]f defendant knew that the events were false, and nonetheless wrote the detailed narrative describing exactly how plaintiff sexually assaulted … her when it actually never occurred, it is axiomatic that she wrote the narrative with actual malice, or actual knowledge that it was false"); *Ruth v. Carter*, 560 P.3d 659, *3 (Nev. 2024) (table) ("[plaintiff's] evidence, if believed, establishes that [he] did not sexually assault [defendant] following the Backstreet Boys concert in 2001, such that [her] statements describing such an incident would perforce be made with knowledge of their falsity"); *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1291 (Colo. App. 2022) ("when faced with similar competing narratives, courts … have routinely held that a plaintiff's allegations that the defendant made false accusations are sufficient to create a factual issue as to actual malice"); 1 Rodney A. Smolla, *Law of Defamation* § 3:45.50 (2d ed.) (treatise chapter on "actual malice and fabricated 'first—hand' allegations of wrongdoing" explaining that "[s]uch deliberate fabrications, if proven, should in almost all circumstances automatically satisfy the actual malice standard").

In reply, Youngblood may suggest that a "he-said, he-said" type dispute is insufficient

`

evidence to show actual malice, but he would be wrong. "This case is not a defamation case against a publisher or a journalist investigating events about third parties. Rather, the Complaint here alleges that Defendant [] knew [the] … post was false when she published it because the events [] recounted never took place," which suffices to show malice. *Ratner v. Kohler*, No. 17-cv-00542, 2018 WL 1055528, at *8-9 (D. Haw. Feb. 26, 2018); *Chastain v. Hodgdon*, No. 16-cv-2087, 2016 WL 5109944, at *1–2 (D. Kan. Sept. 20, 2016) (denying reconsideration).

Accordingly, given Youngblood's substantial motive to make up stories about Bishop Jakes and his total fabrication of the events described, Plaintiff can readily shoulder his burden.

### (c)    Bishop Jakes Has Made the Required "Damages" Showing in this Defamation *Per Se* Case.

Because Bishop Jakes has made a showing of actual malice and brought a claim for defamation *per se*, no additional showing of damages is required. As in other states, Pennsylvania considers an accusation to be defamatory "per se" when it is "obviously defamatory," such as when "it imputes '(1) [a] criminal offense, (2) [a] loathsome disease, (3) business misconduct, or (4) serious sexual misconduct.'" *Ralston v. Garabedian*, 623 F. Supp. 3d 544, 576 & nn.351-352 (E.D. Pa. 2022). This includes accusations of sexual abuse, like those leveled at Bishop Jakes. *Id.* Such accusations obviously harm the accused, so damages are presumed—obviating the need to prove them as an element to the claim. *See Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 368 (E.D. Pa. 2003) ("'Presumed' damages are those that are expected to result from defamation; they require no proof, but instead, as reflected in their name, are presumed.").

The case Youngblood cites (ECF No. 35 at 17) does not abrogate this doctrine. Rather, under *Joseph* "when private figure plaintiffs ***establish liability based on negligence***, recovery is restricted to compensation for actual injury, thus eliminating the specters of presumed and punitive damages in this regard." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 428-29 & n.10 (Pa. 2015)

`

(emphasis added); *Menkowitz v. Peerless Publ'ns, Inc.*, 211 A.3d 797, 806 (Pa. 2019) ("where the alleged defamation is published ***negligently***, a private figure must establish … that the falsehood caused an actual injury") (emphasis added). As *Joseph* explains, the "actual damages" requirement serves as an additional protection against large presumed damages awards that, if awarded for merely negligent errors, could chill free expression. *Joseph*, 129 A.3d at 428, 431-32.

By contrast, presumed damages ***can*** be collected when a plaintiff alleging defamation *per se* shows actual malice. *See id.* at 432 (plaintiffs "recover presumed and punitive damages upon their satisfaction of the New York Times actual malice test"); *Blossoms & Blooms, Inc. v. Doe*, No. 22-cv-1557, 2022 WL 3030788, at *5 (E.D. Pa. July 29, 2022) ("'where the defendant acts with 'actual malice,' the plaintiff need not show 'actual harm'") (citation omitted); *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 188 n.2 (3d Cir.1999) ("Under Pennsylvania law, where a defendant acts with actual malice, there is no need to prove actual damages.") (collecting cases). Accordingly, actual damages are not required here; instead, the presumption of damages applies.[4]

### 2.    The Conspiracy Claims Withstand Scrutiny Too.

Civil conspiracy is a derivative claim that requires an actionable tort.  *See, e.g.*, *Synthes (USA) v. Globus Med., Inc.*, No. 04-cv-1235, 2005 U.S. Dist. LEXIS 19962, at *28 (E.D. Pa. 2005). For the reasons above, Bishop Jakes clearly established a defamation *per se* claim. (*See* Section 1, *supra*.) Thus, the question becomes whether a conspiracy took place to commit defamation.

A civil conspiracy requires: (1) a combination of two or more persons acting with a

---

[4] And while Youngblood mentions the libel-proof plaintiff doctrine, which only a handful of jurisdictions recognize as a bar to recovery, Pennsylvania state courts have not yet recognized it. But this case comes nowhere close to meeting its extraordinarily high standard. For example, in *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1078-79 (3d Cir. 1985), an attorney who had been repeatedly indicted for drug trafficking was not libel-proof as a matter of law, even where his indictments had been widely reported in reputable publications. *Id.* Obviously, scuttlebutt about Bishops Jakes from the darkest corners of the internet—which is all Youngblood offers—does not meet this high standard (in fact, only Youngblood would).

`

common purpose to do an unlawful act or to do a lawful act by unlawful means for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *See, e.g., Grane Healthcare Co.v. Maxim Healthcare Servs.*, No. 2:23-cv-01199-RJC, 2024 U.S. Dist. LEXIS 140026, at *18 (W.D. Pa. Aug. 7, 2024).  Bishop Jakes easily meets this standard.

*First*, Youngblood and at least the YouTuber acted jointly to develop and launch the October 28 show that specifically aimed a public attack on Bishop Jakes that falsely claimed he tried to groom and sexually abuse Youngblood.  (Compl. ¶ 23; Ex. 7 at 6:6-19, 55:9-25.)

*Second*, the YouTuber, in joint action with Youngblood, buttressed the false claims by stating that Bishop Jakes had "fixers" call to stop LRL from airing more episodes about Youngblood's story, and that those efforts validated Youngblood's claims. (Compl. ¶ 67; Ex. 8 at 36:7-13.)  This is key because the YouTuber was no mere interviewer: he added to the fabric of the story above and beyond what Youngblood himself described. (*E.g.*, Ex. 8 at 25:9-12, 29:19-25, 35:18-36:6; Ex. 7 at 61:14-62:8l.) By adopting the statements, the YouTuber demonstrated an overt act to further the common plan, an attempt to give more truth to Youngblood's false claim.

*Third*, the YouTuber and Youngblood acted in concert to **further** the common purpose by launching the **second show**.  The November 3 show speaks for itself: the sole purpose of it was to build on and refine the false claims from the October 28 show and ensure injury to Bishop Jakes. (Ex. 8.) In particular, Youngblood attempted to more clearly target his false claim of sexual assault by stating that Plaintiff "restrained him and forcibly kissed him" as opposed to his initial claim that they embraced at the end of an hours long, wide-ranging conversation about faith and life and parents.  (Compl. ¶ 69; Ex. 8 at 28:4-29:24.)  Further, the YouTuber specifically asks questions to illicit the particular information from Youngblood about the assault, and then proceeds to summarize and repeat those facts in order to guarantee the audience understands Youngblood's

`

sexual assault accusations as such, and that Bishop Jakes is therefore responsible for Youngblood himself becoming an abuser.  (Ex. 8 at 28:4-29:24.)

*Finally*, the primary objective for the scheme was to get money from Bishop Jakes and to harm his reputation. (*See* Compl. ¶ 38-40.) The YouTuber was fully aware of Youngblood's demand letter, and admitted as much on an episode of his show that aired the very night the complaint in this case was filed (on November 25, 2024), as evidence in the record of this case shows.  (*See* November 25, 2024 LRL Tr. at 9:6-17 (ECF No. 14-7).)

**C.**  **Public Policy Does Not Favor Letting Fraudsters Lie and Exploit Others.**

Youngblood claims that the Court should dismiss this lawsuit on public policy alone, which is not allowed. *See Merritts v. Richards*, 62 F.4th 764, 773 (3d Cir. 2023) (even when compelling public policies exist, federal courts have a "'virtually unflagging obligation … to exercise the jurisdiction given'"). And while courts protect legitimate victims, they also "acknowledge the potential for false accusations [of sexual abuse] and the right that someone who is falsely accused has to recover for the harm thereby caused," which can be devastating. *L.S.S.*, 523 P.3d at 1291. Those countervailing interests overcome any invoked by Youngblood. *Id.*

**D.**  **Defendants' Request for Permission to Join Additional Claims.**

The closing request for "leave" to file a "Cross-Complaint" against Bishop Jakes and his son Jermaine, a non-party, is procedurally improper. Youngblood cannot bring a cross claim against anyone (other than the Does) because a cross-claim is one brought against a "coparty." 27A Tracy Bateman et al., *Federal Procedure, Lawyers Edition* § 62:240 (2024) (under Rule 13(g) "cross-claims are to be asserted against parties having like status, such as codefendants").

While the federal rules allow for counterclaims sometimes, Youngblood's description of events alleges ***no*** conduct by Bishop Jakes, only his son. (ECF No. 35 at 20-21.) That's because Bishop Jakes had nothing to do with it, and Youngblood has no basis to say he did. (J. Jakes Decl.

`

¶¶ 1-7.) And counterclaims are subject to Rule 11 and Rule 12's requirements, just like other pleadings. 6 Federal Practice and Procedure, § 1407.

Moreover, Youngblood cannot counterclaim against Bishop Jakes' son, who is a non-party, because "Rule 13 does not authorize assertion of counterclaims against strangers to the litigation." *Federal Procedure, Lawyers Edition* § 62:202. Moreover, there is no personal jurisdiction over Jermaine Jakes because, as a Texas resident who sent a single social media message, he lacks the requisite connection to Pennsylvania. (J. Jakes Decl. ¶ 1); *LCV Cap. Mgmt., LLC v. Nuova Argo Finanziaria S.p.A.*, No. 18-cv-01645, 2021 WL 716728, at *9 (W.D. Pa. Feb. 24, 2021) ("our Court of Appeals has concluded time and again that … emails, similar electronic communication" "even if initiated by the defendant and directed to the plaintiff in the forum State, are not enough for … personal jurisdiction"). So, any effort to add him would be frivolous—indeed, defense counsel has been admonished for making frivolous jurisdictional claims in the past. *Zunzurovski v. Fisher*, No. 23-cv-1088, 2024 WL 1434076, at *2-5 (S.D.N.Y. Apr. 3, 2024).

Finally, to the extent some procedure exists by which Youngblood could assert his proposed claims, he cannot request the Court's permission in his motion to dismiss, which cites no cognizable source of authority for the request, nor any analysis of the factors to be considered. *See* Fed. R. Civ. P. 7(b)(1)(B)-(C) ("The motion must … state with particularity the grounds for seeking the order; and [] state the relief sought.").

### III.    CONCLUSION

Accordingly, the Defendants' anti-SLAPP Motion should be denied.

`

DATED: February 14, 2025

Respectfully Submitted,

By: /s/ Devin J. Chwastyk
Devin J. Chwastyk
McNees Wallace & Nurick LLC
100 Pine Street, P.O. Boc 1166
Harrisburg, PA 17108
(717) 232-8000
dchwastyk@mcneeslaw.com

By: /s/ Dustin A. Pusch
Dustin A. Pusch (admitted Pro Hac Vice)
Meier Watkins Phillips Pusch LLP
919 18th Street NW, Suite 650
Washington, DC 20006
dustin.pusch@mwpp.com

By: /s/ Derrelle M. Janey
Derrelle M. Janey (admitted Pro Hac Vice)
The Janey Law Firm P.C.
111 Broadway, Suite 701
New York, NY 10006
(646) 289-5276
djaney@thejaneylawfirm.com

*Counsel for Plaintiff Bishop T.D. Jakes*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

Date:  February 14, 2025                    By */s/ Devin J. Chwastyk*
                                           Devin J. Chwastyk
                                           Pa. Bar I.D. No. 91852
                                           Lauren Anthony
                                           Pa. Bar I.D. No. 324557
                                           **McNEES WALLACE & NURICK LLC**
                                           100 Pine Street | P. O. Box 1166
                                           Harrisburg, PA  17108-1166
                                           (717) 232-8000
                                           dchwastyk@mcneeslaw.com
                                           lanthony@mcneeslaw.com

                                           *Counsel for Plaintiff Bishop T.D. Jakes*

                                           Derrelle Janey (*Pro Hac Vice* forthcoming)
                                           **The Janey Law Firm P.C.**
                                           111 Broadway, Suite 701
                                           New York, New York 10006
                                           djaney@thejaneylawfirm.com

                                           *Counsel for Plaintiff Bishop T.D. Jakes*

                                           Dustin A. Pusch (*Pro Hac Vice* forthcoming)
                                           **MEIER WATKINS PHILLIPS PUSCH LLP**
                                           919 18th Street NW, Suite 650
                                           Washington, DC 20006
                                           dustin.pusch@mwpp.com

                                           *Counsel for Plaintiff Bishop T.D. Jakes*