Exhibit K – Sworn Affidavit of Duane Youngblood
(Defendant's own testimony detailing his personal experiences,
the retaliatory nature of the lawsuit, and his history of trauma and rehabilitation)

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Thomas Dexter Jakes<br>                    Plaintiff<br><br>~against~<br><br>Duane Youngblood, et al.<br><br>                    Defendant | Civil Action No. **2:24-CV-1608-WSS**<br><br>**Sworn Affidavit of<br>Duane Youngblood** |

    I, Duane Youngblood, declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge and belief. I understand that any false statement made herein may subject me to criminal penalties.

1. I want to begin by addressing my criminal history. I took plea deals in two of my cases and pleaded guilty in one. At that time, I was not emotionally or psychologically present. In 2006, I was arrested, and in 2008, I accepted a plea deal without confronting the issues inside me. I returned to pastoring and tried to push through the situation without addressing my pain. I failed to meet the requirements of my plea deal, violating it and leading to another arrest in July 2014. Two days before my trial, I read the victim's statement and realized how wrong it would be to discredit him. On the morning of the trial, I changed my plea to guilty, and the judge sentenced me. Because I was on probation, I had to face my original judge for a violation hearing.

2. While on probation, I attempted to start a church in Cleveland, Ohio, which required weekly travel. I had a paralegal prepare travel plans, but although we adjusted hotel bookings regularly, I failed to report those changes to the court. This caused my travel to be restricted. My drive to please others and be accepted caused me to neglect the requirements that could have kept me from further violations.

3. At my probation violation hearing, my attorney warned that the judge would be harsh because I had violated a generous 2008 deal. The judge sentenced me to five to ten years in prison, removing my previous street time. I was incarcerated at Camp Hill Prison and then Forest Prison until my release in May 2020. Yet, even with my release, I had not

addressed the deep-seated issues driving my behavior. I no longer pastored but tried various business ventures while still avoiding the core issues within me.

4. While on parole from 2020, I had violations that sent me back to prison for periods of three to nine months. In July 2021, I began seeing a therapist at the Persad Center to confront my struggles with sexual identity and behavior. Along with my state-mandated therapist, we explored the trauma I had experienced in childhood and adulthood. I began to heal and understand myself more deeply. In June 2022, my father passed away. I managed his care from my release in 2020 until his death, providing daily assistance. Though he had once expressed a willingness to address our family's painful past, his declining health prevented that conversation. When he passed, I mourned not only his life but also the chance for closure.

5. Shortly after his passing, I violated parole by withholding important personal information from my therapist. My shame led me to refuse to share this information again in October 2023, resulting in another violation. However, in August 2023, I began working with a new therapist, whose approach opened my eyes to my entire life's experiences. When I returned to prison for my October violation, I continued therapy through letters and bi-weekly sessions. During this time, I also read *It Didn't Start With You* by Mark Wolynn, which helped me understand how trauma shaped my life. My therapist recognized that my initial diagnosis, through Persad, of adjustment disorder with anxiety was incomplete and diagnosed me with PTSD. This new understanding helped me connect my behavior patterns with the trauma I had endured.

6. Upon my release in August 2024, I was assigned a more experienced state therapist who encouraged me to view my entire life's journey, not just my criminal behavior. For the first time, I felt truly heard. These two therapists helped me confront my past, forgive my father, and see humanity's flaws with compassion. Between August 2023 and today, I have spent countless hours processing my experiences and their effects on myself and others.

7. In September 2024, I felt at peace with the progress I had made. I shared my reflections with family and friends, seeing humanity more clearly. This newfound clarity gave me the courage to share my life story. I had previously spoken to Larry Reid during my incarceration about telling my story. By October 2024, after deep self-examination and on my therapist's advice, I agreed to share my journey publicly. My therapist assured me that

2

sharing my story would help both me and others. In alignment with the principles of the Twelve Steps, I sought to make a moral inventory and admit the nature of my wrongs. With this heart, I appeared on Larry Reid's platform.

8. During my over two-hour interview with Larry Reid, I discussed my life from age 9 to 57. The interview was not about Bishop T.D. Jakes or any one person—it was about my life journey. I addressed my abusive behavior first, knowing it would deeply impact many. However, I believed that sharing my entire story—the big picture—was necessary for my healing and for helping others avoid my mistakes. I spoke at length about my father abusing my younger sister and me hearing it from ages 9 to 14 most Tuesdays through Fridays. When I spoke about Bishop Jakes, I was recounting my experiences, not blaming him for my criminal actions. My story covered how the trauma from ages 9 to 19 shaped my self-perception and drove me to live for others' approval rather than my authenticity.

9. My account of my interaction with Bishop Jakes was not about violence but about a moment that deeply affected me. I never accused him of violence. I simply shared that, after a powerful meeting in or about 1986, he pulled me close and attempted to kiss me on the lips. The next day, he called and made inappropriate offers, that I have never forgotten, to make me the only person he would have sex with when he came to Pittsburgh, that I could only have sex with him because he didn't want to give his wife anything, and that he would take care of me the rest of my life. I don't know why he did what he did nor said what he said. That was not the reason for my interview, that is his story to tell. These memories, about him, are nearly 40 years old but remain vivid because they mark the end of my belief that someone could help me heal.

10. In or around 1993 or 1994, Bishop Sherman Watkins, who was the Head of the organization Bishop Jakes, and I were in, attempted to mediate a reconciliation, leading to Bishop Jakes speaking at my church. After the service, in his hotel room, I directly asked him why he had acted that way toward me. His response was, "My stock was rising, and I would have had sex with anyone." That statement has stayed with me for decades. I remained distant from him throughout my time in our organization, which lasted unto I left in 2005.

11. I did not do the interview for the brief segment about Bishop Jakes but to share my life's journey of over 45 years. I did not seek to extort money or cause harm. I wanted to share my story to help others and to continue my own healing.

3

12. Jermaine's claim that he tried to warn me about Larry Reid without seeing my interview is false. Jermaine blocked me before I could even respond to his message. I sought legal counsel only after these events because I feared retaliation. Attorney Tyrone Blackburn reached out on November 1, 2024, with encouragement, sharing his survivor experience. I later, On November 11, 2024, asked if I could talk to him as I felt he was a God send and only then retained him, and he has been a source of support and professionalism.

13. The Plaintiff is trying to use my criminal history to discredit my story, suggesting that my past mistakes mean I can't tell the truth about what happened to me. This is a distraction meant to smear my character and twist public opinion. A criminal record does not take away someone's right to be heard or to share their experience as a victim.

14. Since my release from prison, I have worked hard to rebuild my life. I launched a website, wrote a book, and started a life-coaching business. These efforts have nothing to do with my claims against Plaintiff Jakes. They are a part of my commitment to redemption, accountability, and service to others. It is unfair and wrong to twist my efforts into an extortion scheme when they are simply the work of a man determined to turn his life around and help others learn from his mistakes.

15. As for the legal notice from my attorney, Tyrone Blackburn, it was a standard good-faith effort to resolve a dispute before going to court. I was told this is a common legal practice and should not be called extortion.

16. The Pennsylvania anti-SLAPP law exists to protect people from being silenced by baseless lawsuits meant to stop free speech. I have every right to defend myself publicly and legally against these false accusations.

17. Also, the claim that I "enlisted felons and family members to submit flawed affidavits" is a lie meant to attack my credibility. The people who have supported me did so willingly, offering sworn statements based on their own experiences and knowledge.

18. Finally, in Nashville, TN Bishop Jakes called me out in a church service at our Organizational annual conference. He said that the people I was with did not who I was and that I did not know who I was. That was spoken around 2003 or 2004 and today I am glad to say I do know who I am. This lawsuit has made four things clear to me:
    a. <u>Personal Growth and Accountability</u>: I have done the hard work to become the man I am today. I changed my focus because I no longer wanted to mislead others. I have

4

    fully acknowledged my wrongdoings and am working to rebuild the relationships that truly matter.

    b. <u>Bishop Jakes' Lack of Accountability</u>: Despite his position, Bishop Jakes has not done the personal work I have to confront his actions and their impact.

    c. <u>True Victory Is Inner Peace</u>: My victory is not about winning this lawsuit. It is knowing that I sleep peacefully at night, free from the burden of hiding my truth because I have shared my story openly and honestly.

    d. <u>The Law of Seedtime and Harvest</u>: I know from experience that every man will reap what he sows. I have faced this truth in my life, and no matter what Bishop Jakes says about me, he will face it in his life as well.

19. I share this statement with a heart free from hatred or malice. I did not mention Bishop Jakes to destroy him or demand millions. I did not mention Bishop Watkins to destroy him. I did not mention Bishop Quander Wilson to destroy his memory. I did not mention my father to destroy his memory, I only wanted the freedom to tell my story—all of it—to help others and myself. I fully own my wrongs and believe it is now my time to sow good seeds from all I have experienced.

20. I reject the attempt to frame my story as extortion or deception. I stand by my account, which comes from my life's experiences and pain. My criminal history does not invalidate my truth. I will not be silenced. This is my story, and I have the right to share it.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 2/21/2025

                                                                                *Duane Youngblood (Feb 21, 2025 22:19 EST)*

                                                                                             Duane Youngblood