**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS DEXTER JAKES,

                *Plaintiff*,

    v.

DUANE YOUNGBLOOD,
JOHN DOE 1,
JOHN DOE 2,
JOHN DOE 3,
JOHN DOE 4,
JOHN DOE 5,
JOHN DOE 6,
JOHN DOE 7,
JOHN DOE 8,
JOHN DOE 9, and
JOHN DOE 10,

                *Defendants*.

No. 2:24-CV-1608-WSS

**PLAINTIFF'S OPPOSITION TO DEFENDANT YOUNGBLOOD'S MOTION TO DISMISS PURSUANT TO FRCP RULE 12(B)(6)**

# <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................................ i

Table of Authorities ........................................................................................................... ii

Introduction ........................................................................................................................ 1

   I.     Relevant Facts ................................................................................................ 2

       A.     The Complaint's Well-Pleaded Factual Allegations ......................... 2

       B.     The Procedural Background of This Case. ......................................... 4

   II.    Legal Standard ............................................................................................... 4

   III.   Argument ........................................................................................................ 5

       A.     The Complaint Alleges a Libel *Per Se* Claim .................................. 5

            1.     The Complaint pleads Youngblood's defamatory statements verbatim—quoting them at length—in addition to explaining their defamatory import. ....................................................... 5

            2.     The Complaint alleges that the events Youngblood describes never occurred—he made them up. .......................................... 8

            3.     The Complaint alleges facts suggesting that Youngblood knew his story was false at the time he gave the interview. ............... 9

            4.     The Complaint alleges that Youngblood published statements about Bishop Jakes, that they travelled widely, and that they inflicted grievous harm. .................................................................. 12

                 (a)   *The Complaint alleges widespread publication* .................. 12

                 (b)   *Because this is a case of defamation per se, the law recognizes the allegations' defamatory meaning and reputational harm is presumed.* ........................................... 13

       B.     Plaintiff's Civil Conspiracy Claim Undoubtedly Survives Rule 12(b)(6) Scrutiny. ..................................................................................... 16

            1.     The tort underlying the conspiracy claim is defamation. .................. 16

            2.     The Complaint pleads clearly that Youngblood and his other co-conspirators agreed to launch a defamation campaign to attack Bishop Jakes. ...................................................................................... 17

            3.     The Complaint alleges that Youngblood and his co-conspirators were motivated to destroy Bishop Jakes's reputation. ............................. 19

            4.     The Complaint does not "group plead"—nor is that an actual element of conspiracy under Pennsylvania law. ..................................... 20

   CONCLUSION .................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................... 4, 8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................. 4, 5, 8

*Blackwell v. Eskin,*
    916 A.2d 1123 (Pa. Super. Ct. 2007)................................................ 8, 16, 17, 19

*Chastain v. Hodgdon,*
    202 F. Supp. 3d 1216 (D. Kan. 2016) ..................................................... 11

*Chastain v. Hodgdon,*
    No. 16-cv-2087, 2016 WL 5109944 (D. Kan. Sept. 20, 2016)................................. 12

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016) .................................................................. 4

*Doe v. Princeton Univ.,*
    30 F.4th 335 (3d Cir. 2022) ................................................................ 4, 5

*Eastwood v. Nat'l Enquirer, Inc.,*
    123 F.3d 1249 (9th Cir. 1997) .............................................................. 9

*Eramo v. Rolling Stone, LLC,*
    209 F. Supp. 3d 862 (W.D. Va. 2016) ..................................................... 10

*Franklin Prescriptions, Inc. v. N.Y. Times Co.,*
    267 F. Supp. 2d 425 (E.D. Pa. 2003) ............................................ 7, 8, 14, 15, 17, 20

*Freeman v. Town of Hudson,*
    714 F.3d 29 (1st Cir. 2013)................................................................. 19

*Gee v. Pacheco,*
    627 F.3d 1178 (10th Cir. 2010) ........................................................... 19

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323(1974).......................................................................... 5

*Grane Healthcare Co. v. Maxim Healthcare Servs.,*
    No. 2:23-cv-01199-RJC, 2024 WL 3691612 (W.D. Pa. Aug. 7, 2024) ................... 16

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657 (1989)...................................................................... 10, 11

*Herbert v. Lando*,
    441 U.S. 153 (1979) ............................................................................................ 9, 10

*Hill v. Cosby*,
    665 F. App'x 169 (3d Cir. 2016) ....................................................................... 15, 17

*Isiminger v. Davis*,
    No. 1351 WDA 2014, 2015 WL 7287954 (Pa. Super. Ct. Apr. 6, 2015) ......... 15, 16

*Joseph v. Scranton Times L.P.*,
    129 A.3d 404 (Pa. 2015 ................................................................................... 14, 15

*L.S.S. v. S.A.P.*,
    523 P.3d 1280 (Colo. App. 2022) .......................................................................... 11

*Lacey v. State Farm Gen. Ins. Co.*,
    No. 24-cv-05205, 2025 WL 1363069 (C.D. Cal. May 6, 2025) .............................. 1

*Menkowitz v. Peerless Publ'ns, Inc.*,
    211 A.3d 797 (Pa. 2019) ........................................................................................ 15

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................................. 5

*Ralston v. Garabedian*,
    623 F. Supp. 3d 544 (E.D. Pa. 2022) ..................................................................... 14

*Ramunno v. Cawley*,
    705 A.2d 1029 (Del. 1998) ....................................................................................... 8

*Ratner v. Kohler*,
    No. 17-cv-00542, 2018 WL 1055528 (D. Hawaii Feb. 26, 2018) ........................... 12

*Romano v. Young*,
    No. 07-cv-1708, 2011 WL 346558 (E.D. Pa. Feb. 2, 2011) .................................... 17

*Ruth v. Carter*,
    560 P.3d 659 (Nev. 2024) ...................................................................................... 11

*Saxena v. Martinez-Hernandez*,
    No. 22-cv-2126, 2025 WL 1194003 (D. Nev. April 23, 2025) ................................. 2

*Schiavone Constr. Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988) ...................................................................... 9, 10, 12

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004) ..................................................................................... 19

*Sprague v. Am. Bar Ass'n*,
  276 F. Supp. 2d 365 (E.D. Pa. 2003) ................................................................ 14

*Sprague v. Walter*,
  656 A.2d 890 (Pa. Super. 1995) ........................................................................ 10

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ....................................................................................... 9, 11

*Tavoulareas v. Piro*,
  763 F.2d 1472 (D.C. Cir. 1985) ........................................................................ 10

*United States v. Hayes*,
  763 F.Supp.3d 1054 (E.D. Cal. 2025) ................................................................. 2

*Volomino v. Messenger Publ'g Co.*,
  189 A.2d 873 (Pa. 1963) ..................................................................................... 5

*Wurth Baer Supply Co. v. Strouse*,
  627 F. Supp. 3d 422 (M.D. Pa. 2022) ................................................................ 20

**Statutes**

42 Pa. Cons. Stat. § 8343 ...................................................................................... 15

**Other Authorities**

1 Rodney A. Smolla, *Law of Defamation* § 3:45.50 (2d ed.) ................................ 11

1 Steven S. Gensler, *Federal Rules of Civil Procedure,
  Rules and Commentary* Rule 12 (2024) ............................................................ 19

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 4

Rule 12(b)(6) .................................................................................................. 1, 4, 9

## INTRODUCTION

Defendant Duane Youngblood's Motion to Dismiss under Rule 12(b)(6) (ECF 43) ("Motion") should be denied for many reasons. First among them: ***most of the authority cited in his brief is made up***. In support of the Motion, Youngblood ***fabricates quotes from at least eight cases***, as well as many other holdings. (*See* Declaration of Dustin Pusch ¶¶ 8-18 ("Pusch Decl.").)

***The counterfeit caselaw included this Court's own April 25, 2025 Memorandum Opinion***—with Youngblood's brief making false claims about its content in four separate sections. (*Id.* at ¶¶ 19-23.) Those sections invent remarks sharply critical of the Complaint and attribute them to this Court, which would strongly support his Motion—if only they were real. (*See* MTD at 3-4, 6-7, 13, 18.) But what this Court in fact declared was that it would not consider the sufficiency of the pleadings where the issue hadn't been properly briefed.[1]

The misrepresentations in Youngblood's Motion go much further: he grossly misrepresents most of the cited cases (including all but one case in his conspiracy argument, which are not conspiracy cases at all) and claims that the Complaint does not include factual allegations that it plainly does (for example, pleading the specific words Youngblood used in his defamatory statements), and so much more. Attached is a declaration from Bishop Jakes's counsel denoting in detail the serious issues identified within Youngblood's Motion. (*See* Pusch Decl.).)

In reality, the Complaint more than adequately pleads each and every necessary element for his defamation and conspiracy claims. It is unclear whether the Motion to Dismiss is the product of a fever dream, generated through improper use of AI software,[2] or some combination

---

[1] *See* April 25, 2025 Mem. Op. at 13-14, 17 (ECF 40) ( "The Court will dismiss Youngblood's motion because it relies on statutory provisions that are not applicable in this litigation" and "[t]he Court will not reframe Youngblood's arguments to fit within the Rule l2(b)(6) … framework" because "[a]s discussed above, the Court cannot and will not craft arguments for the parties.").

[2] *See, e.g.*, *Lacey v. State Farm Gen. Ins. Co.*, No. 24-cv-05205, 2025 WL 1363069, at 1* (C.D. Cal. May 6, 2025) (sanctioning counsel for even inadvertent reliance on fake AI-generated cases

of the two.  Regardless, Youngblood's Motion is without legal or factual merit, his perversions of

cited case law and the record in this case must be ignored and accounted for, and the Motion should

be denied so that Bishop Jakes can proceed with proving his case and vindicating his name.

## I.    RELEVANT FACTS

**A.    <u>The Complaint's Well-Pleaded Factual Allegations.</u>**

On October 28, 2024, Youngblood appeared on an episode of the YouTube video podcast

show, Larry Reid Live ("LRL), hosted and operated by Larry Reid, titled "The Abused become

the Abuser," during which Reid interviewed Youngblood. (Compl. ¶ 20 (ECF 4).)  During that

interview, Youngblood falsely accused Bishop Jakes of grooming and sexually abusing him when

Youngblood was "18 or 19 years old."  (Compl. ¶ 24.)

In making those false accusations, Youngblood told a specific story about how Jakes "got

up from the table, he walked around toward the, uh, way I had to exit quicker than I got over there,

and when I started to walk past him, he pulled to himself, wrapped his arms around me, and tried

to kiss me." (Compl ¶ 24.)  Youngblood then described an alleged phone call the next day during

which Bishop Jakes made statements regarding future sexual encounters between him and

Youngblood, saying specifically that there were "three things" he needed from Youngblood: "The

first one is, when I come to Pittsburgh you're going to be the only person I sleep with. The second

one is you can't sleep with anybody else because I don't want to give my wife anything. And

thirdly, I will take care of you the rest of your life." (Compl. ¶ 25.)  Youngblood himself then

---

provided by another lawyer); *Saxena v. Martinez-Hernandez*, No. 22-cv-2126, 2025 WL 1194003,
at *2 & n.5 (D. Nev. April 23, 2025) ("Saxena's use of AI generated cases – and his subsequent
refusal to accept responsibility for doing so – is just another example of Saxena's abusive litigation
tactics, and further explains why the court issued case-terminating sanctions.") (collecting cases);
*United States v. Hayes*, 763 F.Supp.3d 1054, 1067-73 (E.D. Cal. 2025) (sanctioning lawyer for
using AI); Pennsylvania Bar Association, *Joint Formal Opinion 2024-200: Ethical Issues
Regarding the Use of Artificial Intelligence* (May 22, 2024), https://tinyurl.com/5acpbznk.

described these encounters as causing him "absolute destructive sexual damage" and that it was "so so extremely damaging." (Compl. ¶ 26.)  And finally, Youngblood described another alleged conversation years later wherein he claimed Jakes said that his "stock was rising, I would have had sex with anybody at that time" in reference to the prior alleged encounters. (Compl. ¶ 27.)  As of the date of the Complaint, over 120,000 people had viewed Reid's live October 28 interview of Youngblood. (Compl. ¶ 34.)

On November 3, 2024, Youngblood sat for a second interview with Reid on LRL, titled ""Pt. 2 - Larry Reid Live INTERVIEWS Duane Youngblood: 'The Abused became The Abuser.'" (Compl. ¶ 28.) In that interview, Youngblood repeated his previous accusations about Jakes, only this time in response to a prompt by Reid about how what he described in the October 28 LRL episode was "predatory."  Youngblood made it clear that he was accusing Bishop Jakes of actual or attempted sexual assault, describing it as Bishop Jakes "absolutely forcing [his] position" on Youngblood. (Compl. ¶¶ 28-29.)  Youngblood's false statements to Reid on November 3 were viewed, at the time this Complaint was filed, by more than 25,000 people.  (Compl. ¶ 34.)

The events described by Youngblood—from the encounter around the dining room table to the subsequent conversations with Jakes—never happened and were instead the concoctions of Youngblood, Reid, and others to destroy Jakes's reputation, extract millions of dollars from him, and whitewash Youngblood's own criminal predatory conduct and rehabilitate his image.  (Compl. ¶¶ 32-33, 38-44.)

Tellingly, in these interviews, Youngblood was caught lying, specifically about his own prior criminal history, falsely claiming that his 2015 conviction was the result of his communicating with minors in violation of his parole, when in fact his violation was for inappropriately touching two teen victims during counseling sessions and engaging in a three-

week long sexual abuse of another teenage victim. (Compl. ¶ 21.)  And in the $6 million demand letter Youngblood's lawyer sent to Bishop Jakes, Youngblood's own contradictions were again on display, claiming that he was under 18 during these alleged encounters, rather than the ages he used in the interviews.  (Compl. ¶¶ 39-40, 61.)

As a result of Youngblood's false accusations to Reid and his audiences, and of the conspiracy enacted by Youngblood and others to target and attack him, Bishop Jakes has suffered "millions of dollars in reputational harm," his philanthropic missions have been put in jeopardy, he endured specific emotional and physical harm—including a severe medical crisis—and much more.  (Compl. ¶ 46-47.)

**B.**    **The Procedural Background of This Case.**

Although Youngblood is technically in default because he failed to answer the Complaint in the time allowed by the federal rules and cannot rely on any of its standard tolling provisions, Bishop Jakes has not yet sought entry of default. For now, he opposes Youngblood's Motion for the reasons set forth below.

## II.    LEGAL STANDARD

When moving under Rule 12(b)(6), "the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). And "[t]o survive a motion to dismiss, a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 341-42 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). "That requires 'plausibly suggesting' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).) The "plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at

4

678. And a well-pleaded complaint "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Twombly*, 550 U.S. at 556. When evaluating the Motion, the court "must accept [plaintiff's] factual allegations as true and consider those facts in the light most favorable to [him]." *See Doe v. Princeton Univ.*, 30 F.4th at 342.

## III.    ARGUMENT

Bishop Jakes' Complaint states a claim for both defamation and civil conspiracy and Youngblood's argument to the contrary simply ignore the Complaint's allegations and concoct fake case law imposing imaginary requirements on him.[3]

### A.    <u>The Complaint Alleges a Libel *Per Se* Claim.</u>

"A libel is a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession[.]" *Volomino v. Messenger Publ'g Co.*, 189 A.2d 873, 874-75 (Pa. 1963). And a public figure must also allege "actual malice"—that the defendant made the statements with knowledge of falsity or reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-344 (1974) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)). Here, Youngblood incorrectly claims that Jakes has failed to show the elements of libel, but none of those arguments are availing.

### 1.    The Complaint pleads Youngblood's defamatory statements verbatim— quoting them at length—in addition to explaining their defamatory import.

As the Complaint alleges, Youngblood gave two interviews on LRL, on October 28 and November 3, 2024, in which he claimed the reason he abused children in his care as a pastor was because of trauma he endured while being "abuse[d]" by pastors and religious figures in his own

---

[3] Since filing the Complaint, yet more evidence of falsity, actual malice, and conspiracy has come to light, which is detailed in Plaintiff's Opposition to Defendant's Anti-SLAPP Motion. (Anti-SLAPP Opp'n at 5-6 (ECF 37).)

youth. (Compl. ¶¶ 20, 22, 28.) During those interviews, Youngblood leveled several false accusations against Jakes.

**First**, when Youngblood was "18 or 19 years of age":

> "After sitting there and having this long discourse with him, I finally looked at my watch and I'm like, 'oh my goodness, I got to go. I got to get this car back to my mother. She's gonna kill me.' So I said to Bishop, 'I got to get up.' And I got up from the table, **he got up from the table, he walked around toward the uh, way I had to exit quicker than I got over there, and when I started to walk past him, he pulled me to himself, wrapped his arms around me, and tried to kiss me.** And in that moment I literally died."

(*Id.* ¶¶ 24, 52.) **Second**, Youngblood falsely claimed that Jakes called him the next day:

> "In the morning, I step into our bathroom and my home phone rings. My mother answers the phone and she says to me, 'Duane, it's Elder Jakes.' Jakes and I get on that phone and when I get on that telephone, I can hear water. He is sitting in a bathtub and in that thing he says to me, without any hesitation, 'there's three things I need you to do. The first one is, when I come to Pittsburgh you're going to be the only person I sleep with. The second one is you can't sleep with anybody else because I don't want to give my wife anything. And thirdly, I will take care of you the rest of your life.'"

(*Id.* ¶¶ 25, 52.) **Third**, "Youngblood ended his story by claiming that 'there is so much more to me and Bishop Jakes and my family and Bishop Jakes and the absolute destructive sexual damage, but this thing was so so extremely damaging.'" (*Id.* ¶¶ 26, 52.) **Fourth**, Youngblood stated that he once confronted Jakes and asked him "'Why did you do what you did?,'" to which Jakes responded, "'My stock was rising, and I would have had sex with anybody at that time.'" (*Id.* ¶¶ 27, 30.) **Fifth**, during the November 3, 2024 episode, when pressed to further describe how his allegation that "Bishop Jakes violated, groomed" him was "predatory" in nature by Reid, Youngblood stated:

> "When it comes to Bishop Jakes. When I was sharing the story the other day this, I, I'm just running through the story, but I want to make sure people are very clear. I said that we were sitting at a dining room table and I looked at my watch and said I've got to get up and get out of here because I've got to get my mother's car back to her. **But what may have been misunderstood is that Bishop Jakes got up, came around that table, and positioned himself in the corner that I had to walk past.**

> ***When I was walking past that corner, he grabbed me.*** There is no reason if you're going to just give me a hug as we're leaving, go to the door with me and let's hug it out and let me go out the door. We are not at the door, we are still in the dining room, and ***he is in the corner, grabbed me to himself, looked down into my face, and then tried to bend his head down to kiss me on my lips***. That is not a 'you didn't get what you wanted to get.'"

(*Id.* ¶¶ 28, 53.) ***Sixth***, he then suggested that Jakes was "forcing [his] position, [his] idea onto [Youngblood]." (*Id.* ¶¶ 29, 53.)

Despite these extensive quotations, Youngblood's first argument is the facially false claim that the Complaint does not identify any specific defamatory statements by Youngblood, going so far as to claim that "Plaintiff ***does not quote or paraphrase*** any specific defamatory statement by Youngblood" instead relying on "vague references to 'grooming' or 'sexual misconduct' ***without supplying the precise language, speaker, or context***." (MTD at 3, 7-8 (emphasis added).) But paragraphs 24-30 and 52-53 of the Complaint quote specific defamatory statements and exchanges from the LRL interviews, (*see* Compl. ¶¶ 24-30, 52-53), and Youngblood's argument is nonsensical.[4]

But Youngblood does not just misrepresent the record of the contents of the Complaint to erroneously claim that Bishop Jakes has not identified Youngblood's defamatory statements—he couples it with manufactured case law. For example, he cites to *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 267 F. Supp. 2d 425 (E.D. Pa. 2003) for the prospect that defamation "law requires a plaintiff to plead 'the exact words spoken or published and the context in which they were made,'" "require[s] a defamation plaintiff to allege the exact words spoken or published," and "require[s] plaintiffs to attribute statements to each Defendant." (MTD at 7.) But *Franklin*

---

[4] Additionally, the quotes contained in the Complaint also deflate another bizarre argument—that the Complaint "fails to establish that Youngblood's statements were specifically 'of and concerning'" Bishop Jakes. (MTD at 13.) But each interview mentions Jakes by name and lodges allegations against him specifically. (Compl. ¶¶ 24-30, 52-53.)

*Prescriptions* makes no such findings—at all—and to undersigned counsel's knowledge, the quotation regarding "exact words spoken or published" does not appear in any case, let alone in *Franklin Prescriptions*.[5]  The same goes for his quotation of and reliance on *Blackwell v. Eskin*, 916 A.2d 1123 (Pa. Super. Ct. 2007), which does not include any opinion related to identifying the defamatory words of the speaker in a complaint, let alone the quote Youngblood uses in his Motion (and that quote likewise does not appear in any case available in legal research databases). (MTD at 8.)

### 2.    The Complaint alleges that the events Youngblood describes never occurred— he made them up.

The Complaint alleges that Youngblood's statements were false too: "From start to finish, Youngblood's tale of grooming and attempted sexual assault at the hands of Bishop Jakes is patently false." (Compl. ¶ 32.) "Bishop Jakes never kissed or tried to kiss Youngblood, never cornered him or forced him into any situation (sexual or otherwise), and certainly never told him that he wanted to sleep with him or had any conversation of a sexual nature at all with him." (*Id.*) "The interactions described by Youngblood during his LRL interviews on October 28 and November 3 never happened—period."  (*Id.*)

Youngblood (or an AI assistant) ignored portions of the Complaint when he falsely argued that it contains nothing more than "general denials" and allegations that Youngblood was "motivated by ill will." (MTD at 8-9.) As the Court can see, that's false and, moreover, Bishop Jakes' denials plausibly allege falsehood under the *Twombly*/*Iqbal* standard. *See, e.g.*, *supra*

---

[5] The *Franklin Prescriptions* case was a motion for reconsideration (or in the alternative, a certification of interlocutory appeal) of the denial of the defendant's motion for summary judgment on the limited issues of whether the plaintiff was a public figure, whether the claim was endorsed by New York law, and whether The New York Times intended or endorsed the defamatory implication of the claims.  *See Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 267 F. Supp. 2d 425, 430-31 (E.D. Pa. 2003).  The case has nothing to do with any of the defenses at issue in this case.

Section II; *see also Ramunno v. Cawley*, 705 A.2d 1029, 1036 (Del. 1998) ("[I]t is a rare case that may be dismissed under Rule 12(b)(6) on the rationale that the statements complained of are substantially true"). The Motion's claim that Jakes needs to prove more than the non-occurrence of the event in question, (MTD at 8-9), is nothing more than a made up, nonsensical pleading standard that is unsupported by any of the law cited.

### 3.    The Complaint alleges facts suggesting that Youngblood knew his story was false at the time he gave the interview.

The circumstances of this case vividly demonstrate that Youngblood ***knew*** he was lying about Bishop Jakes when he fabricated his stories about Bishop Jakes.

The actual malice inquiry asks whether the defendant published a false statement with knowledge that it was false or with reckless disregard for the truth. *Herbert v. Lando*, 441 U.S. 153, 156 (1979). Although the defendant's state of mind is the focus, the inquiry does not require an admission by the defendant, as Youngblood heavily suggests in his Motion. (MTD at 9-10.) Rather, courts widely recognize that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself" because defamation defendants "are prone to assert their good-faith belief in the truth of their publications." *Herbert*, 441 U.S. at 170; *accord Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1089-90 (3d Cir. 1988) ("A defendant subject to the actual malice standard 'cannot, however, … automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.'") (alterations in original) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

Therefore, courts rely on circumstantial evidence of the defendants' state of mind. *Schiavone*, 847 F.2d at 1090, n.36 ("objective circumstantial evidence can suffice to demonstrate actual malice" and sheds "light … on the defendant's mental state") (quoting Rodney A. Smolla,

Law of Defamation § 3.14[2]). "By examining the [publisher's] actions we try to understand their motives." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997).

In this inquiry, "any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration." *Herbert*, 441 U.S. at 164 n.12; *accord Schiavone*, 847 F.2d at 1090 n.35 (citations omitted); *see also Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. 1995). And while "no [single] piece of [this] evidence … will support a verdict" that "does not mean that together all the evidence may not be clear and convincing." *Tavoulareas v. Piro*, 763 F.2d 1472, 1478 (D.C. Cir. 1985) (Scalia, J., concurring) ("Pieces to a jigsaw puzzle sometimes appear nothing more than scattered fragments, but when placed together in proper fashion they create a clear picture.").

Here, the evidence of actual malice paints a compelling picture. When he appeared on LRL, Youngblood had recently completed a multi-year prison term—and needed to build a new life. (Compl. ¶¶ 18, 33.) To that end, Youngblood agreed to an interview with Reid, "The Abused become the Abuser," in which he misrepresented his own conduct and accused other prominent religious figures of having done far worse to him—thereby falsely transforming himself from sex offender to inspiration. (Compl. ¶¶ 20-22.) The story was a success for Youngblood—he garnered attention and recast himself as the victim rather than the perpetrator of sexual abuse. (Compl. ¶¶ 18, 20-22, 33, 45.) This was one of his substantial motives for fabricating his claims about Jakes. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("[E]vidence concerning

motive" is relevant to the actual malice inquiry); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

But just a few weeks later, his more sinister motivations were revealed: he (with the help of others) dispatched a lawyer to demand $6 million from Bishop Jakes or else he would sue for unspecified nonexistent tort claims arising from the tale. (Compl. ¶¶ 38-44); *see Harte-Hanks Commc'ns*, 491 U.S. at 665 n.6, 668 (holding that court correctly considered newspaper's profit motive in actual malice analysis).

To effectuate those goals, Youngblood fabricated a first-hand account of Jakes trying to kiss him and making suggestive remarks. (Compl. ¶¶ 32, 45); *St. Amant*, 390 U.S. at 732 (fabrication is proof of actual malice). Because Youngblood claims to have personally witnessed conduct that never occurred, the lies about Jakes were necessarily made with actual malice. *See Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1221-22 (D. Kan. 2016) ("[i]f defendant knew that the events were false, and nonetheless wrote the detailed narrative describing exactly how plaintiff sexually assaulted … her when it actually never occurred, it is axiomatic that she wrote the narrative with actual malice, or actual knowledge that it was false"); *Ruth v. Carter*, 560 P.3d 659, *3 (Nev. 2024) (table) ("[plaintiff's] evidence, if believed, establishes that [he] did not sexually assault [defendant] following the Backstreet Boys concert in 2001, such that [her] statements describing such an incident would perforce be made with knowledge of their falsity"); *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1291 (Colo. App. 2022) ("when faced with similar competing narratives, courts … have routinely held that a plaintiff's allegations that the defendant made false accusations are sufficient to create a factual issue as to actual malice"); 1 Rodney A. Smolla, *Law of Defamation* § 3:45.50 (2d ed.) (treatise chapter on "actual malice and fabricated 'first—hand'

allegations of wrongdoing" explaining that "[s]uch deliberate fabrications, if proven, should in almost all circumstances automatically satisfy the actual malice standard").[6]

Key contradictions in the story also show that the tale is fabricated. On LRL, Youngblood stated he was 18 or 19 for his story, but in his subsequent letter from counsel demanding money, Youngblood changed the story to make himself a minor—stating he was just 17. (Compl. ¶¶ 24, 61.) This type of contradiction suggests either an intentional lie or at least a reckless disregard for the truth. *See Schiavone*, 847 F.2d at 1090 (internal inconsistencies are proof of malice).

Given Youngblood's substantial motive to make up stories about Jakes and his total fabrication of the events described, Plaintiff can readily shoulder his burden to allege actual malice.

### 4. The Complaint alleges that Youngblood published statements about Bishop Jakes, that they travelled widely, and that they inflicted grievous harm.

Equally egregious is Youngblood's claim that Jakes failed to allege publication, defamatory meaning, or harm. (MTD at 10-11.) In doing so, Youngblood ignores the paragraphs in which the Complaint does exactly that: during a series of live broadcasts (which were also posted online and transcribed) Youngblood told Reid and his 150,000 subscribers lies about Bishop Jakes, which suggested that the esteemed religious leader groomed, preyed on, and sexually abused and assaulted him, which tarnished Bishop Jakes's reputation. (*See, e.g.*, Compl. ¶¶ 20, 24, 27-29, 34-37, 45-49, 51-58.) In reality, Bishop Jakes has pled all required elements.

#### (a)    The Complaint alleges widespread publication.

The Motion claims that "[t]hroughout the Complaint, [Jakes] refers to 'Defendants' having published or broadcast the statements without delineating what role Defendant Youngblood

---

[6] Nor is a claim of "he-said, he-said" availing.  See *Ratner v. Kohler*, No. 17-cv-00542, 2018 WL 1055528, at *8-9 (D. Hawaii Feb. 26, 2018) (actual malice has been pled where the complaint "alleges that Defendant [] knew [the] … post was false when she published it because the events [] recounted never took place." *Chastain v. Hodgdon*, No. 16-cv-2087, 2016 WL 5109944, at *1– 2 (D. Kan. Sept. 20, 2016) (denying reconsideration).

himself played in the act of publication." (MTD at 12.) But the Complaint plainly alleges: "On October 28, 2024 and November 3, 2024, Youngblood gave a live interview on the Larry Reid Live show in which he accused Bishop Jakes of grooming him, of sexually assaulting and abusing him, and over other predatory conduct of a sexual nature." (Compl. ¶ 51; *see also id.* ¶¶ 24-30 (consistently noting which remarks were made by Youngblood and by Reid).) The episodes themselves, on their face, show that Youngblood made his false accusations to at least Reid directly, including the very titles of the podcasts noting that Reid was "interviewing" Youngblood and that Reid responded and commented to Youngblood about his accusations. (*Id.* ¶¶ 20, 28, 30-31.) Moreover, LRL airs live and is available on demand via YouTube, where it has 150,000 subscribers. (*Id.* ¶ 20.) Both episodes went viral, with at least over 120,000 views for part 1 and over 25,000 views for part 2. (*Id.* ¶¶ 34-37, 54) So, not only did Youngblood relay these false accusations to Reid himself, but also knowingly to Reid's more-than 150,000 YouTube subscribers. (*Id.* ¶¶ 20, 34, 51).[7] In short, it is beyond dispute that Youngblood "published" his false and defamatory accusations about Jakes.

> (b)  Because this is a case of defamation *per se*, the law recognizes the allegations' defamatory meaning and reputational harm is presumed.

The Complaint also plausibly alleges that "Youngblood's statements on the October 28 and November 3 episodes of Larry Reid Live individually and taken as a whole, intended to convey, and were understood by viewers as conveying, the factual accusations that Bishop Jakes groomed, sexually abused, sexually assaulted, and engaged in predatory conduct of a sexual nature with Youngblood." (Compl. ¶ 56.) And that "Youngblood's statements on the October 28 and November 3 episodes … expose[d] Bishop Jakes to contempt, ridicule, and obloquy, tends to affect

---

[7] The Complaint also pleads that it was Youngblood's (and others') plan and "hope" that the false accusations about Jakes would go viral. (Compl. ¶¶ 34-37, 67, 69.)

Bishop Jakes in his profession as a trusted pastor and religious figure, and accuses Bishop Jakes of engaging in unlawful conduct." (Compl. ¶ 58.) That makes them libelous *per se*. *Ralston v. Garabedian*, 623 F. Supp. 3d 544, 576 & nn.351-352 (E.D. Pa. 2022) (Pennsylvania considers an accusation to be defamatory "per se" when it is "obviously defamatory," such as when "it imputes … business misconduct, or … serious sexual misconduct.'"). Indeed, Youngblood's accusations "are as damaging and damning as anyone can make about a prominent pastor and spiritual leader." (Compl. ¶ 58.) And Youngblood's lies *did harm* Jakes' reputation, philanthropic mission, and his emotional and physical wellbeing, even suffering a severe medical crisis as a result. (*Id.* ¶¶ 45-47.)

These well-pled factual allegations defeat Youngblood's arguments for two reasons. **First**, Jakes did plead facts showing emotional and reputational harm (*id.* ¶¶ 45-47), which is all that is required. *See Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 341-43 (3d Cir. 2005) (defamation plaintiffs need only show "'general damages,' … proof of harm to reputation or personal humiliation—but not 'special damages'" which are "proof of actual monetary loss").

**Second**, when an accusation is defamatory *per se* it is considered so obviously harmful that reputational harm is presumed—obviating the need to prove damages as an element to the claim. *See Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 368 (E.D. Pa. 2003) ("'Presumed' damages are those that are expected to result from defamation; they require no proof, but instead, as reflected in their name, are presumed."). Youngblood even admits that presumed damages are available when the plaintiff shows actual malice, which Jakes has. (MTD at 12); *see also Joseph v. Scranton Times L.P.*, 129 A.3d 404, 431-32 (Pa. 2015) (defamation *per se* plaintiffs can "recover presumed and punitive damages upon their satisfaction of the *New York Times* actual malice test").[8] Because

---

[8] Previously, Youngblood cited *Joseph v. Scranton Times L.P.*, 129 A.3d 404 (Pa. 2015) to argue that harm had to be proven rather than presumed. (Anti-SLAPP Mot. at 17 (ECF No. 35).) But *Joseph* does not override defamation *per se*, as Plaintiff explained. (*See* Anti-SLAPP Opp'n at 16-

Youngblood's allegations falsely accused Jakes of "serious sexual misconduct" and because actual malice has been shown, no additional showing of damages is required.

Nor does the statute Youngblood now cites, 42 Pa. Cons. Stat. § 8343(a)(2)-(6), require any showing of additional harm here. (*See* MTD at 10.) Section 8343 does not even list the general damages of which Youngblood demands proof. And more generally, Section 8343 apportions the burdens of proof for issues that ***can*** arise in a defamation case, but the plaintiff only assumes that burden "when the issue is properly raised." 42 Pa. Cons. Stat. § 8343(a). For example, Jakes need not show "special harm" arising from the publication, § 8343(a)(6), because that requirement only applies to certain types of claims (like slander *per quod*). *See Franklin Prescriptions*, 424 F.3d at 341-42 (defamation *per se* plaintiffs are not required to show special damages).

And none of the cases that Youngblood cites for a higher pleading standard made that holding. (MTD at 10-13); *see, e.g.*, *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 267 F. Supp. 2d 425 (E.D. Pa. 2003) (denying summary judgment; never mentioning pleading standards or group pleading); *see also Hill v. Cosby*, 665 F. App'x 169, 173 n.3, 175-77 (3d Cir. 2016) (applying the ordinary pleading standard to hold that defendants' statements could not reasonably be construed as asserting facts about the plaintiff); *Isiminger v. Davis*, No. 1351 WDA 2014, 2015 WL 7287954, at *6 (Pa. Super. Ct. Apr. 6, 2015) (applying the ordinary pleading standard and holding that statements that it sometimes took plaintiff's tow truck 1 to 1.5 hours to arrive and that the city should advertise to find the best possible towing service provider lacked a defamatory

---

17 (ECF No. 37).) Rather, under *Joseph* "when private figure plaintiffs *establish liability based on negligence*, recovery is restricted to compensation for *actual injury*, thus eliminating the specters of presumed and punitive damages in this regard." *Joseph*, 129 A.3d at 428-29 & n.10 (Pa. 2015) (emphasis added); *Menkowitz v. Peerless Publ'ns, Inc.*, 211 A.3d 797, 806 (Pa. 2019) (same).

meaning because they were not of the sort that would "grievously fracture [plaintiff's] standing in the community").[9]

*    *    *

In sum, the complaint more than adequately pleads each and every element of defamation, and Youngblood's arguments are nothing more than red herrings and demonstrate the extent to which Youngblood has gone to try and avoid accountability for his false accusations.

## B. Plaintiff's Civil Conspiracy Claim Undoubtedly Survives Rule 12(b)(6) Scrutiny.

Youngblood's attempt to dismiss the civil conspiracy claim, like his attempt to dismiss the defamation claim, relies heavily on counterfeit case law and erroneous statements of law and facts, and should fail for those reasons alone. Regardless of the abject legal deficiencies of Youngblood's Motion to Dismiss, Bishop Jakes's conspiracy claim more than adequately pleads all necessary elements: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual damage. *See, e.g.*, *Grane Healthcare Co. v. Maxim Healthcare Servs.*, No. 2:23-cv-01199-RJC, 2024 WL 3691612, at *6 (W.D. Pa. Aug. 7, 2024).

### 1. The tort underlying the conspiracy claim is defamation.

Youngblood argues that the Complaint does not plead an actionable underlying tort. For the reasons noted above (Jakes's defamation claim), that argument utterly fails.

Tellingly, in an effort to convince this Court that there is some plausible basis for this argument, Youngblood's Motion again manufactures case law and precedent. For example, in

---

[9] *Blackwell v. Eskin*, 916 A.2d 1123 (Pa. Super. Ct. 2007), which Youngblood also cites, considered the same issue as *Isiminger v. Davis*: whether a statement was of the sort that could inflict grievous harm, not whether it actually did. *Blackwell*, 916 A.2d at 1125.

citing to *Hill v. Cosby*, Youngblood erroneously claims that the Third Circuit "affirm[ed] the dismissal of a civil conspiracy claim because the Plaintiff's defamation claim failed," and even "noted that when the underlying tort collapses, 'there can be no cause of action for conspiracy.'" (MTD at 14-15 (citing *Hill v. Cosby*, 665 F. App'x 169, 176-77 (3d Cir. 2016)).)  The problem: ***that case was not at all a conspiracy claim, the Third Circuit did not opine on any conspiracy claims, and it certainly did not dismiss any such claims***.

> ### 2.      The Complaint pleads clearly that Youngblood and his other co-conspirators agreed to launch a defamation campaign to attack Bishop Jakes.

In arguing that there was no agreement between him and his co-conspirators, Youngblood makes up his legal support out of thin air.  Exactly zero of his cases in this section have anything to do with conspiracy claims, specifically the *Franklin Prescriptions*, *Blackwell*, and *Romano* cases.  (*See* MTD at 15.)  For that reason alone, his argument fails.

Regardless, Plaintiff clearly alleges that Youngblood and at least the host of LRL, Larry Reid, acted jointly to develop and launch the YouTube series, beginning with the October 28 episode, which specifically aimed a public attack on Jakes that falsely claimed he tried to groom and sexually abuse Youngblood.  (Compl. ¶¶ 20-31, 34-37, 67-70.) And they did so to destroy Bishop Jakes's reputation and public image and to line their own pockets on the back of their knowingly false and defamatory attacks, including and primarily by extorting millions of dollars from Bishop Jakes directly (or else the attacks would persist). (*Id.* ¶¶ 38-44, 70.)

***First***, Youngblood and at least Reid—the host and principle of the YouTube show that gave Youngblood the platform to attack Bishop Jakes—acted jointly to develop and launch the October 28 show—titled "The Abused Become the Abuser"—that specifically aimed a public attack at Bishop Jakes, thereby endorsing the false accusations.  (*Id.* ¶¶ 20, 23.)

**Second**, at least Reid and Youngblood acted jointly to further their common purpose by launching the **second LRL episode on November 3**, titled "The Abused Become the Abuser, Part 2." (*Id.* ¶¶ 28, 69.)  Here again, Reid is no mere interviewer; he endorses and extracts from Youngblood the false details about Jakes he wanted for his show.  For example, at the beginning of the November 3 episode, Reid specifically tells Youngblood to explain how Jakes's conduct was "predatory" in nature.  (*Id.* ¶ 28.)  This sets the stage for Youngblood to weave a story about being pushed into a corner by Jakes—unlike the prior narrative that did not include any touching at all—which then allows Reid to say, "Bishop Jakes violated, groomed you," all while attempting to add credibility to Youngblood's accusations by stating that Youngblood feels "honest" to him and that Youngblood is merely "telling the story."  (*Id.* ¶¶ 30-31.) Reid further buttressed Youngblood's false claims by stating that Jakes had "fixers" call to stop his show from airing more episodes about Youngblood's story, and those efforts validated Youngblood's claims—claims which were patently false.[10] (*Id.* ¶ 67.)  In other words, in sum and substance, Reid delivers a message to hundreds of thousands of viewers: believe Youngblood's story.  However, as the words and tenor from the podcast video show, Reid is hardly performing an *interview* of Youngblood; rather, there is an obvious interplay between Reid and Youngblood to tell a false story about abuse where Jakes is the predator and the shows themselves demonstrate, at minimum, the plausibility of Plaintiff's claim that Youngblood and Reid acted in concert toward a common objective: to destroy Jakes and make millions off of him.  (*E.g.*, Compl. ¶ 40.)

---

[10] Attached to the Janey Declaration as Ex. A and Ex. B, respectively, are the transcripts of the October 28 and November 3 LRL episodes, which are incorporated by reference in the complaint. The transcripts include, as does the Complaint, the specific sections with the defamatory statements, as well as additional context.  For example, in connection with the statements made *supra* about Reid's coordination with Youngblood, Plaintiff's factual allegations in the complaint at ¶¶ 28-29 are further elaborated by the transcript at Ex. B at 26:9-22 and 28:4-25, and the allegations at ¶¶ 30-31 are further elaborated by the transcript at Ex. B. at 26:11-12 and 36:7-13.

*Third*, the Complaint pleads facts showing at least the agreement between Youngblood and Reid (and potentially others). As a result of Reid giving Youngblood his platform for what he knew would be Youngblood's false accusations about Jakes, the October 28 and November 3 LRL episodes went viral. (*Id.* ¶ 34.)  Then there was the extortion demand.  By November 15, Youngblood's lawyer sent a letter to Jakes demanding that he pay six million dollars or else. (*Id.* ¶¶ 39-40.)  Reid knew and endorsed that plan, as evidenced by his statements in the podcast that followed the very same night Jakes filed the instant lawsuit (November 25, 2024).[11]  In that LRL episode, Reid admitted that he knew about *and* had seen the $6 million demand letter, and knew the letter was being sent to Bishop Jakes.[12]  (Janey Decl., Ex. C at 8:6-17.)  Given Reid's own statements, taken together with the other factual allegations in the complaint, at minimum, Plaintiff pleads a plausible claim that at least Reid and Youngblood worked together to publish the false story about Jakes to destroy his reputation and extract millions of dollars from him.

### 3. The Complaint alleges that Youngblood and his co-conspirators were motivated to destroy Bishop Jakes's reputation.

Again, Youngblood resorts to erroneous case law and legal support to try and argue that Bishop Jakes's conspiracy claim does not meet the "intent to injure" standard.  (*See* MTD at 16 (citing to the *Castellani* and *Blackwell* cases, which have no conspiracy claims in them

---

[11] While the Complaint more-than adequately pleads the elements of a conspiracy claim, we request the Court consider the November 25, 2024 LRL episode (which aired several hours after the Complaint was filed), which is a matter of public record and is central to the claims in this case as are the other two attendant LRL episodes. *See, e.g.*, 1 Steven S. Gensler, *Federal Rules of Civil Procedure, Rules and Commentary* Rule 12 (2024) (("the court may consider documents not attached to the complaint if the complaint specifically refers to them, they are central to the claim, and [or] their authenticity is not in dispute.") (citing, *inter alia*, *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013))); *see also Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

[12] At the end of the show, Reid asks his thousands of viewers to make a "donation" if they "enjoyed the update" about the Bishop Jakes story.  A banner appears on the screen advertising such "donations" could be made through a wide number of mechanisms, including PayPal, Venmo and Zelle. (Janey Decl., Ex. C at 26:13-17.)

whatsoever).) Nevertheless, the Complaint plainly alleges that the conspiracy between Youngblood and others was implemented and designed to (1) directly injure Bishop Jakes and cause significant harm to his reputation through a series of orchestrated podcasts, (2) threaten further exposure and defamatory attacks unless Bishop Jakes capitulated and paid their demand, and (3) reap the ill-gotten gains from their unlawful actions. (*E.g.*, Compl. ¶ 69.) That more than satisfies the Pennsylvania standard for civil conspiracy. *See Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422, 439-440 (M.D. Pa. 2022) (holding that an "intent to injure" need not be the only motivation of a conspiracy, it need only be one of the motivations).

### 4. The Complaint does not "group plead"—nor is that an actual element of conspiracy under Pennsylvania law.

Youngblood cites no applicable case law for his argument that for a conspiracy claim, "group pleading" is impermissible and that "individual conduct and malicious intent must be alleged." (MTD at 17.) The cases he does cite for those propositions not only make no such holdings but are, again, ***not conspiracy cases***. (*See id*. (citing to *Duffy* and *Franklin Prescriptions*, which bear no relation to conspiracy claims whatsoever).)

Nor does it matter, because the Complaint, as noted above, pleads separately that Youngblood and at least Reid (as well as, upon information and belief, other co-conspirators) each took actions in concert for the conspiracy to harm Bishop Jakes and capitalize unjustifiably from that harm. This argument is yet another red herring, and Bishop Jakes's conspiracy claim is valid.

<u>**CONCLUSION**</u>

For the reasons stated herein, Defendant Youngblood's Motion to Dismiss should be denied.

DATED: May 27, 2025                          Respectfully Submitted,

By: */s/ Devin J. Chwastyk*
Devin J. Chwastyk
McNees Wallace & Nurick LLC
100 Pine Street, P.O. Boc 1166
Harrisburg, PA 17108
(717) 232-8000
dchwastyk@mcneeslaw.com

By: */s/ Dustin A. Pusch*
Dustin A. Pusch (admitted *Pro Hac Vice*)
Amy M. Roller (admitted *Pro Hac Vice*)
Meier Watkins Phillips Pusch LLP
919 18th Street NW, Suite 650
Washington, DC 20006
dustin.pusch@mwpp.com
amccannroller@mwpp.com

By: */s/ Derrelle M. Janey*
Derrelle M. Janey (admitted *Pro Hac Vice*)
The Janey Law Firm P.C.
111 Broadway, Suite 701
New York, NY 10006
(646) 289-5276
djaney@thejaneylawfirm.com

*Counsel for Plaintiff Bishop T.D. Jakes*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

DATED: May 27, 2025                                Respectfully Submitted,

By: */s/ Devin J. Chwastyk*
Devin J. Chwastyk
McNees Wallace & Nurick LLC
100 Pine Street, P.O. Boc 1166
Harrisburg, PA 17108
(717) 232-8000
dchwastyk@mcneeslaw.com

By: */s/ Dustin A. Pusch*
Dustin A. Pusch (admitted *Pro Hac Vice*)
Amy M. Roller (admitted *Pro Hac Vice*)
Meier Watkins Phillips Pusch LLP
919 18th Street NW, Suite 650
Washington, DC 20006
dustin.pusch@mwpp.com
amccannroller@mwpp.com

By: */s/ Derrelle M. Janey*
Derrelle M. Janey (admitted *Pro Hac Vice*)
The Janey Law Firm P.C.
111 Broadway, Suite 701
New York, NY 10006
(646) 289-5276
djaney@thejaneylawfirm.com

*Counsel for Plaintiff Bishop T.D. Jakes*