UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH CARTAGENA,<br>                              *Plaintiff*,<br>v.<br>TERRANCE DIXON,<br>TYRONE BLACKBURN, and<br>T.A. BLACKBURN LAW, PLLC,<br>                              *Defendants*. | Civil Action No. 25-cv-03552<br><br>MEMORANDUM OF LAW IN SUPPORT OF THE<br>DEFENDANT'S MOTION TO DISMISS<br>PLAINTIFFS SECOND AMENDED COMPLAINT |

**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANT'S MOTION TO
DISMISSPLAINTIFFS SECOND AMENDED COMPLAINT**

**By**:

Tyrone A. Blackburn

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**

**ARGUMENT**

**POINT I**: Plaintiff Fails to Allege Actual Malice as Required for a Public Figure Defamation Claim
    A.  Plaintiff Does Not Plead a Single Non-Conclusory Fact Supporting Actual Malice
    B.  Plaintiff Knows That Defendant Dixon Is Telling the Truth
    C.  Statements Based on Personal Observation and Verifiable Sources Defeat Malice
    D.  Plaintiff Lyrics Details His Pedophilic Tendencies
    E.  Defendant's Commentary Regarding His Musical Contributions Is Factually Grounded and Constitutionally Protected

**POINT II**: The Challenged Statements Are Privileged as Litigation Communications and Non-Actionable Under New York Law
    A.  Dixon's Statements Were Qualified and Protected Communications Made in Anticipation of Litigation
    B.  Tyrone Blackburn's Pre-Litigation Communications Are Protected by New York's Qualified Privilege
    C.  Public Statements Regarding Legal Proceedings Are Also Protected
    D.  Lawsuits Aimed at Chilling Legal Advocacy Are Disfavored and Sanctionable
    E.  The Absolute Privilege for Judicial Proceedings Would Also Apply If Recast as IIED

**POINT III**: The IIED and Defamation Claims Against Attorney Tyrone Blackburn and T.A. Blackburn Law, PLLC Are Legally Frivolous, Constitutionally Barred, and Retaliatory in Purpose
    A.  Blackburn's Public Statements Were Lawful, Proportional, and Made in Direct Response to an Orchestrated Media Attack
    B.  The Legal Standards for IIED and Defamation Are Not Remotely Satisfied
    C.  Plaintiff's References to "Extortion" and Rule 3.4(e) Violations Are Disingenuous and Rebutted by Law, Facts, and Logic
    D.  The Intentional Infliction of Emotional Distress (IIED) Claim Against Dixon Must Be Dismissed as a Matter of Law

**CONCLUSION**

2

## **TABLE OF AUTHORITIES**

**Cases**
- *Abrams v. Durst*, 2021 N.Y. Misc. LEXIS 2543 (Sup. Ct. N.Y. Cty. 2021)
- *Akpinar v. Moran*, 83 A.D.3d 458 (1st Dep't 2011)
- *Albert v. Loksen*, 239 F.3d 256 (2d Cir. 2001)
- *Allam v. Meyers*, 2011 U.S. Dist. LEXIS 18581
- *Anderson v. City of Mount Vernon*, 2024 U.S. Dist. LEXIS 87787
- *Bacon v. Nygard*, 140 A.D.3d 577 (1st Dep't 2016)
- *Barbash v. STX Fin., LLC*, 2020 U.S. Dist. LEXIS 210331 (S.D.N.Y. Nov. 10, 2020)
- *Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996)
- *Biro v. Condé Nast*, 963 F. Supp. 2d 255 (S.D.N.Y. 2013), aff'd, 807 F.3d 541, aff'd, 622 F. App'x 67 (2d Cir. 2015)
- *Biro v. Condé Nast*, 807 F.3d 541 (2d Cir. 2015)
- *Brimelow v. New York Times Co.*, 2020 U.S. Dist. LEXIS 237463 (S.D.N.Y. Dec. 16, 2020)
- *Cabello-Rondon v. Dow Jones & Co.*, 720 F. App'x 87 (2d Cir. 2018)
- *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000)
- *Chanko v. American Broadcasting Cos. Inc.*, 27 N.Y.3d 46 (2016)
- *Curiano v. Suozzi*, 63 N.Y.2d 113 (1984)
- *Davis v. Boeheim*, 24 N.Y.3d 262 (2014)
- *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610 (E.D.N.Y. 2018)
- *Dfinity Found. v. N.Y. Times Co.*, 2024 U.S. App. LEXIS 18619 (2d Cir. 2024)
- *Dillon v. City of New York*, 261 A.D.2d 34 (1st Dep't 1999)
- *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113 (2d Cir. 2013)
- *Durant v. A.C.S. State & Local Sols., Inc.*, 460 F. Supp. 2d 492 (S.D.N.Y. 2006)
- *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113 (2d Cir. 1977)
- *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460 (S.D.N.Y. 1999)
- *Firth v. State*, 98 N.Y.2d 365 (2002)
- *Flaherty v. Dixon*, 2023 U.S. Dist. LEXIS 26876 (S.D.N.Y. Feb. 16, 2023)
- *Front, Inc. v. Khalil*, 24 N.Y.3d 713 (2015)
- *Garrison v. Louisiana*, 379 U.S. 64 (1964)
- *Geltzer v. Brizinova (In re Brizinova)*, 565 B.R. 488 (Bankr. E.D.N.Y. 2017)
- *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)
- *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023)
- *Greenberg v. Spitzer*, 155 A.D.3d 27 (2d Dep't 2017)
- *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146 (1993)
- *Heilbut v. Cassava Scis., Inc.*, 2025 U.S. Dist. LEXIS 56283 (S.D.N.Y. Mar. 31, 2025)
- *Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993)
- *Hodges v. McGough Enters., LLC*, 2025 U.S. Dist. LEXIS 109230
- *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235
- *Isaly v. Boston Globe Media, LLC*, 2021 U.S. Dist. LEXIS 91558
- *Jankovic v. Int'l Crisis Group*, 822 F.3d 576 (D.C. Cir. 2016)
- *Kesner v. Jones*, 2023 U.S. App. LEXIS 15255 (2d Cir. 2023)
- *Kerik v. Tacopina*, 64 F. Supp. 3d 542 (S.D.N.Y. 2014)
- *Klein v. McGauley*, 29 A.D.3d 432 (1st Dep't 2006)
- *Liberman v. Gelstein*, 80 N.Y.2d 429 (1992)

- *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003)
- *Mann v. Abel*, 10 N.Y.3d 271 (2008)
- *Marley v. Ibelli*, 203 F. Supp. 2d 302 (S.D.N.Y. 2001)
- *Matthaus v Hadjedj*, 148 A.D.3d 425
- *Mayfield v. NASCAR*, 674 F.3d 369 (4th Cir. 2012)
- *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174 (S.D.N.Y. 2020)
- *McKenzie v. Dow Jones & Co.*, 355 F. App'x 533 (2d Cir. 2009)
- *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016)
- *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)
- *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)
- *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293 (1983)
- *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)
- *Oakley v. Dolan*, 2020 U.S. Dist. LEXIS 28267 (S.D.N.Y. Feb. 19, 2020)
- *O'Neill v. N.Y. Univ.*, 97 A.D.3d 199 (1st Dep't 2012)
- *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019)
- *Pippen v. NBC Universal Media, LLC*, 734 F.3d 610 (7th Cir. 2013)
- *Robinson v. Bagwell*, 2024 U.S. Dist. LEXIS 135624
- *Rosenblatt v. Baer*, 383 U.S. 75 (1966)
- *Ruhling v. Tribune Co.*, 2007 U.S. Dist. LEXIS 116
- *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012)
- *Sheila C. v. Povich*, 11 A.D.3d 120 (1st Dep't 2004)
- *Steinhilber v. Alphonse*, 68 N.Y.2d 283 (1986)
- *Thomas v. City of New York*, 2018 U.S. Dist. LEXIS 189305, 2018 WL 5791965 (E.D.N.Y. Nov. 5, 2018)

**Statutes**
- N.Y. C.P.L.R. § 215(3)

**Rules**
- Fed. R. Civ. P. 12(b)(6)
- Fed. R. Civ. P. 11
- N.Y. Rules of Professional Conduct R. 3.4(e)
- N.Y. Rules of Professional Conduct R. 3.6(d)

**Constitutional Provisions**
- N.Y. Const. art. I, § 8
- U.S. Const. amend. I

## PRELIMINARY STATEMENT

Plaintiff's Second Amended Complaint (SAC) must be dismissed in its entirety under Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). On a Rule 12(b)(6) motion, the court must "accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (alterations adopted) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). The court shall not "accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). *Pandya v. SEC*, 2025 U.S. Dist. LEXIS 5363, *13-14.

Despite having multiple opportunities to plead a viable claim, Plaintiff—a public figure—fails to meet the heightened burden required for defamation and related torts under New York law. This lawsuit is not a good-faith attempt to vindicate reputational harm, but a retaliatory action designed to chill protected legal advocacy and public commentary, in contravention of the First Amendment and New York State constitutional principles.

The Plaintiff's core claim is based on defamation; however, the operative pleading lacks plausible allegations of actual malice—an essential element under the First Amendment and New York law when a public figure is involved. Not only is proving actual malice a heavy burden, but, in the era of *Iqbal* and *Twombly*, pleading actual malice is a more onerous task as well. See *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013), aff'd, 807 F.3d 541, aff'd, 622 F. App'x 67 (2d Cir. 2015) (Pleading 'actual malice buzz-words' is simply not enough to nudge a case into discovery.); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 456 n.9 (S.D.N.Y. 2018) (Conclusory statements of actual malice will not suffice).

Plaintiff offers no facts showing Defendant knew the challenged statements were false or acted with reckless disregard for the truth. Instead, he relies on conclusory allegations and group pleading, which are insufficient as a matter of law. See *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). For this reason, courts routinely dismiss defamation claims before discovery based on the failure to adequately plead actual malice. See *Cabello-Rondon v. Dow Jones & Co.*, 720 F. App'x 87, 88 (2d Cir. 2018); *Biro*, 807 F.3d at 542; *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,

2018 WL 4735717, at *9–11 (S.D.N.Y. September 29, 2018); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014). This Court should do the same here and dismiss this meritless suit.

Moreover, much of the conduct Plaintiff challenges arises from Defendant's pre-litigation communications—demand letters, preservation notices, and statements made in anticipation of litigation. New York courts have long recognized the litigation privilege as a defense to defamation claims. See *Conti v. Doe*, 535 F. Supp. 3d 257, 280–81 (S.D.N.Y. 2021) (New York courts have long recognized the litigation privilege as a defense to defamation claims). While the privilege is not absolute, it applies broadly to pre-suit communications when made in good faith and in anticipation of litigation. See *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 720, 4 N.Y.S.3d 581, 28 N.E.3d 15 (2015) (statements made by attorneys before the commencement of litigation are protected by a qualified privilege when they are pertinent to a good-faith anticipated litigation). The privilege ensures that parties and their counsel can freely communicate legal demands and intentions without fear of retaliatory lawsuits.

Plaintiff's attempt to impose liability on opposing counsel for engaging in routine legal advocacy is legally baseless and ethically troubling. His theory of liability—targeting demand letters, emails, response deadlines, and legal notifications of threats levied against Mr. Dixon—is precisely the type of chilling misuse the litigation privilege is designed to prevent. See *Kraus v. Brandstetter*, 2023 N.Y. Misc. LEXIS 1901, at *7–8 (N.Y. Sup. Ct. March 30, 2023) (privilege barred defamation claims based on settlement and litigation-related correspondence between opposing counsel). Courts have consistently held that even aggressive or accusatory pre-suit communications fall within the privilege, provided they are related to contemplated litigation and not issued with malice unrelated to the litigation itself. Plaintiff alleges no facts that would overcome this protection.

Furthermore, many of the challenged statements are either non-actionable opinions or rhetorical hyperbole, fully protected under the First Amendment. See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991). Still others are time-barred by New York's one-year statute of limitations for defamation under N.Y. C.P.L.R. sec. 215, with no allegations justifying tolling or republication. See *Firth v. State*, 98 N.Y.2d 365, 369 (2002); *Barbash v. STX Fin., LLC*, 2020 U.S. Dist. LEXIS 210331, at *10 (S.D.N.Y. November 10, 2020).

Plaintiff's ancillary tort claims—intentional infliction of emotional distress (IIED—are wholly duplicative of the defamation cause of action. See *Howell v. New York Post Co.,* 81 N.Y.2d 115 (1993) (IIED must allege conduct so outrageous in character, and so extreme in degree as to exceed all bounds of decency); *Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 447 (2000) (false light not recognized in New York).

In sum, this case is not a legitimate vehicle to vindicate reputation—it is a punitive action designed to silence and chill speech protected by the Constitution and state law. Courts should not be used as a means to intimidate attorneys and advocates who speak out on matters of public concern. As emphasized in *Flaherty v. Dixon*, 2023 U.S. Dist. LEXIS 26876, at *13 (S.D.N.Y. February 16, 2023), the judicial system is not a weapon for retaliating against an attorney's legal advocacy. It is a forum for good-faith claims, not tactics of intimidation. This Court must dismiss the SAC in its entirety with prejudice.

## ARGUMENT

## POINT I: PLAINTIFF FAILS TO ALLEGE ACTUAL MALICE AS REQUIRED FOR A PUBLIC FIGURE DEFAMATION CLAIM

To sustain a defamation claim under New York law, a plaintiff must allege: (1) a false statement of fact; (2) published to a third party; (3) with fault; and (4) that is defamatory per se or causes special harm. *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999). Where, as here, the Plaintiff is a public figure, the First Amendment requires that he allege—and later prove by clear and convincing evidence—that the statements were published with "actual malice," that is, either knowledge of falsity or reckless disregard of the truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

Individuals who have assumed roles of especial prominence in the affairs of society and who have invite[d] attention and comment are generally considered public figures. *Gertz*, 418 U.S. at 345. Long-standing U.S. Supreme Court precedent provides that a public figure, in turn, cannot recover for defamation unless they prove that the relevant statements were made with actual malice. *Sullivan*, 376 U.S. at 280. This heavy burden arises from the profound national commitment to debating public issues. *Jankovic v. Int'l Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016) (quoting *Sullivan*, 376 U.S. at 270). It reflects the principle that those—like Plaintiff— who have chosen to seek or hold public prominence or who routinely thrust themselves into public

debate necessarily accept a greater risk of critical public scrutiny and commentary. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1278–79 (D.C. Cir. 2003).

Put simply, Plaintiff was required in his Complaint to plead facts that would plausibly establish, by clear and convincing evidence, that Defendant published a calculated falsehood about him. *Garrison v. Louisiana*, 379 U.S. 64, 73–75 (1964). Allegations about sleeping with minors, theft of intellectual property, and unpaid wages—all the Complaint avers here—do not establish actual malice without additional facts to suggest that the speaker acted according to that bias. See *Palin v. New York Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019) (requiring more than political bias to establish actual malice); see also *Oakley v. Dolan*, No. 17-cv-6903, 2020 U.S. Dist. LEXIS 28267, at *19 (S.D.N.Y. February 19, 2020) ([E]vidence of ill will, without more, cannot establish actual malice). Rather, actual malice requires allegations that the publication was made with a high degree of awareness of [the statements'] probable falsity. *Garrison*, 379 U.S. at 74.

A. **Plaintiff Does Not Plead a Single Non-Conclusory Fact Supporting Actual Malice**

The Second Circuit has specifically held that a public figure must plead 'plausible grounds' to infer actual malice by alleging 'enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice. *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (citation omitted). In this context, "naked assertions," "conclusory statements," and factual allegations that do not permit a reasonable inference that the Defendant is liable for the misconduct alleged are insufficient to survive a motion to dismiss. *Id.* at 544 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Here, Plaintiff does not plead a single non-conclusory fact supporting actual malice. The SAC contains only generalized assertions that Defendant's statements were knowingly false or malicious, without identifying any facts to plausibly infer that Defendant doubted the veracity of his claims. These boilerplate recitations do not meet the constitutional threshold. To show actual malice, a plaintiff must establish by clear and convincing evidence that the communication…was made **with knowledge of its falsity or with reckless disregard of whether it was false**… Actual malice can be established through the Defendant's actions or statements, the dubious nature of her sources, and the inherent improbability of the story, among other circumstantial evidence. Courts across the country have routinely affirmed dismissals of defamation complaints where plaintiffs—particularly public figures—fail to plead actual malice with the requisite specificity. See *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702–06 (11th Cir. 2016); *Pippen v. NBCUniversal Media,*

8

*LLC*, 734 F.3d 610, 614–16 (7th Cir. 2013); *Mayfield v. NASCAR*, 674 F.3d 369, 377–78 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).

The SAC does not allege that Defendant retracted his statements, contradicted them, or was ever presented with evidence disproving them before publication.  Nor does Plaintiff plead that Defendant harbored any doubt about their accuracy.  Absent such allegations, courts routinely dismiss defamation complaints at the pleading stage.  See *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183–84 (S.D.N.Y. 2020) (dismissing defamation claim for failure to allege actual malice, noting that subjective doubt must be shown through concrete allegations).  This Court should follow suit and dismiss Plaintiff's claims for failure to meet this constitutional standard.

### B. Plaintiff Knows That Defendant Dixon is Telling the Truth

Upon information and belief, the reason Plaintiff has failed to allege that Defendant retracted his statements, contradicted them, or was ever presented with evidence disproving them before publication is that Plaintiff knows that Defendant's statements are true.  During one international trip, Plaintiff called Defendant into his hotel suite and was elated as he revealed bloody bedsheets to the Defendant after he took the virginity of two fifteen-year-old Caucasian girls.  (**Dixon Declaration ¶ 26 and 27**).  Plaintiff knows that flight records, travel itineraries, and hotel records corroborate Defendant's and Plaintiff's presence at the Hotels and concert venues in question.

Upon information and belief, Plaintiff knows that Defendant Dixon is not the only person who witnessed him with underage women.  There are endless former members of Plaintiffs' "Terror Squad" (managers, hitmen, accountants, etc.) whom have all recently come forward with documents, and other information to corroborate the claims made in *Dixon v. Cartagena, et al.*, as well as several of the allegedly "defamatory" statements Defendant Dixon posted to his social media.

### C. Statements Based on Personal Observation and Verifiable Sources Defeat Malice. Defendant Dixon Personally Witnessed Plaintiff Cartagena in a Multi-Year Relationship with a 16-year-old girl named Nikki.

Even assuming *arguendo* that Plaintiff could identify any provably false factual assertion, his defamation claim still fails because he cannot establish that Defendant acted with actual malice. The SAC lacks any facts suggesting that Defendant knew his statements were false or acted with reckless disregard for their truth.  Specifically, Dixon personally witnessed the conduct he

9

described, including Plaintiff's relationship with the individual identified as "Nikki a/k/a Chiquita," who was underage at the time. (**Dixon Declaration ¶ 23**). Defendant personally witnessed Plaintiff engage in multiple relationships with multiple women who were 16 years old. (**Dixon Declaration ¶ 28**).

The crux of Plaintiff's defamation suit against Defendant Dixon is the following statements based on direct, personal observations and firsthand experience:

May 23, 2024, Instagram post, stating: "LIL JOEY WAS DATING AND HAVING SEX WITH A 16-YEAR-OLD GIRL NAMED NIKKI AKA CHIQUITA HE HAD A FULL FLEDGE RELATIONSHIP WITH HER FOR 5 YEARS."

September 20, 2024, Instagram post accompanying a picture of Cartagena, Sean "Diddy" Combs, and DJ Khaled stating: "#fatjoe Nikki was underage when u flew her across state lines and out the country."

October 1, 2024, Instagram post stating: "FAT JOE HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO WAS UNDERAGE" and "FAT JOE KNEW DRE WAS HAVING SEX WITH A UNDERAGE GIRL BECAUSE JOE WAS THE GUY TELLING HIM CALM DOWN WE GOING TO TAKE CARE OF IT."

Dixon's statements were not fabricated nor reckless—they were grounded in his own knowledge as a direct participant in events relevant to the allegations. As previously stated, Dixon even traveled with Plaintiff Cartagena and Nikki on numerous occasions, both nationally and internationally. (**Dixon Declaration ¶ 23 and 27**). This is not mere opinion or speculation; it is an **eyewitness account**, entitled to heightened credibility and constitutional protection. Every citizen may freely speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. *N.Y. Const. art. I, § 8.*

Dixon was on the plane with Plaintiff Cartagena when he confided in Dixon, telling him that he was in love with Nikki, was contemplating leaving his current wife for Nikki, and that he had given Nikki the nickname "Snakes on a Plane," which is a reference to receiving fellatio from Nikki while in flight.

Moreover, Dixon possesses audio recordings corroborating his assertions. These include: (1) audio of Nikki herself; (2) audio of Nikki's cousin confirming her age and the nature of her

relationship with Plaintiff; and (3) audio of a former member of Terror Squad affirming the conduct in question. Where a defendant relies on third-party accounts and other supporting materials, courts find a lack of malice. See *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) (Reliance on a reputable source, even if mistaken, does not amount to reckless disregard.); *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) (no malice where Defendant published statements based on interviews, even if controversial).

His reliance on those sources—especially given their consistency, firsthand nature, and existence in recorded form—precludes any inference that he subjectively doubted the truth of his assertions. See also *Barbash v. STX Fin., LLC*, 2020 U.S. Dist. LEXIS 210331, at *8 (S.D.N.Y. November 10, 2020) (Actual malice requires more than a failure to verify. It requires evidence that the Defendant acted despite a high degree of awareness of probable falsity.); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (Actual malice can be established through the Defendant's actions or statements, the dubious nature of [her] sources, and the inherent improbability of the story among other circumstantial evidence.). Here, Dixon's statements rest not on dubious sources or rumor, but on his own experience and independently verifiable recordings.

Accordingly, Plaintiff has not—and cannot—plead facts giving rise to a plausible inference of actual malice. The challenged statements are grounded in truth, corroborated by external sources, and thus fail to support any viable defamation claim.

## D. **Plaintiff Lyrics Details His Pedophilic Tendencies**

Plaintiff Cartagena's love of underage women is in full display in the song he wrote titled "She's My Mama." (**Dixon Declaration ¶ 29**). This pedophile's manifesto was released in November 2006, and has disgusting lyrics like:

> *Now, she was only* **sixteen***, I*
> *had to nurture that*
>
> *Give her some growth, waited.*
> *'til I* **touched the cat**
>
> *Told she goin' have to work if*
> *she gon' get ahead*
> *Then* **she drove me berserk**
> **when she gave me some head**
>
> *She told me that she learnt*

*that from the porno flicks*
*I said,? Mami, stop talkin', just*
<u>**suck on this Dick.**</u>

If Plaintiff wants members of the public not to think that he is a pedophile, then he may want to cease releasing music that outlines grooming, which led to him receiving fellatio from a child. This is disgusting, *pedophilic behavior poorly disguised as art*.

E. **Defendant's Commentary Regarding His Musical Contributions Is Factually Grounded and Constitutionally Protected**

Statements by Defendant Dixon concerning his role in Plaintiff's music career—specifically, that he "kept [Plaintiff] breathing," was underpaid, and was not credited for songs he authored—are not defamatory because they are grounded in fact, supported by public evidence, and constitute protected commentary based on personal experience and artistic authorship.

Defendant Dixon made the following challenged statements based on direct, personal observations and firsthand experience: Challenged Statements:

March 18, 2025, Dixon posted to his Instagram Threads account a post accompanying an image of Cartagena's album cover "Jealous Ones Still Envy," stating: "#FATJOE DONT NEVER FORGET WHO KEPT YOU BREATHING I WROTE THIS FOR YOUR HOMIE."

On April 13, 2025, Dixon conducted an interview on the "Off da Books Podcast" and alleged that Cartagena had underpaid him for his services and failed to credit him for songs he had allegedly written for Cartagena.

Dixon personally witnessed, participated in, and contributed to the musical works underlying the challenged statements. His remarks reflect the lived reality of his artistic and professional collaboration with Plaintiff, rather than reckless or fabricated accusations. Multiple creative works associated with Plaintiff's commercial discography include Dixon's contributions, either as a writer, vocalist, or co-performer. These include:

- *Money Over Bitches* – Fat Joe (featuring Too $hort & TA [Defendant Dixon]);
- *Ice Cream* – Fat Joe (featuring Raekwon & T.A. [Defendant Dixon]); and
- *Congratulations* – Fat Joe (featuring Rick Love & T.A. [Defendant Dixon]).

These songs are publicly available on YouTube, streaming platforms, and album releases, confirming Dixon's participation. Yet, he was never compensated or credited for these works, as evidenced by the United States Copyright Office public record. (**See, Blackburn Declaration**

12

**Exhibit A**).  These facts directly substantiate his statements that the Plaintiff underpaid him and failed to recognize his contributions.  Such statements are not defamatory as a matter of law.

Dixon's statements are rooted in his direct experience and supported by public documentation, rendering them constitutionally protected and immune from defamation liability.  The Plaintiff may disagree with Dixon's characterizations, but disagreement does not render fact-based commentary defamatory.  The law does not—and cannot—penalize firsthand witnesses for speaking truthfully about matters they directly observed or participated in.

Accordingly, Plaintiff's defamation claims premised on these statements must be dismissed.

## POINT II: THE CHALLENGED STATEMENTS ARE PRIVILEGED AS LITIGATION COMMUNICATIONS AND NON-ACTIONABLE UNDER NEW YORK LAW

Even if the statements at issue were otherwise defamatory—which they are not—they are independently barred by New York's litigation privilege and the First Amendment.  Plaintiff's SAC seeks to improperly punish Defendant for protected conduct—namely, (1) pre-suit legal correspondence, and (2) public statements made in anticipation of or relating to litigation.  Both categories are non-actionable as a matter of law.

### A. Dixon's Statements Were Qualified and Protected Communications Made in Anticipation of Litigation

The defamation claim against Dixon must be dismissed because the challenged statements fall squarely within New York's doctrine of qualified privilege.  As the New York Court of Appeals has long recognized, the public interest is served by shielding certain potentially defamatory communications from litigation, rather than risk stifling them altogether. *Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992). This privilege exists to encourage open discourse where legal, moral, or personal duties require speech, particularly in contexts related to good-faith legal claims or self-defense.

A statement is subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his or her own affairs, in a matter where his or her interest is concerned. *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 719, 4 N.Y.S.3d 581, 28 N.E.3d 15 (2015). The Court in *Front* clarified that this doctrine applies not only to statements made during litigation (which are privileged) but also to communications made in

anticipation of good-faith litigation, such as demand letters or public disclosures in furtherance of asserting legal rights. *Id*.

Here, Dixon's statements regarding his unpaid musical contributions and the Plaintiff's alleged involvement in a pattern of sex and labor trafficking were made in the course of asserting his rights and in preparation for filing suit. The statements were not made gratuitously or with reckless disregard for the truth, but rather reflected Dixon's firsthand knowledge of events spanning more than a decade, supported by corroborating witnesses and audio recordings, and made in conjunction with legal consultation and documentation. Dixon intended to protect his legal interests and warn others of the Plaintiff's actions, not to maliciously defame.

Because the statements were made in the conduct of his affairs and in anticipation of litigation, they are entitled to a qualified privilege. To overcome this protection, Plaintiff must plausibly plead actual malice, a burden he has not and cannot meet. See *O'Neill v. N.Y. Univ.*, 97 A.D.3d 199, 213, 944 N.Y.S.2d 503 (1st Dep't 2012) (The Complaint fails to overcome this [qualified] privilege because it contains no more than conclusory allegations of malice). The Complaint offers only broad and unsupported accusations of bad faith, insufficient under both *Iqbal/Twombly* and New York precedent.

Accordingly, the defamation claim fails as a matter of law and must be dismissed.

B. **Tyrone Blackburn's Pre-Litigation Communications Are Protected by New York's Qualified Privilege**

Even where the elements of a defamation claim are sufficiently pleaded, New York law provides a qualified privilege for certain communications made in furtherance of legal rights and obligations. As previously stated, in *Front*, the New York Court of Appeals reaffirmed the long-standing rule that statements made during the course of litigation are privileged, insulating parties and their counsel from liability for defamation arising from such communications. *Id*. Critically, the Court resolved a split among the Appellate Division departments by expressly holding that a qualified privilege extends to pre-litigation communications, so long as those communications are pertinent to a good-faith anticipated litigation. *Id*. This includes preservation notices, demand letters, and other legal outreach made in anticipation of suit, provided that they are not made with malice or for an improper purpose.

The privilege is not absolute, but it remains intact unless the Plaintiff can establish that the statements were made with common-law or constitutional malice. As the Second Circuit has explained:

A defendant forfeits this qualified privilege by making a false, defamatory statement with
"malice" . . . . Common-law malice "mean[s] spite or ill will," and defeats the privilege
only if it is "the one and only cause for the publication" . . . . Constitutional or "actual"
malice means publication with "knowledge that [the statement] was false or . . . reckless
disregard of whether it was false or not."
— *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) (citations omitted), quoted in *Daytree
at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 629–30 (E.D.N.Y. 2018).

Here, Plaintiff fails to overcome this privilege. The challenged statements—targeting
demand letters, emails, response deadlines, and legal notifications of threats levied against Mr.
Dixon—were issued in connection with ongoing or anticipated litigation.

The challenged statements of Blackburn are:

"I mean, listen, Homeland Security and all that stuff aside, you know, nothing --
The whole resolution of this before my client's call yesterday to me, and my email
to you, you know, my goal was to see if we can have some sort of resolution to the
claims that my client has regarding what he feels to be, you know, his contributions
that was not compensated, and you know, work and all sorts of stuff, and time and
all these other things that he feels that he was not compensated for."

"Listen, I want you to be very clear. This is not about Joe's decisions in the bedroom
with whomever he chooses to sleep with. This is business. This is about what he
required my client to do, and left my client in Africa, left my client in Asia, left my
client in Europe when my client refused to do those things. Right? That is the key.
That's the part. If any part of the TVPA was going to be brought, it's going to be
based on those things. Nothing to do with [Doe 3]. I'm not filing on her behalf.
I'm not filing on [Doe 2]'s behalf. I'm not filing on [Doe 1]'s behalf. I'm not filing
on any of people's behalf."

"I will gladly waive services for any BS lawsuit your pedophile client wants to file
against me, and I'll gladly meet you at the S.D.N.Y. prosecutors' office to file your
extortion claim. Let me know what time you want to meet. I'll be sure to walk with
the 19-minute recorded call of Pistol Pete trying to set up my client to be killed on
behalf of Mr. Cartagena. I will walk with the complete recordings of [Doe 3] and
her cousin, which detail how your disgusting pedophile client solicited and
manipulated a 10th grader into performing sex acts. Not to mention all of the other
crimes your client has personally committed or commissioned. This will be fun!"

The Plaintiff does not plead facts showing that any of these communications were issued
with malice as their sole purpose, nor that they lacked pertinence to good-faith litigation objectives.

The SAC itself acknowledges that the challenged statements stem from legal
communications issued by Defendant and his counsel. For example, Plaintiff claims he was
threatened with public exposure unless he responded to certain pre-suit demands. These

allegations fall squarely within *Front*'s scope: statements made by a party or attorney to a potential adversary… about potential claims are privileged if made in good faith and in connection with contemplated litigation.  *Front*, 24 N.Y.3d at 720.

Even if the statements were forceful or unflattering—which is disputed—that is irrelevant. As the *Front* Court held, [t]he mere fact that a communication contains harsh or accusatory language does not remove it from the protection of privilege. *Id*.

As an aside, most of Mr. Blackburn's pre-litigation communications were with Erica Juliana Moreira, a Florida-based lawyer who was ***unauthorized*** to practice law in the State of Florida during the duration of her representation of Plaintiff Cartagena.  In short, Plaintiff has the unmitigated gall to accuse Mr. Blackburn of engaging in unethical legal practices when his attorney intentionally engaged in the unauthorized practice of law for several months, if not years.



Accordingly, these communications are shielded from liability and cannot serve as the basis for any defamation or tort claim as a matter of law.

### C.  Public Statements Regarding Legal Proceedings Are Also Protected

 Here, the Defendant's public statements involve matters of public concern and anticipated litigation, and the law provides additional protections.  In *Gottwald v. Sebert*, 40 N.Y.3d 240, 255 (2023), the New York Court of Appeals reaffirmed that litigation-related speech made in public about a pending or threatened case is subject to both First Amendment protection and qualified privilege, particularly when it involves public figures or issues of public interest.

Statements made in press interviews, podcasts, or social media about ongoing or potential litigation are not actionable, absent a showing of actual malice, which, as shown above, the Plaintiff fails to plead.  This rule is especially strong where the underlying allegations concern abuse, coercion, or criminality, which courts treat as issues of substantial public concern.  See *Dfinity Found.  v. N.Y. Times Co.*, 2024 U.S. App. LEXIS 18619, at *15 (Statements about individuals engaged in high-profile public conduct touch on matters of public concern).

D. **Lawsuits Aimed at Chilling Legal Advocacy Are Disfavored and Sanctionable**

New York courts have repeatedly condemned attempts to sue attorneys for pre-suit or litigation-related advocacy. In *Flaherty v. Dixon*, 2023 U.S. Dist. LEXIS 26876 (S.D.N.Y. February 16, 2023), the Court dismissed defamation and emotional distress claims brought against a lawyer for public comments and litigation demands, holding that [t]he litigation privilege shields attorneys from liability when advocating for their clients in anticipation of suit.

The Court emphasized that using defamation claims as a sword to suppress pre-suit legal strategy is impermissible. The doctrine serves to promote access to courts and shield legal counsel from retaliatory lawsuits. *Id.*

Here, Plaintiff's lawsuit is precisely that—a retaliatory action filed because Defendant asserted legal claims and communicated those claims to Plaintiff and others. To allow such a suit to proceed would eviscerate the protections long accorded to legal advocates and chill the exercise of First Amendment rights.

E. **The Absolute Privilege for Judicial Proceedings Would Also Apply If Recast as IIED**

Even if Plaintiff were to recast his claims as intentional infliction of emotional distress or prima facie tort (as attempted in the SAC), New York law is clear. Those claims cannot be used to circumvent the litigation privilege. See *Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15, 22 (2008); *Anderson v. City of Mount Vernon*, 2024 U.S. Dist. LEXIS 87787, at *21–22. Such end-runs around the privilege doctrine have been repeatedly rejected.

The communications Plaintiff challenges—whether private or public—were made in anticipation of litigation, concerning matters of public concern, and by an attorney representing a client in legal disputes. Under *Front*, *Gottwald*, and the First Amendment, such statements are protected and cannot form the basis of a defamation claim or its equivalent. Accordingly, Plaintiff's claims must be dismissed in their entirety.

## POINT III: The IIED and Defamation Claims Against Attorney Tyrone Blackburn and T.A. Blackburn Law, PLLC Are Legally Frivolous, Constitutionally Barred, and Retaliatory in Purpose

Plaintiff's effort to rebrand protected legal advocacy as "intentional infliction of emotional distress" and "defamation" is not only without merit—it is a flagrant abuse of the judicial process, designed to harass opposing counsel, chill vigorous legal representation, and obstruct a federal tort action brought by a survivor of sexual and labor exploitation. These claims fail as a matter of law

and are emblematic of improper retaliatory litigation tactics, warranting dismissal with prejudice and consideration of sanctions under 28 U.S.C. § 1927 and Fed. R. Civ. P. 11.

A. **Blackburn's Public Statements Were Lawful, Proportional, and Made in Direct Response to an Orchestrated Media Attack by Plaintiff and His Counsel Joseph Tacopina**

Plaintiff's IIED and defamation claims center on statements made by Attorney Blackburn in the days following the filing of this Complaint. Critically, those statements were not "outrageous" or defamatory—they were constitutionally protected responses to a choreographed, high-profile media campaign initiated by Plaintiff's counsel, Joseph Tacopina. Within minutes of filing the underlying Complaint on April 29, 2025, Tacopina released prewritten prejudicial statements to the press. Attorney Blackburn learned of the lawsuit not through formal service, but from a request for comment from TMZ—a clear indication that Plaintiff's legal team prearranged the publicity for strategic advantage.

Plaintiff points to the following public statements, all of which were made by Mr. Blackburn after the Plaintiff filed this lawsuit, and their counsel, Joe Tacopino, sought to establish a false narrative with a tabloid, TMZ, before Defendant Dixon filed his lawsuit. Mr. Blackburn's public statements are:

> "@joetacopina_spal, you ran and filed a baseless lawsuit against my client and me in the S.D.N.Y., alleging Defamation and Intentional Infliction of emotional distress in an attempt to get ahead of the forthcoming lawsuit against your client @fatjoe. No matter how hard you try to deflect and cherry-pick emails and conversations, your client has a lot of explaining to do. I invited you and me to meet with the S.D.N.Y. Prosecutors, but you have yet to respond. You can bring your baseless accusation of extortion, and I will bring the 19-min audio recording of your client's felonious henchman, Pistol Pete, soliciting a former member of Terror Squad to lure my client to a specific location for Pistol Pete and his thugs to "pound him out." Your client, @fatjoe, ordered a hit job against my client. Pistol Pete also discusses how he had to run down on @tonyyayo a member of @gunitbrands due to some fued [sic] with @50cent and run up into clubs to attack other victims. Your client should also prepare to answer questions surrounding two additional recordings where two females discuss your client's disgusting pattern of grooming and sleeping with 16-year-old children."

> "[W]e gave Joe Tacopina and his office a one-minute clip of, um, Pistol Pete . . . threatening, or actually no, . . . trying to set up [Dixon] to be, uh, pounded out. . . . and for 19 minutes he was trying to convince this man to lure my client to a certain location so he and his goons can pound him out and teach him a lesson on behalf of Fat Joe."

"Before that, they got a recording of a young lady that I gave them, another snippet. It was probably like about 60 seconds long of a 15-minute conversation of another young lady who was Fat Joe's, uh, girlfriend.  And he started dating her when she was 16 years old and he was in his late 30s.  And it is clear as day on this recording she's saying that where he did to her—because now she's an adult and now she's a Christian . . . .was inappropriate . . . 'cause, you know, she was a child."

Under Rule 3.6(d) of the New York Rules of Professional Conduct, an attorney "may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of **recent publicity not initiated by the lawyer or the lawyer's client**." That is precisely what Attorney Blackburn did.  His April 30, 2025, post on Instagram and subsequent podcast interview were measured, factual, and limited to mitigating the adverse effects of one-sided public allegations.  Far from violating ethical norms, these statements adhered strictly to Rule 3.6(c) by identifying: (1) the claims at issue, (2) the public record, and (3) the fact that an ongoing investigation existed.

Blackburn's comments were further justified by his ethical duty to defend his client "courageously, vigorously, and with all the skill and knowledge he possesses." NY CLS Rules Sup Ct § 604.1(d). He did so while maintaining decorum and basing his statements on verified recordings and direct interviews—far from the type of "gratuitous, reckless" speech that might expose an attorney to liability.  Indeed, since the filing of the *Dixon v. Cartagena, et al.* lawsuit, Blackburn has been contacted by two additional women.[1] Who disclosed they were assaulted by Plaintiff Cartagena while under the legal age of consent.  This new corroboration, from an independent source unrelated to Dixon, reinforces the credibility and factual foundation of the public statements Blackburn made.

### B.  The Legal Standards for IIED and Defamation Are Not Remotely Satisfied

Plaintiff's claim for intentional infliction of emotional distress ("IIED") against Defendant Tyrone Blackburn and T.A. Blackburn Law, PLLC is wholly incompatible with controlling New York precedent.  Under New York law, the elements of a claim for IIED are: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d

---

[1] All contact information and claims of these two women were turned over to law enforcement.

787, 790 (2d Cir. 1996). While IIED does not proscribe specific conduct, the New York Court of Appeals has required that a plaintiff allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp*., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (N.Y. 1993). Additionally, "New York sets a high threshold on conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Hodges v. McGough Enters., LLC*, 2025 U.S. Dist. LEXIS 109230, *6,", and "[i]ntentional infliction of emotional distress is an extremely disfavored cause of action." *Durant v. A.C.S. State and Local Solutions, Inc*., No. 05-7303 (CM), 460 F. Supp. 2d 492, 2006 U.S. Dist. LEXIS 80987, 2006 WL 3199150, at *6 (S.D.N.Y. November 1, 2006), citing *Marley v. Ibelli*, 203 F. Supp.2d 302, 311 (S.D.N.Y. 2001). The allegations in the instant Complaint fail to meet this high threshold; as such, her claim is subject to dismissal on this basis alone. *Ruhling v. Tribune Co.*, 2007 U.S. Dist. LEXIS 116, *77-79.

New York courts have repeatedly emphasized that IIED is a highly disfavored cause of action reserved for only the most egregious behavior. The standard is exceptionally rigorous: the alleged conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

In *Howell*, the New York Court of Appeals affirmed dismissal of an IIED claim despite allegations that the *New York Post* had trespassed onto the grounds of a private psychiatric hospital and published a photograph of the Plaintiff without consent in connection with a news article about a public figure. The Court held:

> "The photographer's conduct in trespassing on the grounds of a private facility in order to photograph plaintiff did not meet the standard of 'atrocious, indecent and utterly despicable conduct as to meet the rigorous requirements of an intentional infliction of emotional distress claim.'"

*Howell*, 82 N.Y.2d at 692.

Here, as previously stated, Plaintiff's IIED claim rests on constitutionally protected legal advocacy. In response to a media ambush orchestrated by Tacopina, Blackburn made limited and fact-based public statements to mitigate the prejudicial effect of the press coverage, as expressly permitted under Rule 3.6(d) of the New York Rules of Professional Conduct.

20

These statements involved serious but substantiated allegations concerning Plaintiff's past misconduct, including the exploitation and coercion of young women.  Blackburn's public commentary was based on firsthand accounts, audio evidence, and corroborating messages, including from individuals who disclosed being subject to inappropriate and unlawful sexual behavior by Plaintiff.  One woman, who contacted counsel after Dixon filed suit, stated that she had been subjected to non-consensual sexual contact by Plaintiff while approximately 14 years old.  Her statement was provided voluntarily and independently, without solicitation or coercion.

This conduct—reporting serious allegations backed by evidence—is far removed from the type of "atrocious and utterly intolerable" behavior required for IIED liability.  Indeed, the New York Court of Appeals has made clear that even **resort to legal process, if unwarranted or malicious, does not support an IIED claim.** *Curiano v. Suozzi*, 63 N.Y.2d 113, 119 (1984). Plaintiff's attempt to convert protected litigation activity and crisis-response communication into a tort claim is meritless.

Plaintiff's companion claim for defamation fares no better.  As a public figure, Plaintiff must plead and prove "actual malice"—that is, knowledge of falsity or reckless disregard for the truth.  *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  He cannot meet this burden.  Attorney Blackburn's statements were based on firsthand reports, corroborated evidence, and protected opinion.  Under New York law, statements that are "accompanied by a recitation of facts on which they are based" or "that do not imply the existence of undisclosed facts" are constitutionally protected. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991); *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008). Several of the challenged statements—such as social media responses or interview commentary—fall squarely within this zone of protection.

In sum, the IIED and defamation claims against Attorney Blackburn and his firm are legally defective and factually unsupportable.  They are thinly veiled attempts to retaliate against opposing counsel for vigorously representing a client who has brought forward disturbing but credible allegations.  These claims must be dismissed as a matter of law.

C. **Plaintiff's References to "Extortion" and Rule 3.4(e) Violations Are Disingenuous and Rebutted by Law, Facts, and Logic.**

Plaintiff's effort to characterize attorney Tyrone A. Blackburn's conduct as extortionate under NY RPC 3.4(e) is not only meritless—it is a transparent attempt to deflect from his own criminal exposure, suppress protected advocacy, and silence Dixon's serious allegations through

21

retaliatory litigation.  The accusation centers on settlement communications and letters sent by counsel in the normal course of pre-litigation negotiation.  Such communications are not only permissible under the law—they are protected by litigation privilege, and ethical guidance concerning pre-filing conduct.

To the extent Plaintiff claims that any criminal referrals or warnings to law enforcement violate NY RPC 3.4(e), his argument fails under binding case law.  In *Geltzer v. Brizinova (In re Brizinova)*, 565 B.R. 488, 509 (Bankr. E.D.N.Y. 2017), the Court affirmed that Rule 3.4(e) only prohibits threats to present criminal charges "solely" to gain an advantage in a civil matter.  When an attorney has a good-faith basis to believe a crime has occurred—and particularly when third-party safety is at risk—such reports or referrals are not only ethical but may also be **required** by law.  Here, counsel's March 2025 statement concerning Homeland Security was made after credible threats were made to Dixon's life by Plaintiff's surrogates, and the reference was accompanied by a legitimate safety concern, not to pressure a settlement.

Indeed, the threat to go to Homeland Security came after Dixon received repeated death threats on social media and via direct message from individuals closely affiliated with Plaintiff, including "Pistol Pete" and "Rich Player." These threats were made in retaliation for Dixon's attempt to hold Plaintiff accountable and have been corroborated through screenshots and saved messages[2].  One such threat, which the Plaintiff sent to Defendant Dixon, reads, "You love ur family right"—a chilling message that crosses the line into actionable criminal conduct and justifies counsel's invocation of Homeland Security and other law enforcement bodies. (Dixon Declaration ¶ 31).

Below are some of the direct Instagram messages received by Dixon, which reveal the coordinated nature of Plaintiff's threats:

---

[2] Notably, the senders foolishly revealed their identities by using burner accounts where their egos drove them to disclose who they were.

- "DON'T need to lift a finger.  Biggest in the game.  Everyone willing to do it for me."



- "Nigga you will get dragged."



- "But be very careful.  We let you live."



- "Don't u ever forget in ur life… everyone is outside."



- "U love ur family right."



- "You could have Jesus with you nigga ☺.  You food & we gonna eat.



These are not mere online bluffs—they are targeted threats against Dixon's life and the safety of his family, which resides in the Bronx, New York. As counsel, Mr. Blackburn acted appropriately and proportionally in alerting Homeland Security and referencing this threat in settlement communications. Such conduct does not violate Rule 3.4(e); it exemplifies the protective function of advocacy in the face of retaliatory violence.

As previously stated, under NY CLS Rules Prof Conduct R. 3.6(d), a lawyer "may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client." This is precisely what occurred here. On April 29, 2025, Plaintiff filed the instant defamation and IIED action, and within minutes, his counsel, Joe Tacopina, launched a coordinated media campaign.

In response, Blackburn issued a narrow, focused public statement defending Dixon and denying the fabricated allegations, conduct explicitly permitted under Rule 3.6(d).

Ultimately, the IIED and defamation claims against Blackburn and T.A. Blackburn Law, PLLC are not only legally defective but also procedurally improper, ethically unsound, and constitutionally suspect. The inclusion of these claims reveals Plaintiff's true motive—to silence Dixon, retaliate against his counsel, and chill the kind of lawful, necessary legal advocacy that lies at the heart of our justice system. The claims must be dismissed with prejudice, and the Court should consider awarding fees and sanctions under 28 U.S.C. § 1927 and Rule 11.

D. **The Intentional Infliction of Emotional Distress (IIED) Claim Against Dixon Must Be Dismissed as a Matter of Law**

Plaintiff's claim for Intentional Infliction of Emotional Distress ("IIED") against Defendant Terrance Dixon is legally defective and must be dismissed. The cause of action fails on multiple grounds: it is duplicative of the defamation claim, it does not allege conduct that meets the high threshold of "extreme and outrageous" behavior under New York law, and it is barred by well-established case law limiting the use of IIED claims in cases involving reputational harm.

1. The IIED Claim Is Duplicative of the Defamation Claim

The gravamen of the alleged harm is reputational injury arising from public statements; however, the IIED cause of action is duplicative and must be dismissed. See *Klein v. McGauley*, 29 A.D.3d 432, 432 (1st Dep't 2006) ("Plaintiff's claim for intentional infliction of emotional distress was properly dismissed as duplicative of the defamation cause of action."); *Matthaus v. Hadjedj*, 148 A.D.3d 425, 425 (1st Dep't 2017) (dismissing IIED claim "as duplicative of her

defamation cause of action"); *Bacon v. Nygard*, 140 A.D.3d 577, 578 (1st Dep't 2016) (affirming dismissal of IIED claim where "underlying allegations fall within the ambit of the defamation causes of action"); *Akpinar v. Moran*, 83 A.D.3d 458, 459 (1st Dep't 2011) (same).

Federal courts applying New York law are in accord. See *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 473. (New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained." *Id*. at 693-94 (citations omitted)).

Here, Plaintiff's IIED allegations against Dixon rest entirely on the same nucleus of operative facts as his defamation claim: namely, Dixon's public accusations concerning Plaintiff's pattern of coercive abuse, sexual misconduct, trafficking, and non-payment for musical contributions. The Complaint explicitly states that Plaintiff's alleged emotional distress arises from false and outrageous statements made by Dixon—the very statements that form the core of Plaintiff's defamation theory.

Plaintiffs' IIED claim is legally redundant. As New York courts have consistently held, such emotional distress claims must be dismissed as a matter of law.

2. Plaintiff Fails to Plead Conduct that Is "Extreme and Outrageous"

To sustain a claim for IIED under New York law, a plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. *Howell v. New York Post Co.,* 81 N.Y.2d 115 (1993). The standard is rigorous and difficult to satisfy, *Chanko v. American Broadcasting Cos. Inc.*, 27 N.Y.3d 46, 57 (2016), and [L]iability clearly does not extend to mere insults, indignities, threats, annoyance. *Allam v. Meyers*, 2011 U.S. Dist. LEXIS 18581, *18).

None of the conduct Dixon is alleged to have engaged in remotely satisfies this threshold. Plaintiff accuses Dixon of publicly stating the truth about his experiences—statements grounded in lived events, corroborated by other victims, and disclosed in the context of seeking legal redress. Dixon did not threaten Plaintiff, stalk him, harass him, or engage in any conduct that courts have recognized as sufficiently outrageous. Rather, he disclosed what he believes—and what others have corroborated—to be a horrific personal and professional history of exploitation and abuse at the hands of the Plaintiff. If anything, the "extreme and outrageous" conduct in this case flows in the opposite direction: from Plaintiff toward Dixon, including threats, intimidation, and public retaliation.

3. <u>Plaintiff's IIED Claim Is Barred as a Matter of Public Policy</u>

New York courts have consistently recognized that IIED claims are not a fallback option for plaintiffs dissatisfied with the legal limitations of defamation law. As the Court of Appeals has made clear, [i]f conduct constitutes defamation, it cannot also be the basis for an intentional infliction of emotional distress claim. *Howell v. New York Post Co.,* 81 N.Y.2d 115 (1993). Allowing IIED claims to proceed in this context would undermine the robust protections afforded to speech under the First Amendment and the New York Constitution.

Moreover, the public nature of Plaintiff's role as a high-profile entertainment figure and the matters of public concern raised by Dixon's disclosures—namely, labor exploitation, sexual coercion, and retaliatory violence—further shield Dixon's speech from liability. See *Greenberg v. Spitzer*, 155 A.D.3d 27, 45 (2d Dep't 2017) (Courts have consistently refused to allow an IIED claim to proceed where it is based upon statements about matters of public concern.).

4. <u>The Plaintiff Has Not Alleged Severe Emotional Distress</u>

At the onset, Plaintiff's IIED claim can be summarized as preschool-level hurt feelings. Plaintiff touts himself publicly as a hardened "Don" or Bronx "gangsta," yet the Complaint is replete with grievances that are less compelling than those typically voiced by toddlers in daycare. This mismatch between public persona and claimed emotional fragility is not just ironic—it is legally fatal to his cause of action.

As previously explained, Plaintiff failed to meet the extreme conduct standard for IIED. His IIED claims also collapse for lack of specific allegations concerning *severe and verifiable* emotional distress. Conclusory references to emotional upset are insufficient. As the First Department made clear in *Sheila C.*, the claim must be supported by allegations of conduct that is so outrageous and extreme as to support such a claim and must also allege resulting emotional distress that is severe and debilitating. *Sheila C. v. Povich*, 11 A.D.3d 120, 130–31 (1st Dep't 2004).

Here, Plaintiff provides no diagnosis, no medical documentation, no hospitalization records—no facts at all that would suggest actual harm. The Plaintiff did not say he missed tour dates or had to cancel appearances on his newly launched Joe and Jada podcast. To the contrary, Plaintiff has spent his time touring, campaigning for former Vice President Kamala Harris's 2024 Presidential campaign, making daily posts to his social media pages promoting his shows and

concerts, as well as publishing photos of himself courtside at the New York Knicks game, and images of himself eating steak and lobster.

The Complaint is long on self-serving rhetoric and short on legal substance. Absent any allegation of genuine, severe emotional trauma, the IIED claim must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiff's SAC must be dismissed in its entirety with prejudice according to Rule 12(b)(6). The Plaintiff has now had multiple opportunities to plead his claims and has failed each time to satisfy the minimum requirements under law.

Specifically:

- Plaintiff fails to plead actual malice, which is fatal to his defamation and derivative claims as a public figure.
- The majority of the challenged statements are protected under New York's litigation privilege and the First Amendment, as they were made in the context of legal communications and concern matters of public interest.
- The majority of statements identified in the SAC are either non-actionable opinions or time-barred under N.Y. C.P.L.R. sec. 215 (3); and
- Plaintiff's remaining causes of action—including intentional infliction of emotional distress (IIED) are duplicative of his defamation claim and must also be dismissed.

The judicial system is not a weapon for retaliating against an attorney's legal advocacy. It is a forum for good-faith claims, not tactics of intimidation. Plaintiff's attempt to use litigation as a sword to chill advocacy and critical commentary cannot be countenanced under the First Amendment or New York law. This case is the latter. It is a transparent attempt to punish the Defendants for asserting claims and making statements grounded in law, fact, and protected advocacy. The Court should not allow the legal process to be weaponized in this manner.

Accordingly, Defendant respectfully requests that the Court dismiss the SAC with prejudice and grant such further relief as the Court deems just and proper.


Dated: August 11, 2025

Brooklyn, New York                                             */s/Tyrone A. Blackburn, Esq.*
                                                               Tyrone A. Blackburn, Esq.
                                                               Attorney for the Defendants

29